UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | DOCKET NO. 3:13-CR-204 |
| | ) | |
| vs. | ) | |
| | ) | |
| BOGGS PAVING, INC., CARL | ) | |
| ANDREW BOGGS, III, KEVIN | ) | |
| HICKS, GREG MILLER, GREG | ) | |
| TUCKER, & JOHN CUTHBERTSON, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |


TRANSCRIPT OF EVIDENTIARY HEARING
BEFORE THE HONORABLE MAX O. COGBURN, JR.
UNITED STATES DISTRICT COURT JUDGE
NOVEMBER 20, 2015


<u>APPEARANCES</u>:

On Behalf of the Government:

     JENNY GRUS SUGAR, ESQ.
     MICHAEL E. SAVAGE, ESQ.
     United States Attorney's Office
     227 West Trade Street, Suite 1700
     Charlotte, North Carolina

On Behalf of Defendant Boggs Paving, Inc.:

     JAMES D. GALYEAN, ESQ.
     Nexsen Pruet, LLC
     55 East Camperdown Way, Suite 400
     Greenville, South Carolina

     KENNETH D. BELL, ESQ.
     MATTHEW E. ORSO, ESQ.
     McGuire Woods, LLP
     201 North Tryon Street, Suite 3000
     Charlotte, North Carolina

APPEARANCES:

On Behalf of Defendant Carl Boggs, III:

        KENNETH D. BELL, ESQ.
        MATTHEW E. ORSO, ESQ.
        McGuire Woods, LLP
        201 North Tryon Street, Suite 3000
        Charlotte, North Carolina

On Behalf of Defendant Kevin Hicks:

        S. FREDERICK WINIKER, III
        Winiker Law Firm, PLLC
        435 East Morehead Street
        Charlotte, North Carolina

On Behalf of Defendant Greg Miller:

        CHRISTOPHER C. FIALKO, ESQ.
        Rudolf, Widenhouse & Fialko
        225 East Worthington, Suite 200
        Charlotte, North Carolina

On Behalf of Defendant Greg Tucker:

        JACK M. KNIGHT, ESQ.
        Winston & Strawn, LLP
        100 North Tryon Street - 29th Floor
        Charlotte, North Carolina

On Behalf of Defendant John Cuthbertson:

        BEATTIE B. ASHMORE, ESQ.
        Beattie B. Ashmore, PA
        650 East Washington Street
        Greenville, South Carolina

        MARK PATRICK FOSTER, JR.
        Rawls, Scheer, Foster & Mingo, PLLC
        1011 East Morehead Street, Suite 300
        Charlotte, North Carolina


                        Cheryl A. Nuccio, RMR-CRR
                         Official Court Reporter
                       United States District Court
                         Charlotte, North Carolina

1                           I N D E X

2    GOVERNMENT'S WITNESSES                          PAGE

3    CORRY NOEL
         Direct Examination By Ms. Sugar                10
4        Cross Examination By Mr. Bell                  33
         Redirect Examination By Ms. Sugar             72
5        Recross Examination By Mr. Bell                90
         Redirect Examination By Ms. Sugar             94
6
7    MARCENA WRIGHT
         Direct Examination By Mr. Savage              95
8        Cross Examination By Mr. Bell                117
         Redirect Examination By Mr. Savage           126
9
     GREG TUCKER
         Direct Examination By Ms. Sugar              185
10       Cross Examination By Mr. Bell                215
         Cross Examination By Mr. Fialko              229
11       Cross Examination By Mr. Ashmore             233
         Redirect Examination By Ms. Sugar            236
12       Recross Examination By Mr. Bell              240
         Redirect Examination By Ms. Sugar            242
13

14   DEFENDANT'S WITNESSES                            PAGE

15   PHYLLIS GRAYDON
         Direct Examination By Mr. Bell               133
16       Cross Examination By Ms. Sugar               150

17   CHARITY COLEMAN
         Direct Examination By Mr. Bell               246
18       Cross Examination By Ms. Sugar               257
         Cross Examination By Mr. Winiker             266
19
     KEITH JORDAN
20       Direct Examination By Mr. Bell               268
         Cross Examination By Ms. Sugar               270
21       Redirect Examination By Mr. Bell             272

22

23

24

25

1                              E X H I B I T S

2     GOVERNMENT'S EXHIBITS

3     NUMBER                                          ADMITTED

4     1 ...............................................15

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

P R O C E E D I N G S

(Court called to order at 9:30 a.m.)

THE COURT:  All right.  We're here today on the collective Boggs Paving matter to determine amount of loss.

Is there anything else we need to be talking about today?

MR. BELL:  Yes, Your Honor.  We also intend to offer evidence with respect to the role enhancement that's applied as to Mr. Boggs.

THE COURT:  All right.

MR. BELL:  Also, we filed earlier in the week a motion to strike about a dozen inaccurate statements in the government's sentencing memorandum with respect to Boggs Paving.  Most of those inaccurate statements had to do with an entity called Lynches River Contracting.  The attorney who prepared all the legal work for Lynches River, Chad Warpula, who is a partner at Troutman Sanders, is also here to take up that issue and explain those facts.  The government hadn't indicated to me that they now acknowledge their errors on that.  So my request, since Mr. Warpula is here, is let him address those issues if the Court is willing to hear it.

THE COURT:  Yeah, I guess it would just be whether or not I agree with what the facts are and agree with the statements rather than strike them from the government's memorandum.  I mean, it would be -- in this situation it would

1    just be what do I believe and what do I not believe about the

2    matter.

3           MR. BELL:  Yeah.  And at this point about that, Your

4    Honor, with respect to some of them, the government knows what

5    they put in there isn't true.  I mean, in fact, it actually --

6    one of them is contradicted by an attachment to their

7    pleading.

8           And with respect to others, with a phone call to me

9    they could have asked the questions that they wound up getting

10   the answers to wrong.  In fact, after Mr. Boggs' interview

11   post-plea, the Lynches River subject came up.  We answered

12   some of the questions about that.  At that meeting I said,

13   Look, Chad Warpula worked on that.  If you have any questions

14   at all about Lynches River, I'd be glad to make him available

15   to you at any time.  They said, Okay, we don't think we need

16   that.  That's the disappointing thing about all this.

17          THE COURT:  All right.  This got Mr. Savage up.

18          MR. SAVAGE:  It did, Your Honor.  I apologize.  I

19   was helping Ms. Sugar who obviously is more familiar with this

20   than I am and I wrote the deliberately false statements.  And,

21   quite frankly, when I saw the response by Mr. Bell, I was

22   surprised to see I was still in the Western District of North

23   Carolina because he was certainly, I think, more than direct

24   about that.  There certainly were no intentionally false

25   statements.

1         But we intend to show that there was certainly some

2 manipulation involved in that.  And with regard to that, I

3 mean, I think that there are some inaccuracies in Mr. Bell's

4 response that can be demonstrated, I think, as well.  So I

5 think when we get to that, I think you will see that there

6 is -- there's always more than one side to the story and --

7         THE COURT:  There are disagreements about some of

8 the facts and I understand that.

9         MR. SAVAGE:  And it certainly wasn't personal

10 against Mr. Bell, so...

11         THE COURT:  I would not think so.  I would not think

12 so.

13         MR. SAVAGE:  Thank you.

14         THE COURT:  I would not take it as such.  All right.

15         MR. BELL:  But at any rate, Your Honor, Mr. Warpula

16 is here now if you would like to take this issue up now.

17         MS. SUGAR:  Your Honor, all the parties are here to

18 discuss loss, and I think that really applies more to a fine

19 or the penalties as to Boggs Paving which I think make more

20 sense to address on Monday.  Today we're going to talk about

21 loss which involves all of the defendants.  All their

22 attorneys are here.  I think we should just go ahead with

23 that.

24         THE COURT:  Let's wait a minute.  Let me hear from

25 Mr. Bell why would we take him up now.  Does he need to be

1  somewhere?

2        MR. BELL:  No, he's available on Monday as well if

3  that's the Court's preference.

4        THE COURT:  Let's wait until a little further in

5  this if we could with regard to that, Mr. Bell.  I don't know

6  if we can do it Monday or we can do it later today depending

7  on whether we move faster than you all think we do.

8        MR. BELL:  That's fine.

9        THE COURT:  There was a somewhat sappy song years

10 ago by the Bells, "Stay Awhile," and I'm hoping that that's

11 not going to be the way we do this.

12       All right.  Let's see.  Let's go ahead and move on

13 to the loss issue.  Start on that first of all.

14       Has the government got evidence with regard to that?

15       MS. SUGAR:  Yes, Your Honor.  I put in there the law

16 about if it's adopted in the PSR, that the burden switches,

17 but we're happy to put on our evidence first.

18       THE COURT:  Put on -- this case is very interesting

19 in terms of exactly what is the loss, in terms of who is the

20 victim, in terms of a lot of different things.  It's caused

21 the Court some concern because whatever the loss is in this

22 case, there's got to be a deterrent value to stop other people

23 from wanting to do this.  We've got a situation which

24 apparently is very easy to manipulate in terms of bids

25 involving the government so people are going to have to be

1    discouraged from doing that.

2            It's the kind of system that leads to -- when my --

3    in terms of my office, the company that did the renovation for

4    my office was formed on the day they got the bid and was

5    dissolved when they finished the job. Congress is going to

6    have to start worrying about taxpayer dollars a little bit on

7    these things and say best qualified. All these hoops you jump

8    through that everybody knows how to play the game and they get

9    help inside the GSA in playing that, it's not a healthy

10   situation. You end up with a good job and two or three people

11   show up to bid. Why is that? That's because they're going to

12   get that job and somebody else is going to get another.

13   There's just too much corruption going on.

14           But I'm going to determine the loss today and I've

15   got to figure out what the real loss is. And we have read

16   everything you all have done so we're not new to this idea.

17   We've read the cases. We've looked at everything. We've

18   looked at it from two or three different ways. So I'll be

19   interested to see what the evidence is with regard to loss.

20   But I would like the government to go ahead and go forward

21   with that because the PSR is almost always going to adopt the

22   government's position.

23           MS. SUGAR: Yes, Your Honor.

24           THE COURT: Almost always going to adopt the

25   government's position. The safest way to go, if you're -- if

CORRY NOEL - DIRECT

1    you're -- if I was the guy, I would be doing that too.  So I

2    recognize that.  I never objected to a PSR as an AUSA.  I know

3    you all have to every now and then, but it's rare that you do,

4    and that's because the PSR is written in a way that favors --

5    that takes the government's position on that.  You always have

6    an organized, detailed way of going about it.  And the defense

7    is coming to the game late and so -- I understand how those

8    things work.

9                MS. SUGAR:  Thank you, Your Honor.

10               The government calls U.S. Department of

11   Transportation OIG Agent Corry Noel.

12               THE COURT:  All right.

13               CORRY NOEL, GOVERNMENT WITNESS, SWORN,

14                      DIRECT EXAMINATION

15   BY MS. SUGAR:

16   Q.   Agent Noel, could you tell the Court how you're employed.

17   A.   I'm a special agent with the U.S. Department of

18   Transportation, Office of Inspector General.

19   Q.   How long have you been there?

20   A.   I've been there since 2006.

21   Q.   What are your general responsibilities?

22   A.   I investigate matters within the jurisdiction of the

23   secretary of transportation.  That includes within the FAA,

24   federal highway, federal transit, and other transportation

25   modes.

CORRY NOEL - DIRECT

1  Q.   Were you involved -- is one of your responsibilities
2  investigating cases involving DBE fraud?
3  A.   That is correct.  That's part of our contracting grant
4  fraud, yes.
5  Q.   And were you assigned to work on a case involving Boggs
6  Paving and Styx Cuthbertson Trucking?
7  A.   Yes.
8  Q.   How long have you been assigned to that case?
9  A.   I believe I started, like, right around the beginning of
10 2010, maybe late 2009.
11 Q.   Okay.  Have you gathered a lot of bank records, contract
12 records, documents from Boggs Paving, Styx Cuthbertson, and
13 others during the course of your investigation?
14 A.   Yes.
15 Q.   Okay.  I'm going to put up what's marked as Government's
16 Exhibit 1.
17      Did you total the dollar amount of contracts that
18 included federal funds where Boggs Paving used -- asserted
19 that Styx Cuthbertson had performed work on the contract --
20 A.   Yes.
21 Q.   -- pursuant to DBE?
22 A.   Yes.
23 Q.   And what was the total of those federal contracts where
24 Boggs Paving used Styx for DBE credit?
25 A.   87.6 million.

1    Q.    And what was the amount that was reported to the various

2    agencies with regard to how much work that Styx had performed

3    as a DBE on those contracts?

4    A.    Approximately 3.7 million.

5    Q.    And did you obtain as part of the investigation a check

6    register report from Boggs Paving?

7    A.    Yes.

8    Q.    And did that show you invoices that were for actual work

9    and invoices that were for work performed by Boggs Transport

10   and others?

11   A.    Yes.

12   Q.    And did you determine based on the contract numbers the

13   amount of actual work that had been performed by Styx

14   Cuthbertson Trucking out of that 3.7 million?

15   A.    Yes.

16   Q.    And what was that?

17   A.    Approximately $379,000.

18   Q.    Did you also go through and look in the Boggs Paving

19   records that we had to see what they had reported as the gross

20   profit on each of those federally funded jobs?

21   A.    Yes.

22   Q.    And if they had any profit, did you total that number?

23   A.    Yes.

24   Q.    And what was that total?

25   A.    Approximately $4.4 million.

1    Q.   All right.  And then this next page, it says "Attachment

2    B to the government's sentencing memo."  This breaks it down

3    by job and has that information and the source of it on here?

4    A.   Yes.

5         I'm sorry, does this flip up somehow?

6         Oh, I see.  That's a lot better.  Thank you.

7    Q.   Now, was Styx used to -- do some states also have their

8    own minority business requirements in addition to federal

9    requirements?

10   A.   Yes.

11   Q.   And is North Carolina one of those states?

12   A.   Yes.

13   Q.   And during the course of your investigation, did you

14   learn that Boggs Paving had used Styx Cuthbertson to -- for a

15   minority business credit on various state and local contracts

16   in North Carolina?

17   A.   Yes.

18   Q.   Now, that wasn't the primary focus of your investigation;

19   is that right?

20   A.   That is correct.

21   Q.   You were more focused on any jobs that had federal funds;

22   is that right?

23   A.   Correct.

24   Q.   But there were a fair number of jobs where Styx was

25   claimed for having performed MBE credit on state contracts; is

1  that right?

2  A.   Yes.

3  Q.   And did you just -- were you able to determine a just

4  sort of baseline for the total number of -- total dollar value

5  of state and local contracts that were obtained -- that Boggs

6  Paving was awarded where Styx Cuthbertson was claimed to have

7  provided DBE services on?

8  A.   Yes.

9  Q.   And what was the total of the -- the approximate total of

10  the baseline you looked at?

11  A.   $32 million.

12  Q.   And what was the amount of DBE work claimed to have been

13  performed by Styx Cuthbertson on those?

14  A.   Well, for that one, it would have been MBE work, but it

15  was 1.4 million.

16  Q.   All right.  And if you look at the next page.  This is

17  actually just a printout from NCDOT just for one of the

18  divisions of the state; is that right?

19  A.   Yes.

20  Q.   And so the highlighted ones are the ones that are

21  included in the loss calculation on the previous page.

22  A.   Yes.

23  Q.   And the reason that there's two that are not highlighted

24  at the bottom is because those are DBEs so they were already

25  counted by the government?

CORRY NOEL - DIRECT

1  A.    Yes.

2  Q.    And we just looked at the more recent contracts when we

3  did this review this week, right?

4  A.    Yes.

5  Q.    All right.  And did you confirm -- this is also part of

6  Exhibit 1?

7          THE COURT:  That's what I was going to ask.

8          MS. SUGAR:  Yes.

9          THE COURT:  This is Government's Exhibit 1?

10         MS. SUGAR:  Yes.

11         THE COURT:  Let it be admitted.

12         MS. SUGAR:  All right.  Thank you.

13         (Government's Exhibit No. 1 was received into

14  evidence.)

15         MS. SUGAR:  We can hand up a hard copy.

16         MR. SAVAGE:  May I approach, Your Honor?

17         (The document was tendered to the Court.)

18  Q.    (By Ms. Sugar:) This next page of Exhibit 1, is this a

19  summary of those state and local North Carolina jobs that we

20  were previously talking about?

21  A.    Yes.

22  Q.    And did you go through it and see whether or not there

23  were any invoices to Styx on those particular jobs that were

24  payments that had been -- that went through the nominee

25  account and weren't actually for work to Styx?

1  A.    Correct.

2  Q.    And that happened on each one of those projects?

3  A.    Yes.

4  Q.    All right.  Now, there was other projects that Boggs

5  Paving was involved with that related to Styx or bid on

6  projects with Styx that were not included in either of those

7  federal or state numbers; is that right?

8  A.    That is correct.

9  Q.    Did your investigation determine that Boggs Paving

10 obtained two Small Business Enterprise contracts that were bid

11 in the name of Styx?

12 A.    Yes.

13 Q.    And on both of those contracts, did you determine that

14 the entirety of the money went to Boggs Paving and its

15 affiliates?

16 A.    Yes.

17 Q.    And Styx kept none of the money?

18 A.    That is correct.

19 Q.    And what was the total of those two Small Business

20 Enterprise contracts?

21 A.    $118,681.19.

22 Q.    All right.  Was there also another contract where it

23 looked as though Styx was used by another contractor, but your

24 investigation revealed that that happened as a result of Boggs

25 Paving writing him in to a stone price?

1  A.   Yes.

2  Q.   And that was what we referred to during the case as the

3  JT Russell job?

4  A.   That is correct.

5  Q.   So Boggs Paving or Boggs Materials gave JT Russell a

6  quote for some stone and in their quote they included -- the

7  stone also comes with some DBE hauling.

8  A.   Yes.

9  Q.   And we didn't include that in our calculation at all, did

10  we?

11  A.   That is correct.

12  Q.   And what was the amount of Styx that was written in on

13  that JT Russell contract?

14  A.   $434,865.

15  Q.   And did the investigation reveal that much of that work

16  was actually done by Boggs Paving and its affiliates?

17  A.   Yes.

18  Q.   All right.  And did the investigation also reveal that

19  Styx Cuthbertson was included in the successful bid to fund a

20  joint venture that obtained the Monroe bypass project?

21  A.   Yes.

22  Q.   And Boggs Paving is one of those joint partners in that

23  venture?

24  A.   Yes.

25  Q.   And what was the amount of the Styx -- that Styx was

1  written in for in the Monroe bypass?

2  A.   A little over $2.8 million.

3  Q.   Now, he has since been replaced on that project; is that

4  right?

5  A.   That's correct, yes.

6  Q.   We didn't include anything related to the Monroe bypass

7  in any of our calcuations; is that correct?

8  A.   Correct.

9  Q.   Now, we've talked a lot about the Styx nominee account.

10  I'm sure the Court has heard us talk about it.  But did you

11  also have a chance to analyze the payments through that

12  account?

13  A.   Yes.

14  Q.   And that was an account that was at BB&T; is that right?

15  A.   Yes.

16  Q.   All right.  Who else maintained their bank accounts at

17  BB&T?

18  A.   Boggs and its affiliates.

19  Q.   And is that where Styx Cuthbertson has its normal bank

20  account?

21  A.   No.

22  Q.   All right.  And did you look at all of the deposits into

23  that account?

24  A.   Into the nominee account?

25  Q.   Yes.

1   A.   Yes.

2   Q.   And was the vast majority of all these payments from

3   Boggs Paving or its affiliates?

4   A.   Yes.

5   Q.   And they totaled approximately $7 million?

6   A.   Yes.

7   Q.   And there were more, but some were just so old you

8   couldn't really determine where they were from; is that fair?

9   A.   That is correct.

10  Q.   And there were a few other sources of payments; is that

11  right?

12  A.   Yes.

13  Q.   And did you also look at the checks out from the nominee

14  account that was written to Boggs Paving and its affiliates?

15  A.   Yes.

16  Q.   And did those -- what was the total of those?

17  A.   Approximately 6.38 million.

18  Q.   Did you also analyze payments out of that account that

19  were written from Styx Cuthbertson to Styx Cuthbertson?

20  A.   Yes.

21  Q.   And did you also then go through those and determine

22  which of those were the commissions or what we have referred

23  to as the kickbacks to Styx?

24  A.   Yes.

25  Q.   And what amount from the nominee account went to Styx

1   that had the appearance of those commissions?

2   A.   $80,000.  Approximately $80,000.

3   Q.   All right.  Going back to that check register we were

4   discussing before.  Did you make a spreadsheet of all of the

5   invoices that purported to be from Styx that were in the Boggs

6   Paving system?

7   A.   Yes.

8   Q.   And then did you look at invoices that were for actual

9   work and invoices that were just for -- run through work that

10  was not actually performed by Styx Cuthbertson?

11  A.   That is correct.

12  Q.   And is this an analysis of just years 2007 through 2011?

13  A.   Yes.

14  Q.   And the total invoice payments for work that had been

15  done by Styx on projects, is that -- for those years is it --

16  what's the total of that?

17  A.   I'm sorry, can you repeat that for me.

18  Q.   The total amounts of invoices in that year period that's

19  for work that had actually been performed -- I'm sorry.  Did

20  you total all of the invoices that purported to be from Styx

21  for those years?

22  A.   Yes.

23  Q.   And what was the total of that?

24  A.   It was approximately 5 -- a little over $5.2 million.

25  Q.   Now, did you divide that up over what was actually

1  performed by Styx and what has actually just run through the

2  nominee account?

3  A.   Yes.

4  Q.   And what was the total payments to him -- no, let's --

5  what were the total invoices for the jobs to Styx?

6  A.   Oh, it was a little over $1.7 million.

7  Q.   Now, before Boggs Paving wrote checks to Styx

8  Cuthbertson, they also deducted a lot of expenses; is that

9  right?

10  A.   Yes.

11  Q.   So it's fair to say during that time period the actual

12  deposits into Styx's business bank account were less than

13  $1.7 million.

14  A.   Yes.

15  Q.   But this is just the invoices for work done; is that

16  right?

17  A.   That is correct.

18  Q.   And that would also include non-DBE work that Styx was

19  doing for Boggs Paving; is that right?

20  A.   Yes.

21  Q.   So if he was just working on a Walmart parking lot, that

22  would be included in those invoices?

23  A.   Yes.

24  Q.   Did you also total the payments that were invoices to

25  Styx but that went to the nominee account?

CORRY NOEL - DIRECT

1    A.    Yes.

2    Q.    So what was the total of that?

3    A.    Over $3.5 million.

4    Q.    So the difference between the total payments for actual

5    work and the different -- and the total payments to the

6    nominee account was approximately $1.8 million for this time

7    period?

8    A.    Yes.

9    Q.    Now, with regard to the $3.7 million that was attributed

10   to Styx, did you look at the contracts specifically where he

11   was claimed to have done DBE work?

12   A.    Yes.

13   Q.    All right.  I'm going to pull up Exhibit 2 which we would

14   offer into evidence.

15         Did you determine that there was -- many of those

16   contracts where he did little work at all?

17   A.    Yes.

18   Q.    Did you also determine there was many of those contracts

19   where he did no work?

20   A.    Yes.

21   Q.    And did you see some of those where payments were run

22   through the nominee account not for transport work but

23   actually just circled directly back to Boggs Paving?

24   A.    Yes.

25   Q.    All right.  Let's go through some examples.  Did you look

1  through -- when you looked through the check register, did you

2  see how many of the 37 projects that you found invoices for

3  actual work having been done?

4  A.    Yes.

5  Q.    And how many of the 37 projects was that?

6  A.    Fourteen.

7  Q.    And is that totaled in this chart?

8  A.    Yes.

9  Q.    Now, is this an example, this third page, where the DBE

10  reports for job 2926 reported to South Carolina Department of

11  Transportation that Styx had done $55,845.94 worth of DBE

12  eligible work; is that right?

13  A.    Yes.

14  Q.    And does this circle graph show where those payments that

15  totaled that $55,000 actually went?

16  A.    Yes.

17  Q.    And is this a DBE report that was submitted on another

18  South Carolina job where Boggs was the subcontractor, where

19  Boggs did the work?  It says Anderson Columbia, but Boggs was

20  actually doing this contract, right?

21  A.    Yes.

22  Q.    And did you determine that of this $73,898.36, that Styx

23  had actually done no work?

24  A.    Yes.

25  Q.    But the DOT was told he had done all of that work?

1   A.   That is correct.

2   Q.   And is this the reality of what actually happened to

3   those payments?

4   A.   Yes.

5   Q.   All right.  And there was a subcontractor on this,

6   Palmetto Corp.; is that right?

7   A.   Yes.

8   Q.   All right.  We'll get back to that in a minute.

9        This is another DBE report that was submitted.  With

10  regard to the payments listed in the fourth quarter, the

11  23,000, as well as the payments in the first quarter, did you

12  use the Boggs records to determine what had actually happened

13  with those funds?

14  A.   Yes.

15  Q.   So with regard to the 23,000 for fourth quarter of 2008,

16  was -- does the bottom part of this chart show the flow of the

17  actual money on that?

18  A.   Yes.

19  Q.   And with regard to the 11,445, does the bottom part of

20  this page show what actually happened to that money?

21  A.   Yes.

22  Q.   So in this instance, some of the money circled directly

23  back to Boggs Paving, it didn't even go to Boggs Transport; is

24  that right?

25  A.   Yes.

1   Q.   And that's not the only time you saw that happen, is it?

2   A.   That is correct.

3   Q.   Now, we've been talking about the check register, so I

4   want to show you Exhibit 3, which we'd offer into evidence.

5        Is this a snippet of just what you see when you look at

6   the check register summary?

7   A.   Yes.

8   Q.   So the number on the far left, is that the Boggs Paving

9   check number?

10  A.   Yes.

11  Q.   And then the highlighted number is the date?

12  A.   Yes, the check date, yes.

13  Q.   And then the next number, that's the Styx code, so all of

14  the Styx checks are going to have the 47750; is that right?

15  A.   Yes.

16  Q.   And the number that starts with 4433, that's the invoice

17  number?

18  A.   Correct.

19  Q.   And then the following number is the job number.

20  A.   Yes.

21  Q.   All right.  So on these two checks in January of 2010,

22  both the actual work done by Styx Cuthbertson and the -- so

23  the bottom check, is that the check that went to the nominee

24  account?

25  A.   Yes.

1   Q.   So both of those reflect work on job 2926.

2   A.   Yes.

3   Q.   And does this show that there is a fuel deduction being

4   taken out of Styx's check?

5   A.   Yes.

6   Q.   All right.  So with regard to -- are these copies of the

7   two checks that actually correspond to the check register?

8   A.   Yes.

9   Q.   All right.  And with regard to that top check, did that

10  one actually get deposited into Styx Cuthbertson's business

11  bank account?

12  A.   Yes.

13  Q.   And with regard to the bottom check, was that deposited

14  into the nominee account?

15  A.   Correct.

16  Q.   All right.  And then checks were cut from that to Boggs

17  Transport for the bulk of it and then to a much minor degree

18  to Styx Cuthbertson?

19  A.   Yes.

20  Q.   Now, have you read the defense motion with regard to

21  loss?

22  A.   Yes.

23  Q.   And is much of that premised on the notion that Styx was

24  a legitimate DBE?

25  A.   That is correct.

1    Q.   All right.  I'm going to put up Exhibit 4.

2         Is what's -- we'd offer 4 into evidence.

3         Is what's highlighted here, is this the definition of

4    what a disadvantaged business is per the CFR?

5    A.   Yes.

6    Q.   And if you could read the highlighted portion.

7    A.   A business whose management and daily business operations

8    are controlled by one or more of the socially and economically

9    disadvantaged businesses who own it.

10   Q.   All right.  Now, have you reviewed the factual bases of

11   the defendants in this case?

12   A.   Yes.

13   Q.   And with regard to Mr. Cuthbertson, Tucker, and Miller,

14   are those factual bases also signed by the defendants in the

15   case?

16   A.   Yes.

17   Q.   And if you could read the highlighted portion of

18   Mr. Cuthbertson's factual basis.

19   A.   "The management and daily business operations of Styx are

20   controlled by Boggs Group and its employees."

21   Q.   And was that sentiment also in the Greg Tucker and Greg

22   Miller factual bases?

23   A.   Yes.

24   Q.   All right.  And is this an email -- this is part -- this

25   is an attachment to the government's exhibit regarding

1  leader/organizer.  But is this an email related to the small

2  business jobs obtained in Styx's name?

3  A.    Yes.

4  Q.    And this shows employees of Boggs Paving directing -- or

5  managing what Styx is going to do and bid on?

6  A.    Yes.

7  Q.    All right.  And we talked before that Palmetto had done a

8  subcontract here.  Did you review the actual subcontract

9  document with Palmetto that related to this job?

10  A.    Yes.

11  Q.    And did a specific term of that document say all hauling

12  is to be performed for an invoice to Styx Cuthbertson

13  Trucking?

14  A.    Yes.

15  Q.    And was that document signed by Drew Boggs?

16  A.    Yes.

17  Q.    So it was set up in advance that Styx Cuthbertson would

18  not actually do any work on this project.

19  A.    That is correct.

20  Q.    All right.  Are you familiar with the term "commercially

21  useful function"?

22  A.    Yes.

23  Q.    And just read the highlighted portion.

24  A.    "A DBE does not perform a commercially useful function if

25  its role is limited to that of an extra participant in a

1  transaction, contract, or project through which funds are

2  passed in order to obtain the appearance of DBE

3  participation."

4  Q.   All right.  And if you could read the language from the

5  factual basis of John Cuthbertson that's highlighted.

6  A.   Yes.  "Cuthbertson, together with his co-conspirators,

7  used Styx as a 'pass through' entity to obtain the appearance

8  of the required DBE participation and required payments to a

9  DBE entity on projects with DBE requirements.  Most of the

10  funds that Boggs Paving claimed to have paid to Styx were

11  actually paid to Boggs Group or other non-DBE firms and most

12  of the work that Boggs Paving claimed to have been performed

13  by Styx was actually performed by Boggs Group or another

14  non-DBE."

15  Q.   And is that statement echoed in the factual basis of

16  co-defendants as listed on the slide?

17  A.   Yes.

18  Q.   All right.  Are you also -- and is running -- is just

19  running money through a bank account and then returning it

20  right back to the other person, would that be an extra

21  participant through which funds are passed to obtain the

22  appearance of DBE participation?

23  A.   Yes.

24  Q.   All right.  And are there specific rules that relate to

25  DBE truckers in counting their work?

1   A.   Yes.

2   Q.   And if you could read number 1.

3   A.   Yes.  I'm sorry, I have a cold.  I'm sorry, y'all.

4        "DBE must control all work.  To be considered as

5   performing a commercially useful function, the DBE must be

6   responsible for the management and supervision of the entire

7   trucking operation for which it is responsible on a particular

8   contract, and there cannot be a contrived arrangement for the

9   purpose of meeting DBE goals."

10  Q.   All right.  And this is from -- that was from the South

11  Carolina contract on the previous page.  This is from a North

12  Carolina contract; is that right?

13  A.   Yes.

14  Q.   And does it address the ability of a DBE to subcontract

15  out work to a non-DBE?

16  A.   Yes.

17  Q.   And it also -- in order to be able to do that, you would

18  have to still be -- you'd still have to meet the commercially

19  useful function at the outset, right?

20  A.   Correct.

21  Q.   And then you're limited to the subcontracting work by --

22  that's based on the amount that you actually performed; is

23  that right?

24  A.   Correct.

25  Q.   And if you look at -- if you could read the last

1  highlighted sentence.

2  A.   Yes.   "The value of services performed under lease

3  agreements between the DBE and contractor will not count

4  towards the contract requirement."

5  Q.   All right.  Did Styx Cuthbertson, to maintain his DBE

6  certification, did he get interviewed by both North and South

7  Carolina at various times?

8  A.   Yes.

9  Q.   And is this a copy of his certification from July of

10  2009?

11  A.   Yes.

12  Q.   And is there a question, "Has the firm subcontracted jobs

13  with other subcontractors?"

14  A.   Yes.

15  Q.   And what is the answer?

16  A.   He answers, "No."

17  Q.   All right.  And for the South Carolina jobs, on the DBE

18  report does it actually require that you report any

19  subcontracted work on that report?

20  A.   That is correct.

21  Q.   And is this an example of one of those reports?

22  A.   Yes.

23  Q.   And was any work reported as having been subcontracted to

24  Styx -- by Styx Cuthbertson?

25  A.   That is correct, there is no work on this form, correct.

CORRY NOEL - DIRECT

1  Q.  All right.  And if you could read this statement that --

2 was one of the parts of the scheme per the factual basis of

3 Styx Cuthbertson that creating -- would be creating fake lease

4 documents between Boggs Paving and Styx to make it appear as

5 though Styx was leasing trucks from Boggs Group when in truth

6 and fact Styx was not leasing the trucks and control over

7 trucks remained with Boggs Group?

8  A.  That is correct.

9  Q.  And was that same language in the factual basis of Greg

10 Miller and Greg Tucker?

11  A.  Yes.

12  Q.  All right.  Are you familiar with this picture?

13  A.  Yes.

14  Q.  What is that?

15  A.  That's a picture of a magnetic placard that was removed

16 from a truck from a job site in North Carolina.

17  Q.  And that was by a North Carolina DOT employee?

18  A.  That is correct.

19  Q.  And was this part of the cause of this investigation?

20  A.  Yes.

21  Q.  And this was on the JT Russell job?

22  A.  That is correct.

23  Q.  And this is back in 2009?

24  A.  Yes.

25  Q.  And was Boggs Transport driving trucks but making it

1  appear as though Styx Cuthbertson was doing the work?

2  A.    Yes.

3  Q.    All right.  Now, have you examined the bid amounts that

4  were ultimately used by Boggs Paving and compared them in some

5  instances to the next highest bidder?

6  A.    Yes, in the bid tabulations, yes.

7  Q.    All right.  And is this Exhibit 11, is this an example by

8  jobs of the amount -- the difference between Boggs Paving's

9  winning bid and the next person's bid?

10 A.    Yes.

11 Q.    And in each of these instances, was the difference less

12 than the amount that was attributed to Styx in that bid?

13 A.    Yes.

14          MS. SUGAR:  One moment.

15          (Government counsel conferred.)

16          MS. SUGAR:  All right.  Nothing further, Your Honor.

17          THE COURT:  Cross examination.

18          MR. BELL:  Thank you, Your Honor.

19                        CROSS EXAMINATION

20 BY MR. BELL:

21 Q.    Agent Noel, when you were conducting your investigation,

22 did you -- well, first of all, I'm trying to keep up with the

23 number of contracts that have been cited here.  For purposes

24 of your testimony today, how many total contracts did you look

25 at?

1   A.   We looked at the 37 that are listed.

2   Q.   Okay.  So you've only testified about the 37 -- 37

3   projects.

4   A.   Correct.

5   Q.   Okay.  And is that 37 projects that -- are we all -- just

6   to know we're all working off the same sheet of music, that's

7   a spreadsheet that the government sent to defense counsel

8   informing them of projects that would be considered during

9   sentencing; is that right?

10  A.   Yes.

11  Q.   Okay.  Now, did you notice in that 37 that there were 3

12  or 4 that were not listed on there that were included in the

13  indictment?

14  A.   No, I didn't notice that, no.

15  Q.   So when you were looking at these 37 contracts and

16  presumably at some point looked at the ones in the indictment

17  that weren't on that list, did you look at the total DBE

18  commitment for those contracts and compare that to total DBE

19  payments by Boggs?

20  A.   Yes.

21  Q.   All right.  What did you find?

22  A.   Well, the payments were the -- for which DBE?

23  Q.   No, I'm talking about globally for the whole DBE program.

24  Did you look at the total DBE commitments on those projects?

25  A.   No, we didn't.

1    Q.    Oh, you didn't even look at that.

2          Well, if you're --

3    A.    Because the fraud --

4    Q.    If you're trying to determine -- go ahead.

5    A.    Because the conduct didn't occur over all of the

6    contracts.  They only occurred on -- or all of the

7    contractors, only with Styx.

8    Q.    But what I'm getting at, though, is the allegation is

9    that the -- or at least the Court's being asked to consider

10   the harm to the DBE program and the DBEs.  So what I'm asking

11   is if you're looking for programmatic harm, okay, wouldn't you

12   want to know, all right, so what was supposed to be spent on

13   DBEs for these projects and how much was?

14   A.    No.

15   Q.    You wouldn't want to know that?

16   A.    You want to know how much was -- for these purposes

17   today, what was supposedly claimed?

18   Q.    No, I understand.  Look, nobody is disputing that these

19   reports with respect to Styx are all messed up, okay.  So

20   don't think I'm trying to argue with you about that.

21   A.    Okay.

22   Q.    My whole point is that if you're looking at harm to the

23   DBE program or harm to the DBEs for not getting paid the money

24   the government wanted them to get paid, wouldn't you want to

25   know how much DBEs -- DBEs as a whole, not just Styx, DBEs as

1  a whole were supposed to get and then compare that with how

2  much they did get?

3  A.   Yes.

4  Q.   Okay.  But you didn't do that.

5  A.   Because our focus as a criminal -- as a criminal

6  investigator, it's not my focus.

7  Q.   Right.

8  A.   My focus is to look at the actual fraud itself.

9  Q.   Right.  No, I understand what you --

10 A.   If that's what you're looking for, that's a question more

11 for, like, the Federal Highway Administration or either -- or

12 NCDOT or SCDOT.

13 Q.   But you just said that it is something when you're

14 looking at programmatic injury, that is something you would

15 want to know.

16 A.   Programmatic injury?

17 Q.   Yes.

18 A.   From a criminal investigator standpoint, no.

19 Q.   Okay.  I understand.

20      All right.  So let's try to work through some of these --

21 oh, and another thing.  I understand -- I understand what you

22 did and why you did it.  But during the course of your

23 investigation, did you also look at, over the ten-year period

24 of the indictment, total payments from Boggs Paving to Styx

25 Cuthbertson Trucking?

1  A.    Yes.

2  Q.    And did you see when you did that that total payments to

3  Styx Cuthbertson Trucking during the ten-year indictment

4  period exceeded the commitment to Styx Cuthbertson Trucking on

5  the projects you were looking at?

6  A.    For the purpose of a criminal investigation, we were only

7  interested --

8  Q.    Look, I understand what the goal here was for the

9  government.  All right.  All I'm just asking is if you looked

10  at those two numbers?  Yes or no, did you look at the

11  number -- total money paid by Boggs Paving to Styx

12  Cuthbertson?

13  A.    Were checks written in the name of Styx Cuthbertson more

14  than that amount?  Yes.

15  Q.    Now, let's get through some of these exhibits.  I'm going

16  to try -- I was trying to keep up as best I could.

17      Let's see.  I'm going to look at Exhibit 1.  See if I can

18  find the page.

19      Somewhere in your Exhibit 1, you have an analysis or a

20  total of -- I think it's on page 1, actually, where you're

21  analyzing Mr. Cuthbertson's payments.  And you have a line in

22  there for actual work approximately 379,000.  Do you recall

23  that?

24  A.    Yes, I recall that, yes.  It's not on the screen, but,

25  yes, I recall it.

1  Q.   Okay.  And how -- tell me how you came up with that

2  number.

3  A.   We determined how much was actually deposited into his --

4  into his non-DBE -- into his non-nominee account, meaning the

5  account that we believed -- not the DBE account, but his

6  business accounts at his other banks.

7  Q.   Okay.  So -- let me ask you this just as long as we're on

8  the subject.  This nominee account, that's the government's

9  word, right?  I mean, nobody at Boggs called this the nominee

10  account.

11  A.   Well, they called it Styx's account.

12  Q.   Okay.  But my point is, whether it's in a press release

13  or the indictment or in court today, this constant reference

14  to the nominee account, nobody at Boggs called it that, right?

15  A.   Not that we know of, no.

16  Q.   Okay.  So you looked at the deposits that went into one

17  or more of Mr. Cuthbertson's accounts and came up with the

18  $379,000 of money going to him, correct?

19  A.   Correct.

20  Q.   All right.  Now, you are aware, aren't you, that Boggs

21  Paving was owed money by Styx Cuthbertson Trucking for

22  things -- everything from fuel to reimbursements of payments

23  that they were making on his behalf.  All sorts of things,

24  right?

25  A.   Yes.

1   Q.   And you agree those are legitimate expenses that

2   Cuthbertson Trucking owed Boggs Paving, right?

3   A.   That's correct.

4   Q.   I mean, if he buys a truckful of gas, he owes for the

5   gas?

6   A.   Yes.

7   Q.   If doing their administrative services for him they pay

8   an insurance bill, he -- that's his bill; he should reimburse

9   them, right?

10   A.   Yes.

11   Q.   All right.  So -- and you understand -- you -- from your

12   investigation, when they're making those payments to

13   Mr. Cuthbertson, they're netting what they owe him and then

14   taking out what he owes them and then writing a check for the

15   net, right?

16   A.   We fully understand that, yes.

17   Q.   Okay.  So this 379, that's not what they actually paid

18   him.  It's just the net of what they owed each other.

19   A.   That is incorrect.

20   Q.   All right.  Explain that to me.

21   A.   Even though we used a check number, we then took the

22   check number and referred it back to the detailed check

23   register which Boggs provided and which we then took the

24   invoice number which didn't include the actual expenses that

25   were taken out and we took the number that was on the invoice

1   that coincided with that check and we put that into the total.

2   Q.    So this 379 number you're telling me is based off of

3   invoices, not checks.

4   A.    Yes.

5   Q.    And you're confident in this number?

6   A.    For the bank records that we had, yes.

7   Q.    Okay.  On this same page you have a line that says,

8   "Profit on contracts, if any."  And I assume you're talking

9   about Boggs Paving profits, right?

10  A.    Gross profit, yes.

11  Q.    Gross profit.

12  A.    Yes.

13  Q.    4.4 million is your calculation.

14  A.    Yes.

15  Q.    How did you go about determining that?  What did you look

16  at?  What was your analysis?

17  A.    It was just the revenue less the cost of goods sold on

18  this -- from his -- from their projects, from their records.

19  Q.    All right.  And did you look at all 37 projects?

20  A.    Yes.

21  Q.    And you looked at the ones where they lost money and you

22  looked at the ones where they made money?

23  A.    Yes.

24  Q.    Okay.  And when you're looking at cost of goods sold,

25  what -- again, tell me what you looked at specifically.

1    A.    Just what Boggs reported as their cost of goods sold.

2    Q.    And did you perform this work yourself?

3    A.    It was with a team of us, yes.

4    Q.    Who was on the team that was analyzing these records and

5    coming up with this number?

6    A.    It was me, it was Special Agent Tiesha Nixon (phonetic)

7    and Special Agent -- oh, shoot, I'm drawing a blank right now.

8    Q.    That's all right.

9    A.    Tim Palatik (phonetic).

10   Q.    I don't want to embarrass you.

11   A.    Tim Palatik.  He's sitting right there.  He's going to

12   kill me later.  Tim Palatik.

13   Q.    We're still on this first exhibit, I think it's the

14   fourth page if I was following along.  This is the one that

15   reflects state and local projects.

16         Do these state and local projects have, like the NC and

17   SCDOT, do they have, like, committal sheets and DBE reports

18   and that sort of thing?

19   A.    I believe North Carolina does.  I don't recall what South

20   Carolina does.

21   Q.    Okay.  So is it more difficult to track commitments and

22   payments and goals and all that sort of thing for the state

23   and local projects?

24   A.    Actually, no.  North Carolina does a very good job of

25   doing it.  I would say of all the states -- you have to

1  realize I work nationwide so I've seen several of these, and

2  North Carolina is probably one of the better ones to do it.

3  Q.  Okay.  The -- you testified about some SBE or small

4  business contracts.  Do you know the name of those projects

5  you're talking about?

6  A.  Off the top of my head, no.  I just -- I have, you know,

7  several project numbers floating around in my head, but not

8  off the top of my head.

9  Q.  Yeah, I'm not too good with trying to remember the

10  numbers either.  Do you know, like, the name of the project,

11  the county or road or anything like that?

12  A.  Not exactly.  We just refer to them as the small business

13  projects.

14  Q.  Okay.  And you also referenced the JT Russell job, I

15  think is what you folks call it, right?

16  A.  Yes.

17  Q.  All right.  Now, in the JT Russell job, they're the prime

18  contractor for that job, right?

19  A.  Yes.

20  Q.  And they sub their hauling work to Cuthbertson Trucking,

21  right?

22  A.  Yes.

23  Q.  And they file DBE reports, correct?

24  A.  Yes.

25  Q.  Which was their responsibility.  They're the prime.

1    A.    Yes, but we're not charging you with that particular

2    project.

3    Q.    No, I understand you're not -- that Mr. Boggs and the

4    rest of the defendants aren't charged with it.  They're just

5    having the paint of it splashed all over them every time I

6    come in the courtroom.

7          So the -- but you agree with me that was JT Russell's

8    project.  It was JT Russell's obligation to make sure that the

9    committed DBE was doing the hauling and it was JT Russell's

10   job to make sure the DBE reports were accurate.

11   A.    Per the rules, yes.

12   Q.    Was there something besides the rules that would make

13   that not their responsibility?

14   A.    Well, I can say this, was that in interviews that we did,

15   we were informed that the actual -- they were buying the stone

16   from Boggs Paving or one of their affiliates and the actual --

17   and they included DBE hauling as part of their -- or hauling

18   as part of their quote and Styx was included in the hauling.

19   Q.    All right.  Do you also know that that Boggs entity,

20   which is not the defendant Boggs Paving, quoted JT Russell for

21   just stone alone, you can buy the stone at this price, or you

22   can buy stone and haul it, which one do you want?  Are you

23   aware of that?

24   A.    What conversations they had with JT Russell up front, we

25   weren't privy to that, no.

1  Q.   No, I'm talking about afterwards.

2  A.   We only know what they told us after the fact.

3  Q.   Well, you talked to the principal of JT Russell, right?

4  A.   Yes.

5  Q.   And he didn't tell you there was some sort of

6  collaboration between any Boggs entity and him to falsely

7  report Styx Cuthbertson Trucking for DBE purposes, did he?

8  A.   No.  He just told us that the hauling was included in the

9  bid.

10  Q.   Yeah, but with respect to -- and I'm assuming without

11  knowing, frankly, maybe you know, their DBE reports with

12  respect to that project, they were wrong, right?

13  A.   Yes.

14  Q.   Okay.  But did he tell you that he knew that it was going

15  to be done that way?  The principal of JT Russell, did he say,

16  Oh, sure, I knew Mr. Cuthbertson wasn't going to do any

17  hauling.  I knew that our reports were false.  Did he tell you

18  that?

19  A.   No.

20  Q.   And he didn't tell you that he had some sort of agreement

21  with Drew Boggs that that's the way it would be done, did he?

22  A.   No.

23  Q.   Circling back to this nominee account.  Again, the

24  government's word for it.  The problem in this case, if you'll

25  agree with me -- let me ask if you agree with me.  The problem

1  in this case is not that there was an account that money went
2  through.  The problem in the case was the government wasn't
3  being accurately told how much hauling Mr. Cuthbertson was
4  doing and how much he was getting paid for it, right?
5  A.   Well, the account speaks to his control of his business.
6  Q.   Right.  I do want to circle back to that.  But what I'm
7  getting at here is it's not the account that's the problem.
8  The problem is the DBE reports, correct?
9  A.   What was reported, yes.
10 Q.   Right.  So, it wouldn't have mattered whether there's
11 this BB&T account that payments are going in for
12 Mr. Cuthbertson and then Mr. Cuthbertson coming out of that
13 going back to Boggs Transport.  That's not the problem,
14 correct?  The problem is that that money was being reported
15 for DBE purposes.
16 A.   Well, what happens is that with that account, whenever
17 the states would ask for backup documentation and they would
18 ask them for canceled checks, the canceled checks would
19 reflect that it was actually being paid to Styx.
20 Q.   I agree completely.  And, you know --
21 A.   I mean, that was the purpose of the account, right.
22 Q.   Now, that I wouldn't agree with.
23 A.   Okay.
24 Q.   So who told you that that was the purpose of the account?
25 A.   I'm sorry, I'm just going through all of the numerous

1    interviews we did on this.

2    Q.    Well, let me ask you if you recall Kristy Lawrence's

3    interviews and grand jury testimony?

4    A.    Yes.

5    Q.    All right.  And what was Kristy Lawrence's role at the

6    company?

7    A.    Her role was to keep up with the -- with Styx's books, is

8    kind of the gist of what she told us.

9    Q.    Well, she did a lot more than that.  What did she do for

10   Boggs Paving?  What was her job?

11   A.    She was -- I think she said she was a credit manager.  I

12   believe that that was her title.  I would have to look at her

13   interview to be sure about it.

14   Q.    And she's the one who had physical control of this

15   checkbook, correct?

16   A.    Correct.

17   Q.    All right.  And she's the one who made the accounting

18   entries into Boggs Paving's accounting system showing Boggs

19   Paving paid Mr. Cuthbertson X.  She's the one who made those

20   entries, right?

21   A.    And informed her superior of that also.

22   Q.    Okay.  That's fine.  But she's the one who's doing that,

23   correct?

24   A.    Yes.

25   Q.    All right.  That's what one of her jobs is.

1      Now, do you recall from her grand jury testimony that she
2  said that account had been set up since before she got there
3  which was in the early 2000s?
4  A.    Yes.
5  Q.    All right.  And do you also recall her testifying that it
6  was Mr. Cuthbertson who asked her to maintain that checkbook
7  for him?
8  A.    Yes.
9  Q.    And it was Mr. Cuthbertson who authorized her to write
10 checks out of that account on his behalf.
11 A.    Yes.
12 Q.    She did not say that Mr. Boggs, Mr. Hicks or any of the
13 others directed her to do anything with respect to that
14 account, did she?
15 A.    I don't recall anything, no.
16 Q.    Okay.  And in fact, to your -- do you know of anybody who
17 could testify with respect to that account and that checkbook
18 being on the premises of Boggs Paving?  Has any witness of all
19 the scores you've interviewed told you Mr. Boggs even knew
20 about that checkbook?
21 A.    Nobody said it directly, but it was just kind of
22 understood, I believe, was kind of what everyone was saying.
23 It was just kind of understood.
24 Q.    It was understood that Mr. Boggs knew about that
25 checkbook being in Kristy Lawrence's drawer.  Is that what

1   you're telling me?

2   A.   No.   It was understood that everybody at Boggs knew about

3   it.

4   Q.   No, no.   Listen to my question.

5   A.   I understand.   Okay.   The answer is no.   I understand.

6   Q.   Right.   So you don't have a single witness who can say

7   Mr. Boggs was even aware that that checkbook was on the

8   premises or that Kristy Lawrence was writing checks out of

9   Mr. Cuthbertson's account.

10  A.   Not that I recall, no.

11  Q.   Okay.   And do you also recall from her grand jury

12  testimony that when asked --

13  A.   She testified for a long time.   You're asking me to

14  recall a whole lot, so...

15  Q.   Pardon me?

16  A.   She talked for a long time.   You're asking me to recall a

17  whole lot.   You have it right in front of you so -- but go

18  ahead.

19  Q.   Yeah, I mean, if there's a disagreement about my memory

20  and yours, we'll just pull it out and we'll read it together.

21       The -- but do you recall from her grand jury testimony

22  that when asked who told you to write checks from Boggs Paving

23  to Styx Cuthbertson Trucking and put it in this BB&T account

24  and then write checks out of that account back to Boggs

25  Transport, she was asked who told you to do that.   Do you

1  recall that?

2  A.  Vaguely, yes.

3  Q.  And do you recall her answer was nobody?

4  A.  I believe she said that that was something that she was

5  trained to do, if I'm remembering right.  But like I said, I

6  don't have it in front of me.

7  Q.  Okay.  In fact -- and I'm really not trying to put you on

8  the spot because I intend to read into the record later in the

9  day portions of her grand jury testimony.  But to the extent

10  that you do remember, do you recall that she is an

11  administrative person?  She was trained, if you will, to do

12  that by her administrative predecessor.

13  A.  It's possible, but I'd have to verify it.

14  Q.  And, of course, my overall point is not Mr. Boggs and not

15  any of these other defendants, none of them told her to do any

16  of this; is that right?

17  A.  But she informed him of this.

18  Q.  All right.  Who did she -- who do you say she says she

19  informed?

20  A.  She informed Kevin Hicks of this.

21  Q.  Okay.  But not Mr. Boggs.

22  A.  Not that I know of.

23  Q.  Right.  So I guess my original point when we started down

24  this line about this checking account, what the government

25  calls this nominee account, it wouldn't have mattered whether

1   it was handled this way or if they wrote a check to

2   Mr. Cuthbertson and he walked out the door with it and put it

3   in any other account and wrote a check back to Boggs

4   Transport.  The problem with that whole scenario is, as far as

5   Boggs' records would show, it would show paying

6   Mr. Cuthbertson money that really wasn't all for his work,

7   right?  My point is it didn't have to be this account.  Any

8   way you do it there's going to be a check going to

9   Mr. Cuthbertson and a check coming back.

10  A.   Yes.

11  Q.   So the breakdown in all this is -- you would call it

12  something else, I understand.  I don't want to argue with you.

13  But the problem that all this caused is that if somebody in

14  Boggs Paving who's responsible for preparing DBE reports

15  queries the system and says how much did we pay

16  Mr. Cuthbertson, they're going to see that number that's too

17  big, right?

18  A.   Yes.

19  Q.   They're going to see the number that includes money that

20  was for Mr. Cuthbertson's work that he was paid for and money

21  that was actually done by Boggs Transport and made its way

22  back to Boggs Transport, correct?

23  A.   Yes.

24  Q.   Okay.  And you know that Charity Coleman was the employee

25  responsible for preparing those DBE reports?

1    A.    Yes.

2    Q.    All right.  And do you know that's just exactly what she

3    did; that she queried the accounting system and said how much

4    did we pay Mr. Cuthbertson and then put that number on a form?

5    A.    Yes.

6    Q.    And do you recall as well that no -- none of these

7    defendants told her that's the way it should be done?

8    A.    No, I'm not aware of that.

9    Q.    Okay.  Let me go at it another way.  Do you recall her

10   telling you, or telling the grand jury, or telling whoever

11   interviewed her --

12   A.    I don't recall her grand jury testimony to be honest.

13   Q.    Okay.  All right.  But have you read interview reports of

14   her or participated in interviews?

15   A.    Yes, on and off.

16   Q.    Okay.  So based on whatever familiarity you have, do you

17   recall that what she said was she was taught to do that by her

18   administrative predecessor, a woman named Wanda Knight?

19   A.    Yes, I do remember that, yes.

20   Q.    And do you recall her -- and you've talked to Wanda

21   Knight, correct?  Or someone has on the prosecution team.

22   A.    Yes.

23   Q.    Okay.  And do you recall if Wanda Knight said, I learned

24   to do it that way from a woman named Nancy Bovender.  Do you

25   recall that?

1  A.    That sounds familiar.

2  Q.    Okay.

3  A.    Sounds familiar.

4  Q.    And so have you all talked to Ms. Bovender?

5  A.    I don't know.  I don't remember.

6  Q.    Okay.  That's fine.

7  Q.    And do you know or recall that Ms. Bovender had been

8  there doing that sort of work since the '90s?

9  A.    I guess.

10  Q.    Okay.  So based -- and do you recall with respect to all

11  three of those women who at one time prepared DBE reports,

12  that starting with Ms. Bovender back in the '90s and then

13  Ms. Knight and then Ms. Coleman, that the way they did this

14  was they queried the system and they just saw how much money

15  went -- in a check form went to Mr. Cuthbertson, and that none

16  of these defendants, including Mr. Boggs, told them that's the

17  way you should be doing a DBE report?

18  A.    But they were told that's how it was being done.

19  Q.    All right.  Give me the witness who told Mr. Boggs that

20  that's how it was being done.

21  A.    No, you said any of the witnesses.

22  Q.    Okay.  I apologize.  You're exactly right.

23  A.    You didn't say Boggs a second ago.

24  Q.    Who was told by them?

25  A.    Kevin Hicks.  We seen emails to where Kristy Lawrence is

1  telling him exactly how much money she is moving, how much

2  money she is paying.

3  Q.   All right.  Did she ever send any emails to Mr. Boggs

4  saying that?

5  A.   I don't remember.

6  Q.   Okay.  Now, let me look at -- let me ask you about the

7  Monroe bypass which is on here.  Why is the Monroe bypass

8  project on part of this testimony?  Can you tell me that?

9  A.   It was -- it shows -- well, today we're talking about --

10 well, Styx Cuthbertson was used to get the bid for that

11 project.

12 Q.   So he was written in as a DBE hauler --

13 A.   Yes.

14 Q.   -- on that project?

15 A.   That is correct.

16 Q.   Okay.  But no -- the project hadn't even been started

17 when this indictment came down.  I'm talking about like

18 shovels on the ground kind of thing, right?

19 A.   You're right, yes.

20 Q.   No hauling had been done.

21 A.   Correct.

22 Q.   So nobody knows if he would have been used, if he could

23 have done the hauling, if it would have been accurately

24 reported.  Even if they were going to be short of their goal

25 in their commitment to Mr. Styx -- to Mr. Cuthbertson, you're

1  not saying we are projecting a crime here, are you?  We're
2  predicting a crime and that's why we want to talk about it in
3  court today.
4  A.   Well, they submitted a bid for somebody who we know
5  couldn't perform that amount of work.
6  Q.   How do you know that?
7  A.   Because just in past cases and in past -- in looking at
8  other similar DBEs of similar size, that amount of work is
9  beyond their scope.  And we've talked -- or I have talked to
10 several engineers, not just in North Carolina, South
11 Carolina -- like I said, I work nationwide.  I've talked to
12 engineers and truckers in Georgia, all over the Southeast.
13 And someone with four to six trucks, most of the time those
14 DBEs cannot perform $2.8 million worth of DBE hauling.
15 Q.   Okay.  But they get to sub out at least as much to other
16 DBE haulers, right?
17 A.   Only if it's performed by other -- yeah, to other DBEs,
18 yes.
19 Q.   And look, I don't want to belabor this too much because I
20 don't think Monroe bypass has anything to do with anything.
21 But Mr. Cuthbertson could run his six trucks and he could hire
22 20 other DBEs with their six trucks theoretically.
23 A.   Uh-huh.
24 Q.   But yet, the government is assuming, look, that was going
25 to be a fraud.  It was going to be inaccurately reported.

1  A.    Well, because -- we're not saying that.  We're saying

2  that in his current structure and being that from our

3  perspective he's not running his company now and he wasn't

4  running his -- Styx was not running his DBE company throughout

5  the course of all the projects that we looked at, we do

6  believe that he would continue the same behavior.  Now, of

7  course, we're making assumptions there, but that's what it

8  looks like and that's why we tell our counterparts, NCDOT

9  who's our grantee, that, you know, this is the case and this

10 is what we saw.

11 Q.    Okay.  And I want to circle back to whether he was

12 running his own business later.  I'm just trying to stay in

13 order on the notes I made here.

14       But this one exhibit, it's the one that has total

15 invoices for 2007 to 2011.  I'm not sure which one that was.

16       Oh, there we are.  It's the last page on this Exhibit 1

17 or next to the last page.

18       The indictment alleges conduct from 2003 up through the

19 end of 2012.

20 A.    Yes.

21 Q.    Why was a chart prepared for just five of those years?

22 A.    Because those were just the only records where we had

23 complete sets so we could actually compare the records.

24 Q.    Okay.  Well, a little over a week ago now we sent to the

25 U.S. Attorney's Office a CD that had a lot of records -- or

1  all the records we could find with respect to those 37

2  projects.  Did you get a chance to review what we sent over?

3  A.    I believe -- I didn't see the actual CD, but the records

4  from it I do believe I did look at them.  I didn't see the CD,

5  though.

6  Q.    Right.  And so did you, in light of what we were sending

7  over and sort of anticipating what we would try to do, did you

8  look at the documentation we sent over and see what you could

9  do over the whole course of the indictment period?

10  A.    No, because -- well, I guess I didn't see all of those

11  records so I didn't recognize those records.

12  Q.    Okay.  All right.  Let's look at Exhibit 2.  And I think

13  it's page 2 I want to look at.

14         And so as I recall what you said -- I'm trying to

15  understand -- of the 37 projects that we're talking about

16  here, you say that Mr. Cuthbertson only actually performed

17  work on 14 of them?  Is that what you said?

18  A.    Yes, for the records that we had, yes.

19  Q.    Pardon me, I'm sorry?

20  A.    For the records that I reviewed, yes.

21  Q.    Now, did you include real work on those projects, plant

22  hauls?

23  A.    No, we did that separately.

24  Q.    Okay.  So for the other projects -- so what I'm getting

25  at -- well, first of all, explain to the Court what a plant

1  haul is within the trucking business.

2  A.   A plant haul is when you have certain materials that come

3  to the job site.  If it's asphalt, they bring the asphalt to

4  the site.  But then there are certain raw materials that go

5  into those asphalt mixes, meaning like sand and other things

6  like that to make up the asphalt.  Well, those particular

7  materials they have to get to the -- to the asphalt plant to

8  be mixed.  So in order to bring those materials from where the

9  raw materials are originally sitting, they bring that to the

10 asphalt plant.  So they call those plant hauls.

11 Q.   And so to put pavement on a road --

12 A.   Yes.

13 Q.   -- which is the project --

14 A.   Uh-huh.

15 Q.   -- you have to get rock out of the ground -- Mr. Boggs

16 will have at me for leaving a bunch of steps out.  But you get

17 rock out of the ground, among other things, and you take it to

18 the asphalt plant and it gets mixed and made and then trucked

19 from there and put on the ground --

20 A.   Yes.

21 Q.   -- right?  That's the whole process.

22 A.   Yes.

23 Q.   So plant hauls are a legitimate part of the work that

24 goes in to paving the road that the contractors are paid to

25 pave, right?

1    A.    Yes.

2    Q.    And so there's nothing wrong with having your DBE trucker

3    make plant hauls in support of that project and reporting

4    those for DBE purposes.  There's nothing wrong with that, is

5    there?

6    A.    There's nothing wrong with that, that's correct.

7    Q.    So there being nothing wrong with that, why create a

8    chart that shows and represents that Mr. Cuthbertson only

9    performed work on 14 of the 37 projects?  Because if you count

10   plant hauls, which you just said is legitimate, this chart is

11   completely misleading.

12   A.    From your perspective, yes, I can see that.

13   Q.    Okay.  Now, let's talk a little bit about Mr. Cuthbertson

14   being legitimate or illegitimate.  And that's not really my

15   job to take up for him, but I will.

16         What did Mr. Cuthbertson -- how long has he been in

17   business, do you know?

18   A.    I think since the late '90s, I believe.

19   Q.    Okay.  Maybe even earlier?

20   A.    It's possible, yeah.

21   Q.    Do you know that he worked for other companies even

22   before Boggs Paving was formed by Drew and Chris Boggs?

23   A.    Yes.

24   Q.    And so he's been in business a long time.

25   A.    Yes.

1  Q.   And he formed his own company.

2  A.   Yes.

3  Q.   He hires his own drivers.

4  A.   Yes.

5  Q.   He fires his own drivers.

6  A.   Yes.

7  Q.   Okay.  He does and has over decades done work for more

8  than Boggs Paving, right?

9  A.   Yes.  Yes.

10 Q.   Okay.  In fact, he even hauls lumber for -- I don't know

11 if it's really lumber or just trees.  But, I mean, he's got a

12 logging truck that he works with, right?

13 A.   Yes.

14 Q.   So his employees are not hired by Boggs Paving.  They're

15 not fired by Boggs Paving.

16 A.   We've seen emails that may speak to that to where it's

17 possible that Boggs Paving may have been hiring and firing

18 some of his employees.

19 Q.   All right.

20 A.   The issue in all of this is that -- I see where you're

21 getting at.  The issue in all this is that I'm not saying he's

22 not a legitimate business.  What I'm saying, he's not -- it

23 appears that he's not a legitimate DBE.

24 Q.   Okay.  And that's because he goes where Boggs Paving or

25 Boggs Transport tells him to go.

1  A.    No, because he doesn't control or manage or supervise his

2  business respective to these jobs.

3  Q.    Okay.  Yeah, let me ask you about that.  And I don't care

4  whether we're talking about a DBE hauler or non-DBE hauler.

5  All right?

6  A.    All right.

7  Q.    Just going to talk about the whole hauling process of

8  road paving.

9  A.    Okay.

10  Q.    You've got a prime contractor like Boggs Paving.

11  A.    Uh-huh.

12  Q.    And they've got to get on any given day a hundred trucks

13  to this job site and 30 trucks to that job site and, you know,

14  who knows how many things are going on at the same time.

15       The company's trucking dispatcher tells everybody where

16  to go.

17  A.    Right.

18  Q.    Right?

19       And it doesn't matter whether it's Cuthbertson Trucking,

20  a small DBE, or Blue Max Trucking.  The trucking dispatcher

21  for the prime contractor is telling Blue Max, Your trucks need

22  to be here today.

23  A.    Okay.

24  Q.    Right?

25       So they're controlling -- so let's assume that Blue Max

1  was a DBE, which it certainly isn't.

2  A.   Correct.

3  Q.   But -- so nobody -- if I understand the point you're

4  trying to make about not controlling or supervising their own

5  work.  I don't care if you're Blue Max or Cuthbertson

6  Trucking, in that sense nobody is controlling their own work

7  because they're being told where to go to get the road paved

8  by somebody else, the prime.  The prime is saying, We need a

9  hundred trucks to get from the plant to the road today.  I'm

10 telling you to do it.  Right?

11 A.   Correct.

12 Q.   They tell Blue Max just like they tell Cuthbertson

13 Trucking.

14 A.   Okay.

15 Q.   Okay.  No difference, right?  You don't know of any

16 difference.

17 A.   Correct.

18 Q.   And I know that there's been the argument advanced that

19 because nearly all of his work was on behalf of --

20 A.   Before you go on, can I speak to that last point?

21 Q.   Sure, go ahead.

22 A.   I'm sorry to interrupt you, but --

23 Q.   No, that's fine.

24 A.   I see what you're saying about need a hundred trucks a

25 day and we're going -- but for his portion of that hundred

1  trucks, it's Boggs' responsibility to say that, Hey, of that

2  particular portion, you need to do DBE.  And then from that

3  point it's Styx's responsibility to say, hey -- of that

4  hundred thousand or whatever it is that they need to do for

5  that day, it's Styx's responsibility to say, Okay, I only have

6  six trucks.  I need to go and get six trucks.  That's where

7  the control comes in at --

8  Q.    Okay.

9  A.    -- for the DBE itself.  It's not the hundred trucks.

10  What you're saying, I see.  I understand what you're saying.

11  But what is supposed to happen and what happens in other

12  states and other places that I've seen, including some here in

13  North Carolina, what happens is that if the DBE is responsible

14  for bringing -- if they say you need 15 trucks today and the

15  DBE only owns 8, then it's his or her responsibility to go get

16  those additional trucks, not Boggs' choice to go get those

17  trucks.  That's where the control comes in.

18  Q.    And I understand that point.  I'm not disagreeing with

19  you on it.  Although I'm sure you know as a practical matter

20  that's not what happens for any of them, right?  That's not

21  what's happening in the real world.  In the real world --

22  A.    It depends.

23  Q.    -- if a prime needs 20 trucks and its DBE sub has 10 --

24  A.    Right.

25  Q.    -- that prime goes and finds 10 more trucks and gets it

1   on the job.  That's what's happening in the real world.

2   A.   But then also the --

3   Q.   I know it's not regulation.  I get that.

4   A.   But then also the prime, if they do it right, they

5   instruct or they tell the DBE that that's what they're doing.

6   Q.   Okay.  I'm not going to argue with you there.  And I

7   agree with you that the dispatch ought to be keeping up with

8   on this project we've got this commitment for DBE hauling and

9   making sure that DBE haulers are working on that.

10      We agree on that, right?  Dispatch should be doing that,

11  right?

12  A.   Yes.  They should be keeping up with that, yes.

13  Q.   And project managers, or whoever is in charge of a

14  particular project, they ought to be paying attention too and

15  making sure dispatch is putting DBE truckers on their projects

16  to make their commitments, right?  All that should be

17  happening.  And the way things should have been done,

18  including in this case, that's what would have happened.

19  A.   Correct.

20  Q.   Now, when Cuthbertson Trucking is told we need your six

21  trucks wherever today, there's one call to Mr. Cuthbertson,

22  right?  There's not six calls to Mr. Cuthbertson and his

23  drivers.  He's told we need your trucks and then he arranges

24  to get his employees and his trucks to the site, correct?

25  A.   Correct.

1  Q.   That's a decent amount of control, don't you think?

2  A.   To where he tells his six trucks to be there?

3  Q.   Yeah, he's in charge of his people.

4  A.   But what about the trucks that are running underneath

5  him?  Who instructs that other one?  That's the crux of all of

6  this.  Who instructs those additional trucks?  Not the other

7  trucks.  Who instructs the additional trucks that run

8  underneath Styx.

9  Q.   Okay.  That's fine.  I'm not disagreeing with you there.

10      All right.  I'm switching gears on you a little bit here,

11 but I'm just trying to track your direct testimony.

12      This project, the Palmetto project, I think everybody

13 calls it --

14 A.   Yes.

15 Q.   -- down in South Carolina.

16 A.   Yes.

17 Q.   And let me try to describe it for you how I understand it

18 and you either agree or disagree with me or say I don't know

19 anything about it, okay?

20 A.   All right.

21 Q.   Do you know that at the time that project started, Boggs

22 Paving intended to put a plant down near that project for

23 efficiency and cost saving purposes, but then they weren't

24 able to do that?

25 A.   Yes, we've heard that, yes.

1  Q.   Okay.  And so the project was subbed by Boggs to Palmetto

2  because they did have a plant down there, right?  They were

3  sort of going to step in their shoes, correct?

4  A.   Yes.

5  Q.   And Boggs had subcontracted with Mr. Cuthbertson to do

6  the hauling on that for DBE commitment purposes, right?  And

7  that had been reported to the state.

8  A.   It had been reported to the state what?  The commitment?

9  Q.   That Mr. Cuthbertson had been committed to that project

10 for the hauling.

11 A.   I don't remember there was a commitment actually

12 submitted to South Carolina.  I don't recall off the top of my

13 head.

14 Q.   Okay.  That's fine.  But my point being here is if there

15 was, and just let's assume for a second there was, that there

16 was a commitment that Mr. Cuthbertson was going to haul on

17 that job for Boggs Paving.

18 A.   Yes.

19 Q.   But then because of their inability to establish a plant,

20 they essentially let Palmetto step in their shoes.

21 A.   Uh-huh.

22 Q.   It only makes sense for that subcontractor Palmetto to

23 include the DBE commitments, including Cuthbertson Trucking,

24 right?

25 A.   Even if they weren't going to perform it?

1  Q.   No, I'm not going there with you, yet at least.

2  A.   Okay.  All right.

3  Q.   But I mean -- well, the reason I bring this up is the

4  very signing of that subcontract by Mr. Boggs where it

5  required Palmetto to use Mr. Cuthbertson, that's what should

6  have happened, right?

7  A.   Say that again.

8  Q.   When Boggs Paving --

9  A.   Uh-huh.

10  Q.   -- subbed its work because it couldn't do it to Palmetto

11  and Boggs Paving had said we're going to use Mr. Cuthbertson

12  for this trucking, therefore, Palmetto, when you sub this from

13  us, you're going to use Styx Cuthbertson for trucking.

14  A.   Yes.

15  Q.   That's the way it should have been done --

16  A.   Yes.

17  Q.   -- right?

18       And then Palmetto should have used Mr. Cuthbertson,

19  right?

20  A.   Yes.

21  Q.   But at that point, whether it's Anderson Columbia who was

22  the prime or Palmetto who was the sub at that point, that's

23  their responsibility to make sure that Mr. Cuthbertson is on

24  site, their responsibility to pay him for the work he did, and

25  their responsibility to accurately report DBE participation.

1  A.   Even though the subcontract was with -- was between
2  Palmetto and Boggs?
3  Q.   Yes, because in the subcontract they committed to using
4  Mr. Cuthbertson for DBE purposes.
5  A.   Well, it flows down because the -- whoever is the -- and
6  I'm pretty sure our NCDOT -- well, she'll explain this a lot
7  better later.  But when it flows down, whenever there is a
8  subcontract, once it starts to go through the tiers, those
9  tiers are responsible for that level.  So because the
10 contract -- and I may be speaking wrong, but this is the way I
11 remember it.  The subcontract, whoever the name it's in, then
12 it's their responsibility at that point.
13      So the subcontract was with -- between Palmetto and
14 Boggs, if I'm remembering right, correct?  I'm asking you -- I
15 know you're asking me questions, but --
16 Q.   Yeah, maybe we're wandering off my point.  But the prime
17 contractor on that was a company called Anderson Columbia,
18 right?
19 A.   Yes.
20 Q.   And Anderson Columbia submitted DBE reports, right?
21 A.   Yeah.
22 Q.   I know they're wrong.  I'm not saying they were right.
23 I'm just saying they're the ones that submitted it, correct?
24 A.   Yeah.  Yes.  I'm sorry, yes.
25 Q.   Let me ask you about these placards, which is the last

1  page on Exhibit 4 where you had the Boggs Trucking placard and
2  the Cuthbertson placard.
3      Isn't there a regulation that if somebody is going to run
4  under, as they call it, the DBE hauler, that they're supposed
5  to put the DBE hauler's logo on their trucks?
6  A.   If there is -- if there is a lease in place, then they
7  must inform the NCDOT or SCDOT beforehand.
8  Q.   Look, I am not going to argue with you that a whole bunch
9  of things weren't done right in this case, including
10 informing.  But what I'm saying is, there's a regulation that
11 if things are done right and the way they're supposed to be
12 done, that the sub will be putting the DBE's logo on their
13 truck.
14 A.   Yes.
15 Q.   Okay.  Let's look at Exhibit 11.
16     And as I understand, the purpose of this exhibit is to
17 show the correlation -- maybe you would argue the causation,
18 but I would say the correlation between the amount on these 5
19 and only 5 out of 37 projects that Boggs Paving underbid all
20 of its other competitors and their commitment to
21 Mr. Cuthbertson, right?  That's the point of this.
22 A.   Yes.
23 Q.   And so it's your testimony that this shows that they
24 gained a competitive advantage by writing in Mr. Cuthbertson.
25 A.   Yes.  And several other people within Boggs who we talked

1  to also told us it gave them an advantage.

2  Q.   Well, that's an interesting question that you raised

3  that.  One of the defendants in this case, Mr. Mann, who may

4  be testifying here today, I don't know, but he told the

5  government even this week that it was not necessarily an

6  advantage in the bidding process to use Mr. Cuthbertson,

7  correct?

8  A.   He did?  I don't remember.  I don't remember.

9  Q.   That's fine.  We'll get to that, I'm sure.

10       But you probably know the industry well enough.  Would

11 you agree with me that hauling is a commodity?  That is,

12 pretty much everybody charges the same thing by mile or

13 tonnage, however it's going to be paid --  going to be

14 managed.

15 A.   Yeah, and geographic location and that type of stuff.

16 Q.   Right, I don't want to get into all that.

17 A.   Right.

18 Q.   Where your plant is makes a big deal.

19 A.   Yes.

20 Q.   But whoever is going to do the hauling on any project,

21 pretty much all haulers charge the same year to year whether

22 they're charging by tonnage or by miles, right?

23 A.   Yes.

24 Q.   All right.  So that being the case, whether on a bid

25 Boggs Paving writes in Cuthbertson Trucking or Ken Bell

1  Trucking, if we're both going to charge the same thing, how
2  does that give me a competitive advantage over somebody else
3  who can bid Cuthbertson or Bell Trucking?
4  A.    Because that's not the way it was explained to us as to
5  how the bidding process worked at Boggs with respect to Styx.
6  Q.    No, but this chart lays out that there's a financial
7  advantage, that there's money to be saved by bidding
8  Mr. Cuthbertson or writing him in as a sub.  And my point is
9  that that's, again, somewhat misleading because trucking is
10 going to cost whatever trucking costs.  You're not saving
11 money in your business or in your actual performance on the
12 project by writing in Mr. Cuthbertson instead of writing in
13 Ken Bell, right?
14 A.    Wrong.  And the reason why is, is because the way it was
15 explained to us how the bidding process worked at Boggs Paving
16 with respect to Styx was that -- and you're right.  All of the
17 other legitimate DBEs, they would all send their same quotes.
18 If one prime is bidding, they all -- they all get the same
19 quotes from the same subcontractors, whether it's striping,
20 whether it's erosion control, whatever it is, they all get the
21 exact same bid across the board.

22      The advantage that Boggs had was that even -- using all
23 of the same subcontractor bids, at the very end they get --
24 they get to control that final number.  Meaning, if the entire
25 bid was -- let's say the entire bid was, I don't know,

1  $5 million -- well, let's make the numbers easy.  Let's say
2  the entire bid was a hundred thousand dollars, and they needed
3  10 percent -- they needed 10 percent in DBE goal.  Well, what
4  happens -- well, of course, that's $10,000.  Well, if they --
5  if all the other subs equal -- if all the other subs equal up
6  to like -- to the $9,000 -- to $9,000, and you have 10,000
7  left, they can just plug in Styx at that number and not have
8  to use another trucker at a different rate because they were
9  saying they were just plugging in that number at the end and
10  adjusting his rate.  That's what the other people told us.
11  They weren't necessarily using the market price.  They were
12  actually just plugging him into the difference at the very
13  end.
14      So if somebody else were to use another DBE that was
15  using the market price, they could just plug in Styx at
16  whatever number they wanted to.
17  Q.   All right.  So let me make sure I follow that.
18  A.   I know it was a horrible example.
19  Q.   No, no, no.  But when you got to the end and you said
20  they would adjust Mr. Cuthbertson's price as needed, and I
21  read --
22  A.   Or the quantities or however they wanted to do it.
23  Q.   I read a witness report interview that said that.  What I
24  would like to see is a bid from Boggs Paving where
25  Mr. Cuthbertson was written in for something other than his

1  standard rate, the same rate everybody else was charging

2  because I haven't seen that.  I have seen this witness

3  statement you're talking about.  I haven't seen any evidence

4  of that.

5  A.   I'll concede that.  That's fine.

6        MR. BELL:  All right.  Those are all my questions,

7  Agent Noel.  Thank you.

8        THE COURT:  Redirect.

9        MS. SUGAR:  Thank you, Your Honor.

10                 REDIRECT EXAMINATION

11 BY MS. SUGAR:

12 Q.   Let's just quickly talk about a couple of those projects.

13      With regard to the -- what we call the Palmetto project,

14 I'm going to pull up Exhibit 124.  Is this a copy of the first

15 page of that subcontract for one of those two projects between

16 Pal -- Boggs Paving and Palmetto?

17 A.   That is correct.

18 Q.   And did it specifically say that Palmetto was now going

19 to do the hauling?  Is that specifically listed in the

20 contract?

21 A.   That is correct.

22 Q.   And the provision later just says that it's going to be

23 run -- or it's going to go through Styx.  It doesn't say he's

24 going to actually do anything.

25 A.   That is correct.

1  Q.   Is that right?

2  A.   That is correct.

3  Q.   And if we look at Exhibit -- we'd offer this into

4  evidence as 137.

5       Is this a copy of the -- let me try and make it bigger.

6       This is the remittance advice for a check related to that

7  job.

8  A.   The check's on here too.

9  Q.   It's the unsigned copy of the check.

10  A.   Okay, I got you.

11  Q.   This is a copy of the remittance advice for one of those

12  projects; is that right?

13  A.   That is correct.

14  Q.   Okay.  So if you flip to the next page of this, does this

15  show the checks that went out of the nominee account after

16  this check was mailed -- or after that check was -- the other

17  check was made?

18  A.   Yes.

19  Q.   And did it also have an actual invoice behind it with how

20  the amount to be paid to Palmetto was come up with?

21  A.   Yes.

22  Q.   And does the last page show that it was just a 2 percent

23  to Styx?  That's all he got for his -- that's what he had done

24  is just a pass-through and got 2 percent?

25  A.   Yes.

CORRY NOEL - REDIRECT

1   Q.   All right.  And if we look at Exhibit 138, who signed
2   that check?
3   A.   Drew Boggs.
4   Q.   All right.  Is there something in the industry that's
5   called a -- is it known that DBEs are frequently more
6   expensive than non-DBEs?
7   A.   Yes.
8   Q.   And I'm going to pull up Exhibit 88 and go to -- look at
9   the top.  See if I can -- there we go.
10       And is that an email from Drew Boggs?
11  A.   Yes.
12  Q.   And if you could read the very last sentence of his
13  email.
14  A.   "I guess that's the attitude you get when you are a DBE
15  and you can name your tune."
16  Q.   All right.  And in order to put DBE truckers into a
17  contract at that standard price, you'd have to be able to find
18  DBE truckers who had the available trucks and the available
19  manpower and weren't too busy to work on those projects,
20  right?
21  A.   Correct.
22  Q.   So you could only use the DBE for the trucking part of a
23  contract if you had actual bids in from DBE truckers who had
24  the capacity to do the amount of work on your project.
25  A.   Correct.

1    Q.   But you've interviewed witnesses in this case and they

2    told you they could write in Styx for whatever amount because

3    it would end up working out in the end.

4    A.   Yes.

5    Q.   Now, there was some talk about the magnet.  When North

6    Carolina DOT saw the magnets on the trucks, they were

7    concerned, right?

8    A.   Yes.  That was kind of the precipice of all this.  That's

9    how we came to know about it.

10   Q.   They didn't just see -- they didn't just say, Oh, well,

11   they're just labeling the trucks that are being used for

12   leases, did they?

13   A.   Correct.  They had had issues -- they -- there was kind

14   of grumblings within the industry.  And also, they had been

15   looking -- NCDOT had been looking because this was kind of an

16   ongoing thing with Boggs at the time, not just on this job,

17   but on previous jobs, that Styx was written in, but he

18   wasn't -- but he wasn't on site doing the work.  Boggs

19   Transport trucks were running.

20   Q.   All right.  Do you remember Mr. Bell asking you whether

21   you remember any interviews where any witnesses said that they

22   directly talked to Drew Boggs about the nominee account?

23   A.   Yes.

24   Q.   All right.  And I'm showing you what I've marked as

25   Exhibit 22.

1      Is this an FBI 302 of an interview with Kristy Lawrence?

2  A.   Can I step down and look at it?  I can't see it on the

3  screen here.

4           THE COURT:  You certainly can.  They can give you a

5  hard copy too if they want to.

6  Q.   Is this a copy of the 302 with Kristy Lawrence in June of

7  2013?

8  A.   I still can't see it.

9           MR. BELL:  Can you bring that up over here?

10           THE CLERK:  It's on now.

11           THE WITNESS:  Ah, yes, I can see it now.

12           THE COURT:  I don't have it, Cynthia.

13           Okay.  Now I do.

14  Q.   Is that a 302 with Kristy Lawrence dated June 2013?

15  A.   Yes.

16  Q.   All right.  If you could read the bottom of page 6

17  beginning with "Lawrence had some."

18  A.   Sure.  "Lawrence had some direct emails with Drew Boggs.

19  Drew Boggs was always concerned about operational costs such

20  as fuel.  If Hicks was not present at work, Lawrence would on

21  occasion discuss Styx with Drew Boggs to include the

22  discussion of money coming back to Boggs from Styx.  Lawrence

23  believed that Drew Boggs was fully aware that the money paid

24  to Styx was coming back to Boggs."

25      Can you slide it over a little bit.

1        Yeah.  "To Boggs.  Drew Boggs was aware that Lawrence
2   maintained Styx's checkbook, and once instructed her to make
3   sure she kept it locked up."
4   Q.   Do you remember, was there an occasion in late 2009 where
5   South Carolina DOT became upset that -- or it was concerned
6   about how Styx had been reported as having performed on a job
7   in Kershaw County?
8   A.   Yes.
9   Q.   And, in fact, in that case did -- had a DBE report been
10  submitted?
11  A.   Yes.
12             MS. SUGAR:  If I can have one moment.
13             (Pause.)
14  Q.   (By Ms. Sugar:) All right.  I'm going to pull up Exhibit
15  173.
16        And is this a DBE report that was submitted on that
17  project?
18  A.   Can you turn it on?  It's not on here.
19        I'm sorry, repeat the question for me.
20  Q.   Is this a DBE report that was used on that project?
21  A.   In Kershaw County, yes.
22  Q.   And it reports $70,063.75?
23  A.   Yes.
24  Q.   And it's signed by Arnold Mann?
25  A.   Yes.

1   Q.   All right.  Now, if you could look at -- do you know that

2   Arnold Mann eventually was taken off that project and another

3   project manager named Ralph Hawkins went on it?

4   A.   Yes.

5   Q.   All right.  I'm going to pull up 194.

6        And is this an email from Kristy Lawrence to Ralph

7   Hawkins about that same job?

8   A.   Yes.

9   Q.   And this was after the date of that DBE report; is that

10  right?

11  A.   Yes.

12  Q.   And it says, We have met the goal for Styx and paid them

13  the $70,000.

14  A.   Yes.

15  Q.   In fact, looking at the check register, that is the

16  amount that had been run through the nominee account as

17  payment to Styx on this job; is that right?

18  A.   That's correct.

19  Q.   That is the number that is in the accounting system; is

20  that right?

21  A.   Yes.

22  Q.   Did -- this is Exhibit 195.

23       Did South Carolina DOT David Rogers reach out to Ralph

24  Hawkins and Arnold Mann and say that that DBE report had been

25  incorrect?

1  A.    Yes.

2  Q.    And if you could read the second sentence and the third

3  sentence of it.

4  A.    Yes.   "You will not receive credit towards your DBE goal

5  for using Styx Cuthbertson until the report is corrected and

6  submitted with the required documentation."

7  Q.    I'm sorry, if you could -- in the first -- if you could

8  read the first paragraph.

9  A.    The first paragraph, okay.   "The latest DBE quarterly

10  report for Styx Cuthbertson, file number 28.038324 for third

11  quarter 2009 is incomplete.  A DBE hauler must list all of the

12  other haulers they leased or subcontracted to perform work on

13  an SCDOT project.  According to our records, there was little,

14  if any, work performed directly by this hauler.  Also, they

15  are to submit copies of the lease agreements for each hauler

16  along with the quarterly report in accordance with their

17  contract and in accordance with federal regulations," and it

18  refers to 49 CFR 26.

19  Q.    So they were specifically told, these two project

20  managers, that how they had done the DBE reporting had been

21  wrong.

22  A.    Correct.

23  Q.    And they were told if there's subcontracting, you have to

24  tell me.

25  A.    Correct.

1    Q.    All right.  Now, I'm going to pull up Exhibit 196.

2          And this is an email from Ralph Hawkins to Drew Boggs

3    about that project.

4    A.    Yes.

5    Q.    And what does it say?

6    A.    It says, "Attached is the letter regarding Styx on the

7    Kershaw job.  Please add anything you feel that would help our

8    situation."

9    Q.    And looking at the draft letter, what does the first

10   paragraph say?

11   A.    "The third quarter 2009 DBE quarterly report for Styx

12   Cuthbertson Trucking Company, Inc., was submitted containing

13   erroneous information.  The amount paid for this project is

14   incorrect.  The individual responsible for preparing the

15   report is no longer employed by Boggs Paving, Inc."

16   Q.    Right.  It says that the report contained erroneous

17   information; is that right?

18   A.    Yes.

19   Q.    But had the report been prepared exactly how all the

20   other DBE reports had been prepared in the office?

21   A.    Yes.

22   Q.    And ultimately, did they say he hadn't -- he hadn't

23   actually hauled the asphalt, but then they did say, But he did

24   some plant hauls and that's what you should count?

25   A.    Yes.

1  Q.    And so they didn't say he had subbed any work, right?

2  A.    Correct.

3  Q.    All right.  Now, ultimately in the letter that was sent

4  to South Carolina DOT, I'm going to show you 197, there were

5  some edits made after that draft was sent by Ralph Hawkins; is

6  that right?

7  A.    Yes.

8  Q.    And have you noticed that Ralph Hawkins always writes in

9  upper case letters?

10  A.    Yes.  All of his emails are in upper case, yes.

11  Q.    So he says -- if you would read the subject of the email.

12  A.    Sure.  "Per our conversation yesterday, attached is the

13  letter that was mailed in December.  If you have any

14  questions, Drew Boggs, president of Boggs Paving, asked that

15  you give him a call.  Have a nice weekend."

16  Q.    And this is the actual letter that was sent?

17  A.    Yes.

18  Q.    And it still said that that DBE report was submitted

19  containing erroneous information?

20  A.    Yes.

21  Q.    And it said the amount paid was incorrect?

22  A.    Yes.

23  Q.    And that's even though that was exactly from the records

24  of Boggs Paving?

25  A.    Yes.

1 Q. And all of this happened in late 2009?

2 A. Yes.

3 Q. And it said the individual responsible for preparing the

4 report is no longer employed here?

5 A. Yes.

6 Q. And that it claimed that he hadn't done the work he was

7 supposed to do, but plant hauls should be counted?

8 A. Yes.

9 Q. All right. Now, did the process of running payments

10 through Styx continue after 2009?

11 A. Yes.

12 Q. Were they still counting all of the work that was run

13 through the nominee account after this point?

14 A. Yes.

15 Q. So Drew Boggs was certainly aware of how payments were

16 attributed to Styx, at least by the time of this 2009 letter,

17 wasn't he?

18 A. Yes.

19 Q. Now, Mr. Bell talked to you about plant hauls. When you

20 were interviewing some of the witnesses in this case and, in

21 fact, in some of their factual bases, did they tell you that

22 it was decided to start putting Styx on more plant hauls so

23 DOT wouldn't be able to notice when he wasn't on projects as

24 much?

25 A. Correct.

1    Q.    And did you review the plant hauls -- did you review the

2    plant haul codes in the check register detail to see what was

3    attributed to Styx as plant hauls?

4    A.    Yeah.   Anything that had a 9000 level was a plant haul.

5    Q.    And was there any way from the records to determine

6    exactly which job plant hauls would be counted to?

7    A.    No.

8    Q.    So there's no records that they kept that said this

9    quarter this job, this is what this haul goes to.

10   A.    Correct.

11   Q.    It all just went to a blanket 9000 number.

12   A.    Yes.   There were four of them from the different plants.

13   It may be more before.   But each plant had its own 9000

14   number.

15   Q.    All right.   I'm going to show you what's marked as

16   Government's Exhibit 5.

17        And is this a summary of the plant hauls attributed to

18   Styx in 2009, 2010, and 2011?

19   A.    Yes.

20   Q.    And does it go up substantially during that time period?

21   A.    Yes.

22   Q.    And does that match what those witnesses had told you

23   about changing over to plant hauls in order to make it harder

24   to track where Styx was supposed to be?

25   A.    Correct.

1   Q.   And did you actually look -- you did actually go through

2   the check register and see when those invoices that Styx had

3   done for plant hauls happened; is that right?

4   A.   That is correct.

5   Q.   And in 2011 there wasn't even 72,000 worth of plant

6   hauls.  That was just run through the nominee account, right?

7   A.   Yes.

8   Q.   That was work done by someone else.

9   A.   Yes.

10  Q.   Okay.  Looking at the next page, is this a spreadsheet

11  you did showing by year the use of off-site hauling for Styx

12  invoices?

13  A.   Yes.

14  Q.   And it dramatically goes up during the time period where

15  DOT seems to be more focused on Styx's role?

16  A.   Yes.

17  Q.   And you can even break it down by quarter; is that right?

18  A.   That is correct.

19  Q.   So you'd have to be able to look at the quarter the DBE

20  was reported and match it up for plant hauls; is that right?

21  A.   Yes.

22  Q.   And there was just no way in the records that you could

23  do that; is that right?

24  A.   Correct.

25  Q.   And it also -- you don't just have to look for plant

1  hauls, you have to look for locations; is that true?

2  A.   Yes.

3  Q.   So there's different plants that are different locations.

4  So you'd also have to know whether the job was near a

5  particular plant in order to attribute the plant haul to any

6  particular job; is that right?

7  A.   Correct.

8  Q.   Now, you can't -- the contract specifications -- or the

9  DBE committal for Styx, it listed particular project lines

10 that he was going to work on; is that right?

11 A.   Correct.

12 Q.   And a lot of the time he wasn't even listed as having

13 performed -- as being signed up to perform plant hauls; is

14 that right?

15 A.   Correct.

16 Q.   So he should have been doing the actual specifications in

17 the contract, not just -- or it would have to be told to DOT

18 if there was a change in what he was doing.

19 A.   Yes.

20 Q.   You had indicated that you didn't recall the job numbers

21 of the small business jobs obtained in Styx's name.

22 A.   Correct.

23           MR. BELL:  Ms. Sugar, that's not up over here.  I'm

24 sorry.

25           MS. SUGAR:  Every time I hit it.

1        MR. BELL:  I'm not blaming you for anything.

2        MS. SUGAR:  I'm sorry.

3        Okay.  There we go.

4   Q.   Does paragraph 41 of the indictment, is that one of the

5   small business jobs, job -- Boggs job 3166?

6   A.   Yes.

7   Q.   All right.  And is paragraph 42, the other small business

8   job was Boggs job 3194?

9   A.   Yes.

10  Q.   With regard to the Monroe bypass, that's not included in

11  our numbers, but did you actually get testimony from

12  co-defendants in this case who said at the time that he was --

13  that Styx was written in on that bid, no one actually thought

14  he was going to do that work?

15  A.   Yes.

16  Q.   Are you familiar with the charges in this case?

17  A.   Yes.

18  Q.   And one of the charges is concealment money laundering

19  conspiracy?

20  A.   Yes.

21  Q.   And to your knowledge, has -- have two of the defendants

22  pled guilty to that?

23  A.   Yes.

24  Q.   And does the concealment money laundering relate to the

25  use of the Styx nominee account?

1  A.    Yes.

2  Q.    How much went through that account?

3  A.    I'm sorry, say that again.

4  Q.    What was the total amount that went through that Styx

5  account?

6  A.    I believe it was -- if we could bring back up the

7  exhibit, I could tell you; but I believe it was $7 million,

8  the total amount that went through the account.  I think it

9  was $7 million or approximately around $7 million.

10 Q.    And are you familiar with -- all right.  This is from

11 document 130, the factual basis of -- the factual basis of

12 Styx Cuthbertson.  If you could read the last sentence of

13 paragraph 12.

14 A.    Sure.  "The Styx nominee account was opened at the

15 direction of Boggs Paving."

16 Q.    And this account wasn't at the location where Styx's

17 regular business account was, was it?

18 A.    That is correct.

19 Q.    Whose business accounts were there?

20 A.    Boggs and its affiliates.

21 Q.    And we saw that the statements were mailed to the

22 attention of Boggs Paving CFO Kevin Hicks; is that correct?

23 A.    Correct.

24 Q.    Now I'm going to call up Exhibit 7.

25       Who is Mike Moore?

1    A.    He's the former CFO of Boggs Paving.

2    Q.    And before the statements were sent -- and this is just

3    the regular mailbox for Boggs Paving; is that right?

4    A.    I'm sorry, I can't see.

5    Q.    P.O. Box 1609.  That's where Boggs Paving --

6    A.    Yes.

7    Q.    -- got its mail, right?

8    A.    That is Boggs' P.O. Box, yes.

9    Q.    And this lists the prior CFO Mike Moore as the person who

10   should get these statements; is that right?

11   A.    Correct.

12   Q.    And you talked to Mr. Moore; is that right?

13   A.    Yes.

14   Q.    All right.  And I'm going to put up Exhibit 8.

15         And is this a statement from that same BB&T account?

16   A.    Yes.

17   Q.    And it went to the Boggs Paving mailing address, right?

18   A.    Correct.

19   Q.    And who's Peggy Taylor?

20   A.    She's the former former CEO or the CEO before --

21   Q.    CFO.

22   A.    CFO, I'm sorry, of Boggs Paving.

23   Q.    Now, there's a subpoena issued to Styx Cuthbertson in

24   this case; is that right?

25   A.    Yes.

CORRY NOEL - REDIRECT

1  Q.   And he had very limited records; is that right?

2  A.   That is correct.

3  Q.   And his sister told you that you'd have to go to Boggs

4  for the records, right?

5  A.   Correct.

6  Q.   And have -- with the exception of the JT Russell job and

7  then the jobs that were, say, Anderson Columbia but Boggs

8  operated, did you see any instances where Styx did DBE work

9  for anyone other than Boggs Paving?

10 A.   Not that we saw, no.

11 Q.   And he had a separate lumber truck, right?

12 A.   Yes.

13 Q.   That was not used for DBE, was it?

14 A.   Correct.

15 Q.   Now, with regard to JT Russell, did the investigation

16 reveal that employees of Boggs Paving were actually providing

17 the information to be used in the DBE reports to JT Russell on

18 that project?

19 A.   Yes.

20 Q.   During interviews with employees of Boggs Paving in

21 preparation for this case, did they tell you whether or not

22 Styx Cuthbertson even reviewed the contracts before signing

23 them?

24 A.   No, they said he didn't review them.

25 Q.   Was there actually questions raised about whether he was

1  even literate?

2  A.    Correct.

3  Q.    Were there any records you got from the subpoena of Styx

4  Cuthbertson that indicate that he even knew what jobs he was

5  signed on to at any given time?

6  A.    He -- no, we didn't see any records from him that showed

7  he knew what was going on with the projects he was on.

8           MS. SUGAR:  Nothing further.

9           THE COURT:  We're going to take a break right now

10  before we finish cross examination.  I know you'll have more.

11  But it's going to be until -- we're almost -- we're getting

12  close to two hours so we're going to take a 15 minute break,

13  and maybe that will help everybody organize as we move

14  forward.  We're two hours into this and we're still on the

15  first witness.

16           All right.  Thank you.

17           (Brief recess at 11:20 a.m.  Court back in session

18  at 11:36 a.m.)

19           THE COURT:  Okay.  We're ready for cross

20  examination.

21           MR. BELL:  Thank you, Your Honor.  I have very

22  little.

23                     CORRY NOEL

24                RECROSS EXAMINATION

25  BY MR. BELL:

1  Q.   Agent Noel, I've asked Ms. Sugar to pull up Government's

2  Exhibit 137.

3          MR. BELL:  And I don't know which page of this,

4  Ms. Sugar.  It's the one with the check that you asked him

5  about the signature.

6          MS. SUGAR:  That's 138.

7          MR. BELL:  Oh, okay.  My mistake.

8          MS. SUGAR:  This is the same check, but this is the

9  signed one.

10          MR. BELL:  That's the one.  Thank you.

11  Q.   (By Mr. Bell:) Agent Noel, that Exhibit 138, this check

12  from Boggs Paving, you were asked who signed that check and

13  you said Drew Boggs.  Do you see that that's a signature stamp

14  or a printed signature?  It's not an actual handwritten

15  signature.

16  A.   It could be.

17  Q.   Okay.  Are you aware through your investigation that

18  there was a signature stamp for Drew Boggs?

19  A.   Yes.

20  Q.   And that it was kept by Kevin Hicks?

21  A.   Yes.

22  Q.   Okay.  And let me ask you one other thing.  On this

23  Exhibit 5 which talks about plant hauls.

24  A.   Yes.

25          MR. BELL:  I want to look at your chart.  We can

1   just look at page 2, that would be good enough.

2   Q.   And your testimony was it's your opinion and suspicion,

3   whatever, that the increased use of plant hauls was related to

4   the DOT investigation, right?  Is that essentially what you

5   were saying?

6   A.   Yes.

7   Q.   Okay.  Are you aware that a Boggs related entity named

8   Buckhorn opened a quarry in South Carolina and it got sort of

9   up and running in 2009?

10  A.   Yes.

11  Q.   And are you aware that before that quarry was opened,

12  they were buying a lot of their rock from Martin Marietta, its

13  quarry?

14  A.   I don't know it for a fact.  I don't know.

15  Q.   Okay.  Well, would you accept if I tell you that that's

16  where the rock was coming from the time in the plant was

17  actually inside the quarry so there really weren't any rock

18  hauls?  I mean, it was set up like 50 feet away.

19  A.   If that's what you're saying.  If that's what it is, it's

20  what it is.

21  Q.   Could it be instead of a reaction to a DOT investigation

22  and an attempt to hide what haulers were doing by using plant

23  hauls, that the better explanation is that now Buckhorn's

24  providing the stone and they're having to have everybody,

25  whether it's Cuthbertson or Boggs Trucking or Blue Max or

1  anybody else, they're having to haul the aggregate, the rock,

2  from that new quarry to all of their plants, some even as far

3  as 90 miles away?  Could that explain why they started using

4  plant hauls for DBE and other reporting purposes?

5  A.   But you said they started in 2009, correct?

6  Q.   Correct.

7  A.   Well, the spike was not until 2011.

8  Q.   Right.  And I'm not trying to be unfair about it.  It was

9  open and then, of course, its use increased until the demise

10 of most everything in this case.  But I'm just asking in your

11 opinion, is it possible that that's the explanation?

12 A.   No, because that's not what the Boggs employees told us.

13 Q.   Right.  Yeah, I know a lot of people said a lot of

14 things.  I'm asking about what the actual facts are and the

15 correlation of, you know, what we know to have happened, the

16 opening of the quarry and then -- because you know from

17 looking at records that plant hauls by all haulers increased

18 during this time period from that plant -- I mean, excuse me,

19 from that quarry to all the Boggs plants all over the two

20 states.

21 A.   In 2009 or 2011?

22 Q.   Both.  '09, '10, '11, '12.

23 A.   But the spike didn't start until 2011.

24 Q.   All right.

25 A.   But the plant opened in 2009.

1  Q.   I don't think we're going to come to an understanding on

2  this so I'll just let it go.

3  A.   All right.

4           MR. BELL:  That's all I have, Your Honor.

5           THE COURT:  Anything else?

6           MS. SUGAR:  Yes.

7                    REDIRECT EXAMINATION

8  BY MS. SUGAR:

9  Q.   Let me just really briefly, I'm going to put up Exhibit

10  3 --

11           THE COURT:  Please briefly.  This is the third time

12  around.

13           MS. SUGAR:  Just this one thing.

14  Q.   Exhibit 3, page 3.

15       And then on this side I'm going to put up 138.  Do you

16  see on the right that's actually -- on the left side, is that

17  what you understand to be the Drew Boggs stamp?

18  A.   Yes.

19  Q.   And that's not the same as the actual signature that's on

20  the --

21  A.   Correct.

22  Q.   -- check on the right?

23  A.   Correct.

24           MS. SUGAR:  All right.  That's all.

25           THE COURT:  Mr. Bell, do you want to say anything?

1       MR. BELL:  No, you can look at it.  We can all look
2   at it and see what it is.
3       THE COURT:  All right.  Okay.  You can come down.
4       (Witness stepped down.)
5       THE COURT:  Call your next witness.
6       MR. SAVAGE:  Yes, Your Honor.  The United States
7   calls Ms. Marcena Wright.
8       MARCENA WRIGHT, GOVERNMENT WITNESS, SWORN,
9                   DIRECT EXAMINATION
10  BY MR. SAVAGE:
11  Q.   Good morning.
12  A.   Good morning.
13  Q.   Could you please state your name for the record and
14  please spell your first name.
15  A.   Marcena Wright.  M-a-r-c-e-n-a.
16  Q.   Okay.  And Wright is W-r-i-g-h-t; is that correct?
17  A.   Correct.
18  Q.   Ms. Wright, how are you employed?
19  A.   I am the director of the Office of Equal Opportunity and
20  Work Force Services for the North Carolina Department of
21  Transportation.
22  Q.   What are some of the roles and responsibilities you
23  perform in that job?
24  A.   As the director I am also the DBE liaison officer, the
25  Disadvantaged Business Enterprise liaison officer.  I am the

1  director of six programs related to equal opportunity, the

2  whole civil rights program for the NCDOT.

3  Q.   Okay.

4  A.   That includes the DBE program.

5  Q.   And who do you report to?

6  A.   I report to the chief deputy secretary of transportation.

7  Q.   And tell me a little bit about your education and

8  training and experience that allows you to do this job.

9  A.   I began working with the DBE program in 2005.  So I have

10 ten years' experience as a DBE program manager.

11 Q.   Okay.  And to be fair, that was not all in North

12 Carolina, was it?

13 A.   No.  It started in Ohio.

14 Q.   Okay.  And were there some similarities between the Ohio

15 program and the North Carolina program?

16 A.   Yes.  The DBE program is a federal program and so the

17 rules that apply in 49 CFR, Part 26 apply to all state

18 transportation agencies.

19 Q.   But to be fair, as we've heard, there are some

20 differences between the various states, are there not?

21 A.   There are some, usually in their contract provisions.

22 Q.   Well, let's talk about the DBE.  The DBE as defined in

23 the CFR and as it's understood in North Carolina, what is it?

24 What is the program?

25 A.   A disadvantaged business enterprise is a firm that is

1    certified through the state transportation agency as a small
2    and disadvantaged firm.  By disadvantaged, it means that the
3    firm is both socially and economically disadvantaged.  And
4    those -- those firms are eligible to participate in the
5    program.
6    Q.    So what makes a firm socially or economically
7    disadvantaged?
8    A.    The economic disadvantage is proved in two ways, and both
9    must be proved by the applicant.  The owner or owners must
10   have a personal net worth of less than $1.32 million.  The
11   firm itself must be a small business as defined by the Small
12   Business Administration.  There's a table related to each
13   industry.  But in no case can a firm exceed $23.98 million for
14   a three-year average of gross annual receipts.
15   Q.    Okay.
16   A.    And that's what defines economic disadvantaged.
17   Q.    How about the social aspect of that?
18   A.    The social aspect is proved when the applicant submits
19   for the owner or owners upon whom they're relying for
20   disadvantage in this program an affidavit of disadvantage.  In
21   this case, a woman is presumed -- rebuttably presumed to be
22   disadvantaged and a minority as defined in the Code of Federal
23   Regulations.
24   Q.    Now, why go to all this trouble?  I mean, what is the
25   purpose of identifying socially and economically disadvantaged

1  companies when it comes to the Department of Transportation?

2  I mean, you're all about building roads.

3  A.   Well, the DBE program applies to all transportation

4  administrations, including federal highway.  But to be

5  specific about why this program was created, it was created to

6  address past discrimination.  It was designed to create a

7  level playing field for small and disadvantaged firms in

8  gaining access to these public contracts which are paid for by

9  the people.

10 Q.   In your experience as a DBE both in North Carolina and

11 Ohio, were there any studies done as to whether or not a set

12 aside of a certain percentage of public money for smaller or

13 disadvantaged firms is -- works?

14 A.   There are, in fact, a number of studies.  And all of the

15 state transportation agencies across the nation that have a

16 DBE program that sets a goal, it's not a set-aside but a goal,

17 when they set a goal, it's usually based on a disparity study,

18 and that is the case in North Carolina.

19 Q.   So if the State of North Carolina didn't have a DBE

20 program, would -- in your experience, would smaller and

21 disadvantaged companies be able to participate in the huge

22 amounts of money that are spent on our roads, bridges, and

23 transportation systems?

24 A.   According to all the disparity studies I've seen and

25 read, these small and disadvantaged firms do not get

1  opportunities on these contracts without the implementation of

2  a program that's designed to address that discrimination that

3  takes place.

4  Q.   Well, the program, you say, is designed to help -- make a

5  level playing field.  How does it help the economy overall, if

6  at all, by giving, say, certain companies an edge over certain

7  other companies?

8  A.   I'm sure that you may have heard that small businesses

9  employ a lot of people and these particular businesses, if for

10  no other advantage, they employ at least one person, the owner

11  of the business.  But when they became moderately successful,

12  they employ additional people.  And of course, every state is

13  facing that issue of making sure that the fullest number of

14  people are employed.  So these programs offer not only the

15  opportunity for entrepreneurialship, but also for jobs.

16  Q.   Well, particularly in North Carolina, we have different

17  regions of our state that are more successful or more

18  economically prosperous than others.  Do you find that this

19  program has a greater or lesser impact depending on what

20  region of the state is contracting?

21  A.   There can be regional differences in the number of

22  disadvantaged firms that are available to do the work.  There

23  can be other aspects of this program with regard to creating

24  jobs on projects.  And this program is designed to address

25  both issues with regard to their inequitable access.

1  Q.   So the people in, say, a rural county might expect that

2  some people -- that contractors and workers in their county

3  might actually share in some of the huge amounts of money that

4  might be spent on an interstate highway or airport runway or

5  something like that?

6  A.   Certainly.   And we measure that.

7  Q.   Well, how is it -- you mentioned some of the

8  requirements.   How is it that you get out the word about how

9  to be a DBE in North Carolina?   What sort of information

10  systems do you have and how do people know how to get into the

11  program?

12  A.   We have an extensive outreach program.   We do this with

13  public information sessions.   We do this through the outreach

14  and prebid process, making sure that firms that are eligible

15  to be certified in the program know how to apply and how to

16  get certified.   We work with those firms to make sure that

17  they are able to submit a complete package for certification.

18  We do this through all of the sub recipients of federal funds

19  as well with their outreach programs.

20  Q.   And do you talk to prime contractors about the DBE

21  program?

22  A.   On a regular basis, yes, we do.   We provide education

23  both in public information sessions and we also meet with

24  contractors one on one when they require assistance in

25  acquiring DBEs to work on their projects.

1  Q.    How does a company become a DBE in North Carolina?

2  A.    The company must apply through the North Carolina

3  Department of Transportation Unified Certification Program.

4  Q.    Now, you mentioned before that this isn't a set-aside.

5  It's a goal program.  It's not a handout.

6  A.    Correct.

7  Q.    Okay.  What do you mean goals?  Can you explain that to

8  the Court.

9  A.    Well, in the statute, in the Code of Federal Regulations,

10  there's a statutory goal of 10 percent.  But in order for a

11  state transportation agency to set an overall goal for their

12  program -- and, of course, we're required to do that -- there

13  has to be evidence of the discrimination that we refer to.  In

14  the case of North Carolina, we do that through conducting a

15  disparity study every five years to verify whether or not this

16  program and setting an overall goal is still necessary.

17  Q.    Okay.  Have your studies found that it's still necessary?

18  A.    Yes.  The most recent study was completed in 2014 and it

19  still showed that there was a disparity.

20  Q.    Okay.  Now, there's a concept called certification with

21  respect to DBEs.  What is certification and what does it give

22  a DBE?

23  A.    Certification is a program that has both rights and

24  responsibilities.  The DBE applicant must submit a complete

25  package which includes the DBE application, their supporting

1  documents, including tax and financial documents, lists of

2  their equipment, lists of their employees.  And then they are

3  visited by one of our certification officers at the principal

4  place of business to verify their statements in their

5  application.

6  Q.   Then there's a thing called prequalification.  Is that

7  what you're talking about with the certification process?

8  A.   No, I'm not.  That is a separate process.

9  Q.   What is prequalification?

10 A.   Prequalification is that firm's ability to do work on a

11 transportation or highway project.  It is handled by a

12 completely different department and the two are not tied

13 together.

14 Q.   Okay.

15 A.   We cannot require prequalification in order to become a

16 certified DBE.

17 Q.   So even though you're certified, that doesn't mean you

18 can just go out and do any job?

19 A.   Correct.

20 Q.   Tell us about prequalification.  What does that involve?

21 A.   I am not as familiar with the prequalification process.

22 Q.   Okay.

23 A.   It is handled through our division of highways and it

24 determines the capabilities of that firm to perform the work.

25 Q.   Okay.  Now, if you have a DBE, and say it's a highway

1  contract, they're certified and prequalified, how is it that

2  they get a contract?

3  A.   The DBE may obtain a contract in two ways.  They can

4  become a bidder and bid on the project to do the work solely

5  by themselves.  Or they may provide a quote to a bidder that's

6  listed in the bidding documents and provide a quote and become

7  a subcontractor.

8  Q.   Okay.  And that would be -- when you say a "bidder," that

9  would usually be the prime contractor?

10  A.   Yes, those are considered prime bidders.

11  Q.   So the prime can bring their own DBE, that's one way, or

12  the prime can go on a list of people who are certified and

13  prequalified that you maintain and they can access.

14  A.   I am not comfortable with the concept of the prime can

15  bring their own DBE.

16  Q.   Okay.  Well, what -- how would you say it?  Can they

17  contract with their own DBE?

18  A.   A prime contractor may look at the DBE directory and the

19  list of prequalified firms and select from those or they may

20  write to all of them and solicit bids from all of them.

21  Q.   Okay.  Thank you.  Now, once the prime contract -- the

22  prime contractor submits the bid, is there a component of that

23  bid that relates to the DBE part?

24  A.   Absolutely.  The prime contractor must provide a DBE

25  utilization report that lists the DBEs and the type of work

MARCENA WRIGHT - DIRECT

1   that they're to do and the amount awarded to them.

2   Q.   Now, that's -- that's an estimate of what they can do in

3   the sense of things can happen on the job, right?

4   A.   And you know, it may not turn out exactly the way the

5   bidder plans for a number of reasons that are all inherent to

6   contracting.

7   A.   Changes can occur.

8   Q.   When the bid is accepted and the DBE part comes in, is

9   there a contract or a standard contract that governs that?

10  A.   Yes.

11  Q.   Okay.  Let me show you what has been marked as

12  Government's Exhibit Number 6.  And I'll show you the first

13  page.

14       Do you recognize that type of document?

15  A.   Yes, this is a...

16  Q.   And there's usually some standard language.

17            MR. SAVAGE:  And I'm going to ask Ms. Sugar if she

18  can go to page 5 of that, it's actually 33357.

19  Q.   And I'm going to ask the witness, are you familiar with

20  the language and the provisions in this contract that begin

21  with that page?  We'll make that a little larger for you.

22  A.   Yes, these provisions are part of our special provisions

23  for NCDOT.

24  Q.   Okay.  Just looking at the first paragraph, you mentioned

25  a code of federal regulation and all that.  Is that what you

1  were referring to?

2  A.   Yes.   That's the policy.

3           MS. SUGAR:   Okay.   And just scrolling down.   And the

4  Court can read this for itself.   I'm not going to read it at

5  this point.

6  Q.   There are very specific things about who does what and

7  what the definitions are.   All of that.

8  A.   Yes.

9  Q.   Okay.   And this is in a contract that's signed by the

10  prime contractor.

11  A.   Yes.

12  Q.   They get a copy of this.

13  A.   Yes.

14  Q.   Okay.   And then going to the next page which would be

15  33358.   If you go down and we'll scroll down to the part, it

16  talks about the contract goal.   And I think there was some

17  testimony earlier today and also we talked about, in this case

18  what's the contract goal for this contract?

19  A.   This has a 7 percent DBE goal.

20  Q.   And what does that mean?

21  A.   It means that the contractor must demonstrate good faith

22  efforts to meet that goal.   The classic demonstration of good

23  faith effort is meeting the goal.   If the contractor falls

24  short of that goal, then they must take certain actions that

25  are also listed in the code to meet the goal.

MARCENA WRIGHT - DIRECT

1    Q.   Okay.  And then if we go -- keep scrolling and go through
2    the next page, there is -- there are a number of things that
3    have to do with how a DBE subcontracts, whether their bids are
4    electronic or paper, things that they have to fill out.  Just
5    different paperwork that has to be done to show that they're
6    going to do what they say they're going to do; is that right?
7    A.   Yes.
8    Q.   Now, we've heard a lot of talk today about what counts
9    towards a DBE goal.  And that's no mystery, is it?
10   A.   It's written in all of the documents.
11   Q.   Right.
12   A.   All the contracts.
13   Q.   And in particular, we're looking at page 8 of this
14   contract.  It's just laid right out there, isn't it?  It's the
15   total dollar of the value of the participation of the DBE.
16   And it says, if we go -- for instance, what are some of the
17   things that are counted towards that participation?
18   A.   Well, probably the most obvious point is the commercially
19   useful function.  These are expenditures to the DBEs when
20   they're performing a commercially useful function and the work
21   on this particular contract.
22   Q.   Okay.  Now, have you ever heard it said, Well, it's just
23   easy to fake it?  You know, you can just have a woman in
24   charge of a company and then it's really the husband who's
25   running it.  It could be -- somebody could be a minority and

1  simply contract all the work out to somebody else.

2      Do you pay attention to those things?

3  A.   We do.  And two aspects of our program.  The first, of

4  course, is during the certification process, the owner or

5  owners are interviewed extensively for their expertise, their

6  management and control of the firm.

7      And then when the firm is certified and in the field, we

8  have field personnel that examine the work of those DBEs, that

9  they are performing commercially useful functions.

10  Q.   And if we can go down to the next paragraph in this.

11     It talks about specifically in this contract, and this

12  happens to be a road contract, that -- how DBEs might enter

13  into subcontracts.  So that's spelled out as well.

14  A.   Yes.

15  Q.   Okay.  More than that, there are specific things that the

16  Department of Transportation requires if the DBE is a trucking

17  firm.  And why is it that you have, like, these special

18  requirements for trucking firms?

19  A.   The rules regarding trucking firms are designed so that

20  the small and disadvantaged business that's certified as a DBE

21  is playing on a level playing field.  These are small firms.

22  And in order to make sure that we have each firm performing a

23  commercially useful function, we had to set up a series of

24  rules.  A trucker that has only one truck or six trucks, we

25  want them to be able to have access to these kinds of public

MARCENA WRIGHT - DIRECT

1   contracts.  And so we set up rules for the ways in which they
2   can increase their capacity by subcontracting with other DBE
3   contractors.
4   Q.   Well -- and I'm going to ask you just to read the
5   subparagraph A.  I'm not going to ask you to read the whole
6   contract.  But if you could just read that particular
7   provision, 3A.
8            MR. BELL:  Which page are we on, Mr. Savage?
9            MR. SAVAGE:  We're on page 9.  It's Bates 361.
10           MR. BELL:  Thank you.
11           THE WITNESS:  "The DBE shall be" --
12   Q.   Oops.
13   A.   It's moving.
14   Q.   There you go.
15   A.   "The DBE shall be responsible for the management and
16   supervision of the entire trucking operation for which it is
17   responsible on a particular contract, and there shall not be a
18   contrived arrangement for the purpose of meeting DBE goals."
19   Q.   And what's the meaning of "contrived arrangement" in this
20   contract?  Or how do you understand contrived when you're
21   policing your program?
22   A.   Contrived can mean -- it can be evidenced in a number of
23   ways.
24       The DBE may have only two trucks and on the day that they
25   show up for the work, there are suddenly 16 trucks on the job.

1  They may have a verbal arrangement with regard to utilizing

2  those trucks.  And that's not allowed in the program.

3       They can be actually subcontracting to non-DBEs and

4  that's not allowed in the program.

5       So there are a number of ways that contrivance can be

6  evidenced.

7  Q.   Okay.  And just scrolling down, there's -- for instance,

8  it addresses one of the key things here and that's the DBE can

9  lease trucks from a non-DBE firm, but it has to lease them and

10 it's entitled -- and it's not going to get credit for all of

11 those things if it leases -- if it -- if it leases from a

12 prime, for instance.

13 A.   Correct.  Probably the best way to illustrate is if a DBE

14 has two trucks and they subcontract to a non-DBE for the same

15 number of trucks, that addresses this aspect of the law.  In

16 this way they do not exceed the value of the transportation

17 services that the DBE is providing.  So that would be allowed.

18      But if they tried to -- if they owned only two trucks and

19 leased four, then that would not be allowed for a non-DBE.

20 Q.   Okay.  And there is this concept of 50 percent; is that

21 correct?  The control issue.

22 A.   I'd like to put it more like two for two.  If you own

23 two, you can subcontract for two.

24 Q.   Okay.

25 A.   If you go beyond that, it doesn't mean you can't do it.

MARCENA WRIGHT - DIRECT

1  It means it cannot be counted towards the goal.  And I think
2  that's an important distinction.
3  Q.   So you have two trucks.  You go back to the prime -- to
4  use an example, if you have a company that's a DBE called Styx
5  and you have two trucks and you have a prime that's called
6  Boggs and they have 20 trucks.  You use 20 of their trucks and
7  two of yours, that doesn't count.  Only the two trucks count.
8  A.   Only the two trucks.
9  Q.   Count.  Thank you.
10 A.   Yes.  You can only double your capacity.
11 Q.   Now, we mentioned earlier that --
12       THE COURT:  Fourteen of them don't count.  I
13 understand.
14       MR. SAVAGE:  Yes, Your Honor.
15       THE COURT:  Fourteen of them don't count.  I
16 understand.
17       MR. SAVAGE:  Thank you, Judge.
18 Q.   Let me go to the next part about kind of the good faith
19 and we'll hit that quickly.
20      On the next page, which is page 10 -- can you go back.
21 We talk about, like, things don't always work out the way
22 people plan when they're building something as complex as a
23 road.  How do you work with primes to make sure that they get
24 their job done, your goals are met, and the road gets built?
25 A.   In our office we routinely receive requests from prime

MARCENA WRIGHT - DIRECT

1  contractors when they have a situation where a DBE is either

2  not performing or is no longer available.  A delay in a start

3  of a project, for instance, might mean that that DBE that was

4  submitted with the bid may be otherwise engaged.  When that

5  happens, our office is contacted.  And, of course, our DBE

6  directory is a public directory and it's available to anyone

7  where they can select a new DBE to take the place of the one

8  that they were counting towards the goal.  And that request

9  comes to NCDOT and is approved by NCDOT prior to the new DBE

10  doing any work.

11         MR. SAVAGE:  And if we can go to the next page of

12  this contract, page 12 I think it is.

13  Q.   It talks about that in the contract, right?  How you fix

14  that.

15  A.   Yes.  This process is well-known.

16         MR. SAVAGE:  I think the judge gets the idea.

17  Q.   Working on to page 13, it talks about how the changes in

18  work can affect DBEs.  And then it starts to talk about

19  reporting.

20         MR. SAVAGE:  And if we could go to page 14 and then

21  talk specifically about how reporting is done for

22  Disadvantaged Business Enterprise participation.

23  Q.   Now, how important is this reporting to the program

24  you're trying to run?

25  A.   The reporting is essential.  We are required to report to

1  all three transportation administrations on any DBE
2  participation.  We report twice a year to the Federal Highway
3  Administration on the number of DBE contracts awarded, the
4  number of dollars actually paid to DBEs.  That information is
5  submitted by the Department of Transportation to Congress so
6  that it shows the effectiveness of the program.  So the
7  reports are essential.
8  Q.   If the reporting is not maintained and it doesn't have
9  integrity -- in other words, if the State of North Carolina
10 doesn't maintain a program with checks and balances and
11 accurate reporting, are there -- are there penalties to North
12 Carolina as a result of that?
13 A.   Yes.  In 49 CFR, Part 26 it describes the responsibility
14 for the state transportation agency to provide the reporting.
15 And a failure to report certainly could jeopardize the funding
16 for the program.
17 Q.   And the reporting is done not just when the bid is done,
18 is it?  Are there different reports that are made along the
19 way as the money is dispensed?  It's not just you create a
20 company on the day of the contract and then you pay them at
21 the end and they can do whatever they want.  Are there interim
22 payments and checks and balances as the contract is let out,
23 as the contract is worked out?
24 A.   Yes.  We review the payments and contract awards in the
25 program on a monthly basis.  We report to our governing bodies

1  quarterly and then, of course, to the federal government every

2  six months.

3  Q.    Okay.  I think that's enough of that contract.

4       You talked about inspections.  What do you mean by

5  inspections?

6  A.    We have contract compliance officers that go out into the

7  field.  Of course, all of the NCDOT personnel that are

8  involved in the project keep their eyes and ears open for the

9  activities on the project.  And there are inspectors for the

10  quality of the work.  But we have separate officers that go

11  out and inspect the role of the DBE in the contract.

12  Q.    Well, what happens if your inspectors suspect that

13  there's fraud or that somebody is not reporting accurately?

14  What happens?

15  A.    When there is a suspicion of fraud or a report of fraud

16  or a complaint about fraud, we have an investigatory process.

17  We have investigators that review everything concerned with

18  that project and with that DBE and provide an investigation

19  report.

20  Q.    What are some of the penalties or steps that can be taken

21  if you find that a DBE or a prime has been engaged in fraud?

22  A.    Well, I think it's important to remember the contract

23  actually states these requirements with regard to compliance,

24  and so this could be a breach of contract and it can actually

25  cancel the contract.  That is one of the penalties that could

1  take place.

2  Q.   Is there a suspension process?

3  A.   There are several other sanctions that are possible with

4  regard to a failure to comply with a DBE program and

5  suspension is one of them.  Debarment is one of them.  There

6  can be a debarment for a period of time or there can be a

7  permanent debarment.

8  Q.   Now, if a contractor, a prime contractor is debarred or

9  disqualified, a prime, what happens to -- are they allowed to

10  bid on future contracts?

11  A.   No.

12  Q.   Okay.  What happens to the contracts that have already

13  been let?

14  A.   They continue.

15  Q.   For instance, if a contract had been applied for, for,

16  say, a project like the Monroe bypass, and it had been let

17  while the contractor and the prime was qualified and

18  certified, just because they've been debarred, disqualified,

19  and decertified does not mean that they cannot work on that

20  contract because it's already been let.

21  A.   That's correct.

22  Q.   Thank you.  Let me talk about the damage.  What damage

23  does DBE fraud create to your program?

24  A.   Well, I go back to the purpose of the program.  It is

25  designed to address past discrimination.  It's designed to

MARCENA WRIGHT - DIRECT

1   level the playing field so that small and disadvantaged firms
2   have an ability to compete fairly for these opportunities.
3   And one of the primary purposes of our goal in the program is
4   to ensure that only eligible firms receive the benefit of this
5   program.  When we have our secretary of transportation sign
6   the assurances with regard to receiving federal funds, that is
7   part of our responsibility to make sure that only eligible
8   firms receive the benefit of these dollars.
9   Q.   Well, let me ask you to maybe quantify this in terms of,
10  first of all, your percentages.  Let me give you a
11  hypothetical.
12       Say you have a hypothetical where a DBE and a prime have
13  cheated only on federal contracts and maybe not state
14  contracts.  Does that give you any assurance that only half of
15  the -- half of the program is damaged?
16  A.   Well, in North Carolina our program for contract
17  compliance includes all contracts and so we have the same
18  checks and balances for state funded projects as we do for
19  federal projects.  And so this might cause us to take a closer
20  look at those contracts for a contractor at both levels of
21  government.
22  Q.   If you find that a contractor has lied and cheated and
23  provided false documentation with respect to federal
24  contracts, would you rely on the integrity of their filings in
25  other cases?

1  A.    They would require close scrutiny and an investigation.

2  Q.    In terms of dollars, minority contracts, these contracts

3  are worth hundreds of millions of dollars and the minority

4  part of that is you offer a small sliver of it.  So what is

5  the value -- what is the damage to the program if you get your

6  road?  You have your road, right?  The road is built.  The

7  minority and the DBE and the prime cheated, but you still have

8  a road.  Everybody drives on it.  What's the harm?

9  A.    But for the fraud, a legitimate, eligible DBE would be

10  the recipient of those dollars rather than a fraudulent.

11  Q.    So how many of those dollars do you count as fraudulent

12  in the North Carolina DOT if only a percentage of the contract

13  was to go to a minority?

14  A.    Every dollar that does not end up in the pocket of a --

15  an eligible firm is a damage to the program, a damage to the

16  people of North Carolina.  These are the people's dollars.

17  Q.    Okay.  And these are dollars that are appropriated by the

18  legislature in the State of North Carolina and in the federal

19  Congress and have very specific requirements about how they're

20  supposed to be used.

21  A.    Yes.

22  Q.    Thank you.

23        Going back to the 50 percent.  If a trucker signs up,

24  say, for a hundred thousand dollar contract and they, like,

25  contract out just 50 percent of what they do, does that mean

1  there are not any rules that affect the part that's not

2  contracted to the DBE?

3  A.    Every subcontract has the same contract provisions and

4  the need for compliance with the program.

5          MR. SAVAGE:  No further questions, Your Honor.

6          THE COURT:  Cross.

7                      CROSS EXAMINATION

8  BY MR. BELL:

9  Q.    Ms. Wright.

10  A.    Yes.

11  Q.    My name is Ken Bell.

12        Let me ask you, when was Cuthbertson Trucking first

13  certified as a DBE in North Carolina?

14  A.    I don't know the answer to that.

15  Q.    Okay.  Do you know how long he was certified as a DBE by

16  North Carolina?

17  A.    I do not.  Although that information is readily

18  available.

19  Q.    Okay.  Would you be able, like during a lunch break or

20  something, be able to pull that information up?

21  A.    Yes.

22  Q.    Or call somebody and get it?

23  A.    Yes.

24  Q.    Thank you.

25        Now, let me ask you about this trucking difference, if

1  you will, in the DBE program because as I understand it -- you

2  always correct me because you're the expert in this.  For

3  everything but trucking, if you have a DBE subcontract, the

4  only part you can count is what is done by and paid to that

5  DBE, correct?

6  A.    Correct.

7  Q.    Okay.  But with respect to trucking, let's say you have a

8  $10,000 commitment to a DBE truck, but it's okay and will

9  count towards DBE credit if the DBE trucker does 5,000 of it

10 and some other trucker who may not be a DBE does 5,000 of it;

11 is that right?

12 A.    That's correct.

13 Q.    So -- and I know you can't over count.  It's sort of a

14 one-for-one ratio thing, right?

15 A.    Yes.

16 Q.    So -- but what I'm getting at is with respect to the

17 government's interest in controlling where its money is going,

18 if you have a $10,000 DBE commitment to a trucker, the

19 government really only insists that 5,000 of that go to a DBE

20 truck, correct?

21 A.    Yes.

22 Q.    Now, I think we were looking at a contract before, and I

23 don't know that it's really worth -- oh, let me ask you this

24 just on this history of this whole one-to-one ratio thing.

25       Back in the '90s, and close to 2000, are you aware that

1  the federal regulations didn't have any limit on this ratio
2  sort of thing?  That is, a DBE trucker could have one truck
3  and hire Blue Max trucking to do the rest of it and bring
4  their 100 trucks and it could all count towards the DBE
5  commitment?  Are you aware of that?
6  A.   I'm aware there have been a number of rule changes
7  through the years in the program.
8  Q.   You can't confirm for me that back in the '90s and up
9  towards 2000, there was no restriction, no limit on how much a
10  DBE could subcontract and still get credit for it?
11  A.   No, I cannot confirm that.
12  Q.   Then -- do you know that then for a very little while in
13  the early 2000s, the regulations were changed, as you say, and
14  there was no ratio.  DBE truckers were treated just like DBEs
15  were doing guard railing.  I don't care how many people you're
16  subbing work out to, you could only take credit for the DBE's
17  work.  Are you aware that at one time --
18  A.   I can only confirm that there have been a number of
19  changes in the rule.
20  Q.   All right.  And do you know, then, that this one-to-one
21  ratio thing came in in about 2003, more or less?  If you don't
22  know, that's fine.
23  A.   I don't know.
24  Q.   Okay.  That's fine.
25       Now, in these contracts that Mr. Savage was showing

1  you -- and if he wants to pull it up, that's fine, but we can

2  just talk about it.

3      Page 9 that we were looking at where it was discussing

4  that a DBE hauler or trucker can engage in this one-to-one

5  ratio thing that we're talking about, but not with the prime

6  contractor.  Do you recall that language?

7  A.   Yes.

8  Q.   I'm sure he'll find it for us and pull it up.

9      But it doesn't say anything about not being able -- for

10 the DBE trucker not being able to use an affiliate of the

11 prime contractor, does it?  It just says contractor.

12 A.   It just says contractor, but if I may.

13 Q.   Sure.

14 A.   The essential point here is about control and that's

15 really the point of the DBE being involved:  Do they control?

16 And that's why the lease is so important.  That they must have

17 full control of those vehicles and those drivers during the

18 time that they have the lease ongoing.

19 Q.   And I understand that there are a lot of rules and

20 regulations about how things should be done and I'm not here

21 to argue with anybody about whether things were done the way

22 they should be done by Boggs Paving, so don't think that's

23 what I'm trying to do.

24      But what I'm saying is the rule -- if things had been

25 followed right, there is no prohibition on a company called

1   Boggs Transport, which is not the prime contractor, being the

2   one-to-one sub with a DBE trucker, is it?  It's not prohibited

3   by the contract.

4   A.   I don't know the answer to that.

5   Q.   Okay.  I think Mr. Savage was asking you about, and I

6   think the phrase used was good faith efforts to, I guess, be

7   relieved from the DBE commitment.  Do I understand the term

8   right?

9   A.   Good faith effort is a process.  And as I said, the most

10  obvious evidence of good faith effort is meeting the goal.

11  When the goal is not reached for any reason after the contract

12  is let, there are aspects of the good faith efforts that can

13  be taken so that the contractor can replace whatever might

14  have been lost in participation of DBEs.

15  Q.   Right.  And so again, I understand there's a process and

16  there's a way things are supposed to be done, should be done.

17  I'm not disputing it should be done that way.  But there's a

18  process that if -- let's say a prime contractor has a

19  commitment to a DBE trucker and they're working on the

20  project, getting towards the end of the project and they say,

21  Look, we're not going to make it.  We are not going to get

22  this trucker to make his goal.  There is a process by which

23  they can come to DOT and say, We're not going to make it.  We

24  either need to be able to find another DBE trucker or if we

25  can't, we just need to be relieved from this.  We've done our

1  best, best faith efforts to fulfill this goal with DBE

2  truckers.  We just can't do it.  There's a process where they

3  can get sort of blessed for that failure, if you will,

4  correct?

5  A.   There's a process by which they can demonstrate in

6  written documentation their good faith efforts.

7  Q.   And that's what I'm getting at, though.  If they do it

8  right and do it as they should, there is a way for DOT to say,

9  All right, look, we're not going to hold you to that

10  commitment.  We're not going to worry about our control of

11  that money going to a DBE, but we're willing to relinquish

12  that control and say, all right, it doesn't have to be spent

13  on a DBE.

14  A.   I would not characterize it that way.

15  Q.   How would you characterize it?

16  A.   When the company demonstrates through written

17  documentation their good faith efforts, it's either accepted

18  or it's not.

19  Q.   Right.  And I was just trying to draw the logical

20  conclusion about it.  If it's accepted and they come and say,

21  Look, we have used our best efforts, we can't fulfill our

22  goals with DBE, and if the government accepts that

23  representation, then they let them out of it, right?  They

24  don't have to fulfill that goal, right?  They don't have to

25  fulfill the goal if the state says they don't have to fulfill

1  that goal.

2  A.   If we accept the good faith efforts, that's true.

3  Q.   And all I'm getting at there is there is a way where the

4  government is willing to relinquish its control over what

5  types of subcontractors their money goes to.

6  A.   No, I would not say that.

7  Q.   Okay.  I understand.

8       Let me ask you about the damages aspect that Mr. Savage

9  was talking about.  And I think if I understood you right, you

10 say, Look, the real worry here is that the program is injured

11 if certified DBEs are not getting the money intended for them

12 by the U.S. Department of Transportation and the states as

13 well, right?  So is that --

14 A.   Yes.

15 Q.   Is that what you were saying?

16      So if there's a -- let's say there's a -- the goal here

17 is if there's a project with a hundred thousand dollar DBE

18 goal, as you put it, right?  We want a hundred thousand

19 dollars to go to a DBE, right?

20 A.   We want it to go to that specific number and type of DBEs

21 that are listed in the contract.

22 Q.   Right.  I was going to circle around to that.  I'm not

23 trying to be unfair about anything.

24 A.   Okay.

25 Q.   I mean, the overarching goal when the contract is -- when

1   the project is let -- because when the project is let --

2   excuse me.  When it's put out for bid and contractors come in

3   with their bids, DOT doesn't care what kind of DBE business is

4   doing what, right?  You don't care whether -- if they have a

5   hundred thousand dollars worth of DBE commitments, DOT doesn't

6   care if it's for guard railing, striping, seating, trucking.

7   They don't care, right?

8   A.    Correct.

9   Q.    As long as it's a hundred thousand dollars to a DBE.

10  A.    Correct.

11  Q.    Now, I fully agree and accept that state DOT, USDOT is

12  entitled to be told who we're going to use and for what and

13  have accurate reporting with respect to that.  Okay.  So I'm

14  not going to disagree with you on that.  You're entitled to

15  the accurate reports.

16      But I'm talking about if you didn't get accurate reports,

17  but when we're thinking in terms of damages, if on a given

18  project, same one we were talking about, there's a hundred

19  thousand dollar commitment and there was a hundred thousand

20  dollars actually paid to DBEs but not the one that was

21  supposed to be, but to real DBEs, the program's not harmed,

22  right?  I mean, sort of the reporting is and your right to

23  know, which I accept.  But the program, the goal of the

24  program to get a certain amount of money to certified DBEs,

25  that goal is met, correct?

MARCENA WRIGHT - CROSS

1    A.    The program is harmed.

2    Q.    Because the reporting is wrong.

3    A.    Well, because the contractor did not meet the terms of

4    their contract.

5    Q.    No, I'm not disputing the contract terms were not

6    fulfilled.  I'm trying to see if we can come to an agreement

7    that the program --

8          THE COURT:  Can you put a monetary -- if a hundred

9    thousand was due to a DBE and a hundred thousand is paid to

10   the wrong DBE, can you put a monetary damage on that?

11         THE WITNESS:  Yes.  I think it's important to

12   remember that these are small businesses.  And when they have

13   a contract that states that they are going to be paid $50,000

14   or a hundred thousand dollars, their entire mobilization,

15   their entire overhead is set up based on the anticipated

16   receipt of those funds.  It can destroy that small business.

17   Q.    Yeah, I can -- I'm sorry.

18   A.    And therefore, it can harm the program because now we

19   have one less company that can participate.

20   Q.    Okay.

21   A.    So there is real harm that occurs.

22   Q.    And I understand that can obviously be a civil action

23   brought for breach of contract if the prime does not follow

24   through on its commitment to the DBE.  But with respect to --

25   maybe you don't know because I know you're not part of the

MARCENA WRIGHT - REDIRECT

1  investigative team.

2      With respect to Boggs Paving, the scenario that you were

3  just worried about, that somebody who had a contract didn't

4  get paid and therefore went out of business, that didn't

5  happen in this case, did it?

6  A.   If you have any dollars that were not paid to a

7  legitimate or eligible DBE, then that has harmed the DBE that

8  could have won those dollars.

9  Q.   I understand that's what you're saying.  I'll try one

10 more time.  Then I'll let it go.

11      If the goal is to put a hundred thousand dollars into the

12 hands of DBEs and a hundred thousand dollars went into the

13 hands of DBEs, the only harm to the program is that the

14 reports were wrong.

15 A.   Maybe I can put it this way.  Up until the time that

16 contract is signed, it is a goal.  Once the contract is

17 signed, it's a commitment to specific firms for a specific

18 purpose, a specific type of work and a specific payment.

19           MR. BELL:  I understand.  Thank you.

20           That's all I have, Your Honor.

21           THE COURT:  Redirect.

22           MR. SAVAGE:  Briefly.

23                    REDIRECT EXAMINATION

24 BY MR. SAVAGE:

25 Q.   Ma'am, you gave me an example when we talked on the phone

1  the other day about what -- how you were trying to develop

2  small businesses, particular small businesses, and you likened

3  it, I think, to a graduate in a high school.  Can you tell the

4  Court about that analogy.

5  A.   Be more specific.

6  Q.   I think when you talked to me about it, it was like you

7  were not just trying to develop just any particular DBE firm,

8  but there were certainly certified DBE firms.  And that you

9  were getting them into business.  And it was like they were in

10  high school and they started out like as a small company.

11  A.   Oh, I see.

12  Q.   And as they grew, you're trying to get them to be bigger

13  companies, hire other minorities, that sort of thing.

14  A.   This is one of the items that's also listed in the

15  purpose in the statute, the 49 CFR, Part 26, is that

16  ultimately we want these firms to be able to compete outside

17  of the DBE program.  So we provide support to those firms so

18  that they can grow beyond a program that has goals to working

19  on any type of project.

20       A small trucking firm, for instance, may be provided with

21  supportive services funds so that they can expand.  We had one

22  firm that expanded from just doing hauling to also being able

23  to do concrete finishing, for instance.  We helped them with

24  their work force development, to train their staff.  We

25  provided them with funding for getting their prequalification,

1  getting their financial audit and financial review statements
2  for prequalification.  And they ultimately won a prime
3  contract as a company that did bus pads.

4     And so that is another purpose of the program is to grow
5  these firms so that they can be truly successful.

6              MR. SAVAGE:  Thank you.

7              No further questions, Your Honor.

8              MR. BELL:  Nothing further.

9              THE COURT:  You may come down.

10             Oh, wait a minute.  Wait a minute.  I had failed the
11 first time to ask other learned counsel here whether they had
12 any questions, so let me go through and see.  I'm going to go
13 back over the last witness that was here.  Let me see if
14 anyone has that.

15             Let's see here.  All right.  Now we got -- anybody
16 here other than Mr. Bell for Boggs Paving or Mr. Boggs?

17             MR. BELL:  Mr. Galyean is here on behalf of Boggs
18 Paving, Your Honor.

19             THE COURT:  All right.  Would you have any
20 questions?

21             MR. GALYEAN:  No, Your Honor.

22             THE COURT:  Would you have any questions of the last
23 witness?

24             MR. GALYEAN:  No, Your Honor.

25             THE COURT:  I would put him back on.

1              All right.  Thank you.

2              Mr. Winiker.

3              MR. WINIKER:  Yes, Your Honor.

4              THE COURT:  Do you have any questions of this

5    witness representing Mr. Hicks?

6              MR. WINIKER:  Not of this witness, Your Honor.  At

7    this time I don't believe I have any questions of the last

8    witness.

9              THE COURT:  If you'll think about that, I'll put him

10   back up if you have any additional questions --

11             MR. WINIKER:  Thank you, Your Honor.

12             THE COURT:  -- that you would like to ask to the

13   last witness.

14             Thank you, sir.

15             Mr. Fialko.

16             MR. FIALKO:  Yes, sir.  I represent Greg Miller.  I

17   had no questions for Mr. Noel nor this witness.

18             THE COURT:  Thank you.

19             THE COURT:  Mr. Knight.

20             MR. KNIGHT:  Yes, Your Honor.  I represent

21   Mr. Tucker.  And we have no questions of either witness.

22             THE COURT:  All right.  Thank you very much.

23             Is Mr. Ashmore or Mr. Foster here?

24             MR. ASHMORE:  Good afternoon, Your Honor.  Beattie

25   Ashmore on behalf of Styx Cuthbertson.  And we have no

1    questions of either witness, Your Honor.

2            THE COURT:  All right.  Thank you.

3            Anyone else here on behalf of anyone?

4            MR. HERRIN:  May it please the Court, Your Honor,

5    Joseph Herrin, Special Deputy Attorney General.  I represent

6    DOT.  We have nothing with anyone, but we would ask that she

7    be excused if possible.

8            MR. BELL:  No objection.

9            THE COURT:  Is there anyone from the defense side

10   that objects to this witness being excused now when she comes

11   down right now?

12           (No response.)

13           THE COURT:  Anybody need any additional questions of

14   this witness?

15           (No response.)

16           THE COURT:  All right.  Thank you, ma'am.

17           THE WITNESS:  Thank you.

18           THE COURT:  You are excused.

19           (Witness stepped down.)

20           THE COURT:  You may call your next witness.

21           MR. SAVAGE:  As to loss we have no more witnesses.

22           THE COURT:  Okay.  Mr. Bell, do you want to start

23   with somebody?  We can take a break in a little bit, but I'd

24   like to go a few --

25           MR. BELL:  Your Honor, I think -- if we're going to

1  take a break in the next hour, I would like to do it now
2  because I would rather not interrupt the direct.  I know we
3  just came off one about an hour ago, but I didn't bring my
4  little power shake with me today.

5          THE COURT:  I've got some.  I can bring you one up.

6          MR. BELL:  Actually, I don't eat lunch, but --

7          THE COURT:  They're supposed to be lean shakes, but
8  they're not asking me to go on TV about them.  Okay.

9          MR. BELL:  I guess I'm just saying my preference is
10 if we're going to break again before 1:30, I'd just as soon
11 take it now.

12         THE COURT:  What does the government say?

13         MS. SUGAR:  Your Honor, we're fine to break now.
14 That's fine.

15         THE COURT:  How long do you anticipate your
16 presentation on loss to be?

17         MR. BELL:  I think the -- I think my actual direct
18 will probably be a half an hour or less.

19         THE COURT:  And that will be -- then it's all
20 argument after that?

21         MR. BELL:  No, we -- we have some witnesses that
22 sort of bleed between role enhancement and loss, but the
23 summary witness we have that's focused on loss amount, we only
24 have the one.

25         THE COURT:  How long do you think we're going to be

1   on role in the offense following all of that?

2           MR. BELL:  Again, I can only speak as to direct, but

3   maybe an hour.

4           THE COURT:  Okay.  All right.  So it sounds like we

5   probably have at the most three hours, would that be accurate?

6           MS. SUGAR:  I would hope so, Your Honor.  I don't

7   know how long you would like us to argue, but I'm suspecting

8   it's not that long.

9           THE COURT:  Not a real long time.  I do have some

10  questions for both sides about things when all this is over

11  with, but -- so...

12          All right.  Let's try to get back -- let's take --

13  let's go ahead and take a break until 1:40.  That's going to

14  give us about an hour, little over an hour and ten minutes.

15  That way we can get into the -- into -- is that enough for

16  your nap, Mr. Bell?

17          MR. BELL:  I was about to say, I don't think I need

18  that much, Your Honor.

19          THE COURT:  Okay.

20          MR. BELL:  Whatever the Court likes.  We don't need

21  that long.

22          THE COURT:  Well, some people are going to want to

23  eat lunch.

24          MR. BELL:  Okay.

25          THE COURT:  And so I'm going to give everybody a

1   chance to eat lunch.  Since we're going to take a break, we'll
2   take an hour and ten and that will give everybody a chance to
3   do something until about 1:40.  So it's a little less than an
4   hour and ten minutes.  The longer I talk, the more I'm eating
5   into your nap time.  So we'll go ahead and take a break at
6   this time until 1:40.
7                (Lunch recess at 12:32 p.m.)
8   FRIDAY AFTERNOON, NOVEMBER 20, 2015
9                (Court back in session at 1:39 p.m.)
10               THE COURT:  All right.  Mr. Bell.
11               MR. BELL:  I call Phyllis Graydon, Your Honor.
12            PHYLLIS GRAYDON, DEFENDANT BOGGS' WITNESS, SWORN,
13                        DIRECT EXAMINATION
14  BY MR. BELL:
15  Q.   Would you tell us your name, please, ma'am.
16  A.   Phyllis Graydon.
17  Q.   Where do you live?
18  A.   I live in Greenville, South Carolina.
19  Q.   What's your educational background?
20  A.   My educational background, I have a bachelor of arts in
21  business administration and economics from Furman University.
22  Q.   And what's your profession?
23  A.   I'm a certified public accountant.
24  Q.   How long have you been a certified CPA?
25  A.   Since 1988.  Twenty-seven years.

PHYLLIS GRAYDON - DIRECT

1  Q.  And do you practice in Greenville?

2  A.  I practice in Greenville.

3  Q.  All right.  And were you asked to assist us in reviewing

4  some Boggs Paving records with respect to the DBE program?

5  A.  Yes, I was.

6          MR. BELL:  Let me throw up on the screen -- get

7  Mr. Orso to do it, better yet -- what we'll call Government's

8  Exhibit 1.  I mean, excuse me, government's exhibit.  Golly,

9  12 years later you would think.  Defense Exhibit 1, Your

10 Honor.

11         It's actually 2, Your Honor.  I misspoke.  Defense

12 Exhibit 2.

13         THE WITNESS:  I can't see it.

14         MR. BELL:  Okay.  Throw it up there somehow.

15         MR. ORSO:  Can you see it now?

16         MR. BELL:  And, Your Honor, if you would like a hard

17 copy of this, it is a little hard to see, we can hand one up.

18 We have one for the government if you'd like.

19 Q.  Still not seeing it?

20 A.  No, I can see it.

21         MR. BELL:  Your Honor, would you like a hard copy?

22         THE WITNESS:  I could always use one, yes.

23         (The document was tendered to the Court.)

24 Q.  All right.  This sheet is entitled "Jobs listed by

25 government in indictment and as relevant conduct."

1  And how many projects does this list as being examined by

2  you?

3  A.  Forty-one.

4  Q.  And how did you come to the number 41?

5  A.  I was provided with a list of 38 jobs and I compared that

6  list to the indictment and added three additional jobs that

7  were not in the original list of 38.

8  Q.  Okay.  So you're referring to the list of 38 as in sort

9  of a spreadsheet format we got from the government saying

10  these are the projects at issue?

11  A.  Yes.

12  Q.  But then you went back to the indictment, said other --

13  there are three named in the indictment that didn't make the

14  sheet for some reason, so you included them to look at as

15  well?

16  A.  I did.

17  Q.  And when you were analyzing -- did you analyze each of

18  those projects in detail?

19  A.  Each one individually.

20  Q.  And what did you look at to begin your analysis?

21  A.  I looked at data available through the Boggs accounting

22  system called Spectrum.  In that system not only are there the

23  normal accounting records, but starting at some point in 2008

24  or 2009 Boggs began scanning backup documents, so those are

25  available in PDF format in that system.

1      I also had available to me job cost -- job files.  Those
2  are paper files.
3      Also had available haul tickets, weigh tickets, time
4  cards, check stubs or minutes advices with all the documents
5  attached that supported the payments.
6  Q.   Did you get the contracts themselves and committal sheets
7  and those sort of things?
8  A.   Those were in the job files.  Sometimes each job might
9  have a box, but those were in there, the full contracts.
10 Q.   Okay.
11 A.   Also obtained data from a system called BidX.  It's a
12 government bidding system.  I paid a subscription for that so
13 I could look at each individual job and see who bid, who was
14 the high bidder, who was the next highest bidder, any other
15 documentation I could get out of that system.
16 Q.   Is that a system hosted by the government?
17 A.   I don't know who it's hosted by.  I just know it's called
18 BidX.
19 Q.   All right.  And just skipping ahead a little bit here.
20 There are some projects down towards the bottom, last quarter
21 or so, where the contractual DBE percentage is listed as
22 unknown.  Did -- among the things that you looked at, did you
23 ask defense counsel to search the entire government production
24 to us to plug in any holes that you had?
25 A.   I did.  Once we completed going through as much

1  documentation as we could find, we provided a list back of the

2  jobs that we had missing information and asked them to provide

3  us, if they could, anything that was available otherwise.

4  Q.   All right.  So stating the obvious for those last few

5  where you say "unknown contractual DBE percentage," of all the

6  things you looked at, including government's production, there

7  just wasn't a piece of paper or anything electronic that you

8  could find that tells us what the contractual obligation was.

9  A.   Electronic, paper, nothing.

10  Q.   All right.  And again, with respect to the required

11  payments to DBEs, I see that most of the columns there are

12  filled out and that is because you could find paper and

13  documentation to supply those numbers?

14  A.   Yes.

15  Q.   And again.  Where it says "unknown," what the particular

16  committals were, you couldn't find anything with respect to

17  the committals on those projects.

18  A.   That's correct.

19  Q.   All right.  So when you're moving over to the numbers

20  actually paid to all DBEs and then the payments regarding

21  Mr. Cuthbertson, I see that you did not include in the amount

22  paid to DBEs anything for those projects that you didn't know

23  what the DBE commitment was.

24  A.   That's correct.

25  Q.   Why is that?

1    A.    So that I would be comparing what I knew was to be paid

2    to DBEs to what was actually paid.

3    Q.    Were you able to determine that on those jobs DBEs were

4    actually paid for work?

5    A.    Yes.

6    Q.    But you just didn't include it really out of a sense of

7    fairness.  Since you didn't know what they were supposed to

8    pay them, you weren't going to give Boggs Paving credit for

9    having paid them.

10   A.    That's correct.

11   Q.    And same thing under the column that says "Required

12   payments to Styx."  Again, unknown because of lack of

13   committal sheets or other indication of what the contractual

14   commitment was?

15   A.    That's correct.

16   Q.    And again, moving over to the last column, "Paid to

17   Styx," because you didn't know what was committed to them, you

18   did not include -- or credit any payments to Mr. Cuthbertson

19   with respect to those jobs?

20   A.    That's correct.

21   Q.    But were you able to determine that with respect to those

22   jobs, he did receive payment?

23   A.    Yes.

24   Q.    Just, again, out of -- if we don't know one column, we

25   shouldn't use a number for another.

1   A.   That's correct.

2   Q.   Now, in the -- the next to last column on the right where

3   it says "Required payments to Styx," there's a footnote in

4   the -- to the sheet that says, "Reflects 50 percent of

5   commitments based on DBE hauler accounting regulations."

6   A.   Yes.

7   Q.   So when you are listing out a number for required

8   payments to Styx, when you knew you took the hauling

9   commitment to Mr. Cuthbertson and then said he's required to

10  do at least half of that and somebody else can do the other

11  half.  Is that your methodology there?

12  A.   That's the methodology.

13  Q.   All right.  And when in the column there it says "Amount

14  paid to DBEs" for these various projects, is that exclusive of

15  payments to Mr. Cuthbertson?

16          THE WITNESS:  Scroll up -- Matt, can you scroll up

17  for me, please.

18          MR. ORSO:  Up?

19          THE WITNESS:  So I can see the bottom.

20          No, that includes him.

21  Q.   All right.  So that captures everybody.

22  A.   That captures everybody.

23  Q.   Payments to Mr. Cuthbertson or any other DBE with respect

24  to that project.

25  A.   Yes.

PHYLLIS GRAYDON - DIRECT

1    Q.   Okay.  All right.  If you would, I always hate to just

2    have you read what's in front of all of us, but with respect

3    to these 37 -- excuse me, 41 projects that the government says

4    are in play, what is the total -- well, let me get you to

5    explain that.  The final prime contract price, what does that

6    mean?

7    A.   The "Final prime contract price" was the final amount

8    that was paid to Boggs Paving on those particular jobs.

9    Q.   And what's the total for all of these projects?

10   A.   $88,940,075.21.

11   Q.   And of the documentation that could be found, what was

12   the total commitment to all DBEs for those projects?

13   A.   3,837,777.03.

14   Q.   And how much money was actually paid to DBEs on that

15   project -- on those projects?

16   A.   $4,368,577.14.

17   Q.   Now, was that much payment to DBEs actually reported to

18   departments of transportation?

19   A.   No, there were different numbers reported.

20   Q.   So are you saying with respect to some of these projects,

21   work on the projects was done by a certified DBE, but they may

22   not have been written into the contract committed to or

23   reported to the DOT?

24   A.   That's correct.

25   Q.   And did you do anything to -- well, tell us, what did you

1  do to determine that an entity was a DBE for purposes of

2  including them in this number?

3  A.  So to know whether or not I needed to include them, I --

4  there's a report that you can print out of Boggs' accounting

5  system called a "DBE Job Cost History Report" which lists all

6  DBEs paid on a particular job and the amounts those DBEs

7  invoiced Boggs Paving.

8      So we started with that list of these are the DBEs on

9  this job and compared that to the commitments that we knew by

10  DBE.  And if there were DBEs listed that were paid, then we

11  accessed South Carolina or North Carolina to see when or if

12  that particular vendor, subcontractor was a DBE or not.

13  Q.  So you actually confirmed not whether they had ever been

14  a DBE, but whether a particular entity was a DBE at the time

15  they were working on the project.

16  A.  That's correct.

17  Q.  And again, the column of "Required payments to Styx"

18  which you've explained takes half of the commitment for his

19  hauling part of the project, what was the total committed to

20  him?

21  A.  1,281,260.61.

22  Q.  And how much was paid to him with respect to those jobs?

23  A.  $569,352.71.

24  Q.  All right.  Now, of that amount, 569,000, would that

25  include payments for, what we heard earlier, plant hauls?

1  A.   No, it does not.

2  Q.   Why is that?

3  A.   As was stated earlier, in Boggs' accounting system plant

4  hauls have their own particular job number.  They are in the

5  9000s.  And there is no manner of determining what plant haul

6  might be related to a particular job or even -- because I

7  didn't know even when a particular job -- on what day somebody

8  might be hauling and how to know what plant haul might go to a

9  particular job.  There is no way of figuring that out.

10  Q.   But do you know that Mr. Cuthbertson did perform plant

11  hauls on these -- some or all of these jobs?

12  A.   He was written in to some of the contracts to do plant

13  hauls on some of these jobs.

14  Q.   But that was --

15  A.   That was his DBE commitment.

16  Q.   There's just no way to track --

17  A.   There's no way to track it, not in the accounting system

18  that Boggs had.

19  Q.   So by some unknown amount of money, that 569 is actually

20  low.

21  A.   Correct.  That number represents only amounts invoiced by

22  Styx Cuthbertson to Boggs Paving for a particular job and

23  identifies the job on the invoice.

24  Q.   Now, that number you have there, 569, I don't have it in

25  front of me anymore, but is different from the number that you

1   heard Agent Noel testify about this morning.

2   A.   Yes.

3   Q.   Do you know why that might be?  Do you have some thinking

4   on that?

5   A.   My recollection from the exhibit was that his is for a

6   shorter time frame and doesn't look at all the jobs that are

7   on this list.

8   Q.   And did it net or show a net or a gross amount as opposed

9   to whatever you did?

10  A.   My recollection from what he said this morning was it was

11  a net amount paid to him.

12  Q.   And what did you do?  How did you come up with your

13  figure?

14  A.   My number is a gross amount invoiced by Styx Cuthbertson

15  to Boggs Paving.

16  Q.   And then you follow a check out?

17  A.   Follow a check out.

18  Q.   And so if there was a -- were there times that there

19  would be an invoice such as -- make up some numbers -- for

20  $10,000 but a check for $8,000?

21  A.   Uh-huh.

22  Q.   Is that because deducted from what Boggs Paving owed him

23  would be things like the fuel that they sold him or bills they

24  paid on his behalf?

25  A.   Yes.

PHYLLIS GRAYDON - DIRECT

1    Q.    So you looked at what he was owed and paid without

2    worrying about what he owed back for various things.

3    A.    Correct.

4    Q.    And did you go to great pains to take out of these

5    numbers the money that was paid from Mr. Cuthbertson's account

6    to Boggs Transport?

7    A.    I did.

8    Q.    So nothing on this chart reflects any money that went

9    first to Mr. Cuthbertson and then to Boggs Transport.

10   A.    Nothing.

11   Q.    I'm going to show you what I've marked as Defendant Boggs

12   Exhibit 1.

13            MR. BELL:  Again, Your Honor, we have a hard copy if

14   you'd like.

15            THE COURT:  I would, please.

16            (The document was tendered to the Court.)

17   Q.    This exhibit bears the title "Boggs Paving - Payments to

18   all DBEs - 2003 to 2013."

19   A.    Yes.

20   Q.    Tell us what you did to create this chart.

21   A.    Out of the Spectrum system there's a report.  Again, it's

22   called "DBE job cost history," and you can do it without limit

23   to jobs.  You don't have to define the jobs but you can define

24   the date range.

25            So I printed that report and defined the date range as

PHYLLIS GRAYDON - DIRECT

1   1/1/2003 to 12/31/2013 and printed a report that told me every

2   invoice amount, every DBE during that time period.

3   Q.   And the total paid to all DBEs exclusive of

4   Mr. Cuthbertson was how much?

5   A.   $23,738,516.73.

6   Q.   And how much was paid to him during this time?

7   A.   $4,470,764.50.

8   Q.   All right.  And so to be completely fair and accurate,

9   this is all payments whether to DBEs whether they were working

10  on a project that required DBE participation, includes

11  projects well beyond the 41 that the government has asked us

12  to focus on.  This is all payments over a ten-year period to

13  all DBEs.

14  A.   Yes.  I believe it's an 11-year period.

15  Q.   Pardon me, 11 years.

16  A.   It's an 11-year period, but yes.  Without regard to job,

17  whether they were DBE requirement or not.

18  Q.   Pardon me, I'm sorry?

19  A.   Without regard to job and whether there was a DBE

20  requirement or not.

21  Q.   All right.  Let's show you Defendant Boggs Exhibit 4,

22  please.

23          (The document was tendered to the Court.)

24  Q.   This is titled "Boggs Paving Inc. - Profit numbers by

25  job."

1    Again, did you look at Boggs Paving profits or loss with
2    respect to each of the 41 projects?
3    A.    Yes, I did.
4    Q.    And what did you do to do that?
5    A.    There is another report that you can print out of
6    Spectrum that reflects in a one-page format the final billing
7    amounts for each job.  It also reflects all the direct costs
8    that Boggs paid with regard to each job.
9         And then so I confirmed the final pay amount back to
10   other documents, a final pay advice from the DOT or whatever I
11   could find that would confirm that that was a final pay
12   amount.
13   Q.    What did you --
14   A.    The direct -- excuse me.
15   Q.    And what did you do to determine the direct costs?
16   A.    The direct costs also come off of that report.  There are
17   a couple of other reports that you can run that summarizes job
18   costs in various different formats that come back to the same
19   amount that account for direct costs for each job.
20   Q.    Did you verify that information?
21   A.    I verified every one of them.
22   Q.    You have a column there, "Allocable supervisory costs at
23   2.23 percent of direct costs."  Describe what that means to
24   us.
25   A.    What that means is when you are calculating the gross

1  profit from a job, you have the amount that you got paid for
2  the job and you have direct costs which might be your internal
3  direct costs, a person whose time card is kept for that job,
4  equipment that goes to that job, if it's your materials that
5  go to that job, all the subcontractors, and any materials that
6  you purchased.  But there are also typically allocable costs,
7  we in the accounting world call those indirect costs, that are
8  not easily -- they're not accounted for in the job cost system
9  because they're not easily attributable to a specific job.
10      And in Boggs' case those are the supervisory costs.
11  Supervisor might handle one job or five jobs.  Today he might
12  be handling five and tomorrow he might be handling two.  They
13  don't keep time cards.  So their costs, which is their salary,
14  their benefits, transportation, communication, any other
15  things that are attributable to a supervisor, are kept in one
16  accounting place and not allocated out to specific jobs.
17  Q.   So how did you go about assigning some monetary value to
18  those supervisors or their superintendent or foreman or
19  whatever falls into that category to assigning some part of
20  their costs to these 41 jobs?
21  A.   I looked at Boggs' financial statements for the 11-year
22  period, 2003 to 2013, which is very specific gross revenue,
23  direct job costs, indirect job costs, administrative, general
24  administrative, those kind of things.  And I looked at the
25  ratio of indirect costs, total indirect costs in that 11-year

148

1   period to total direct costs in that same 11-year period, and

2   that ratio was 2.23 percent. That's the amount of indirect

3   costs or supervisory costs in relation to direct costs in that

4   11-year period.

5   Q.   That was a methodology conceived by you independent of

6   input from defense counsel?

7   A.   Yes.

8   Q.   Not that I would have known how to suggest it.

9        All right. And so looking at these 41 projects, what is

10  revenue less direct costs less supervisory costs? What's the

11  profit or loss?

12  A.   $94,347.83.

13  Q.   And this includes Boggs Paving's entire profit or loss.

14  It's not just focused in on whether they made any money off of

15  doing trucking in isolation, right? It's the entire --

16  A.   This is just Boggs Paving.

17  Q.   And when you came up with the number $94,347.83, did you

18  know anything about the sentencing guidelines?

19  A.   I have no idea what the sentencing guidelines are.

20  Q.   Now, were you in here this morning when the government

21  had an exhibit stating that Boggs' profit during this time was

22  4.4 million?

23  A.   Yes.

24  Q.   All right. Can you tell us why your number differs from

25  that?

1  A.   They only included jobs that have profit.  They didn't

2  include jobs that have losses.  And they also did not include

3  any indirect super -- allocable supervisory costs.

4  Q.   Let me have you look at Defendant Boggs Exhibit 3.

5       Just describe this chart to us and what went into its

6  creation.

7  A.   So the first amount, the $1,281,260, is the commitment to

8  Styx on the 41 jobs, and we say 41 but that excludes JT

9  Russell as it does in the government's --

10 Q.   Okay.

11 A.   -- numbers as well.

12      That is the 50 percent commitment.

13 Q.   Right.

14 A.   It's not a hundred percent.

15      So the next number, 2,562,521, represents the hundred

16 percent commitment to Styx on those jobs.

17      The $3.7 million is the amount that the government has

18 calculated was committed to Styx on federal contracts.

19      And the final number is the amount that was paid to Styx

20 from 2003 to 2013 for all work he performed and it's

21 $4,470,000, approximately.

22 Q.   Why is the -- do you have any idea why the government's

23 number for commitments to Mr. Cuthbertson is different than

24 yours?

25 A.   Not really.

PHYLLIS GRAYDON - CROSS

1          MR. BELL:  I don't have any other questions, Your
2    Honor.
3          THE COURT:  Cross.  Any of the other -- before
4    cross, any attorneys for any of the other defendants have any
5    questions?  I'll give you another chance after -- after the
6    government goes.  But any -- any defense attorneys for any
7    defendant?
8          MR. WINIKER:  No, Your Honor.
9          THE COURT:  If you do, speak now or hold your peace,
10   at least until after the government.
11         Okay.  I see none.  All right.
12                    CROSS EXAMINATION
13   BY MS. SUGAR:
14   Q.   Good afternoon, Ms. Graydon.
15   A.   Uh-huh.
16   Q.   I'm Jenny Sugar.  I'm a prosecutor in the Western
17   District of North Carolina.
18        Looking at Defense Exhibit 3, the 3.7 million is not
19   commitments.  That was what is reported to the DOTs as having
20   been paid to Styx as a DBE on those contracts.  It's not the
21   commitment amount.
22   A.   Okay.
23   Q.   Does that -- that's a different number, right?
24   A.   That is a different number.
25   Q.   So in fact, they -- did you -- was that one of the things

1  you look at, how much was actually reported?

2  A.    I did.

3  Q.    And that was -- would that explain the difference?

4  A.    It could explain the difference.  I don't have in my head

5  what my total -- I would have looked at, again, all of the

6  jobs and don't know that I know what the total would have

7  been.  But, yes, that can explain the difference.

8  Q.    If we look -- just going in backward order.  If we're

9  looking at these -- the profit numbers, we made clear in our

10  filing -- it said if we don't account for loss, it's 4 --

11  A.    I can't see what you're looking at.

12  Q.    Oh.

13      We said if we don't take -- if we just don't count any

14  time there was a loss, it's 4 -- 4.4; and if we do take out

15  the loss, it's 2.2.  And that's pretty close.  This is about

16  $2 million.

17  A.    It's very close.

18  Q.    So we just didn't take out any of the overhead costs.

19  A.    The supervisory costs, right.

20  Q.    Because we were just going off of the sheets that only

21  had the job by the gross profit number, right?  I mean, that's

22  how it was done by -- that's where you would get the

23  job-by-job number.  You had to do this math -- there's no

24  accounting record that has this on it.

25  A.    There's no accounting record that has that, but it needs

1    to be accounted for to make sure you've got the gross profit

2    accurately.

3    Q.    Well, that's if you're -- I mean, yes.  But there is

4    no -- there weren't records --

5    A.    There is no methodology.

6    Q.    Right.  Right.

7    A.    There's no records.

8    Q.    If you compare the final paid amount to the revenue less

9    direct costs, $94,000 out of 87 million, that is a profit

10   margin of about 0.11 percent, right?  Is that right?

11   A.    If you say so.  I don't have a calculator, but, yes,

12   probably.  It's a small number.

13   Q.    Now, do you do accounting for a lot of highway

14   construction?

15   A.    Not highway construction, but other construction.

16   Manufacturing.  It's very similar.

17   Q.    All right.  I'm going to show you what I have marked as

18   Exhibit 15, and this is just an article that says, "Highway

19   and bridge construction firms' profitability declining," and

20   it has Sageworks quotes.  And it says, "Sageworks' data shows

21   the net profit margin on average for these types of

22   construction have steadily gone down."  The average net

23   profit -- net margin has decreased from a high of 6 to 7 in

24   2006 and '07 to about 2 percent in 2013; is that right?

25   A.    That's what it says.

1  Q.   That's what it says, okay.

2  A.   That's what it says.

3  Q.   And if we were to have 2 percent of 87 million, that

4  would be about $1.74 million; is that right?

5  A.   That would probably be that math.

6  Q.   All right.  And if you look at these jobs, there was one

7  job that they just did not do a good job on.  There's almost a

8  $1.5 million loss just on one project; is that right?

9  A.   Uh-huh.

10  Q.   So that is a big reason why the profits are so low; is

11  that right?  It would be more than 1-1/2 million dollars if

12  there weren't that one bad contract; is that right?

13  A.   If you excluded that one job, yes.

14  Q.   Okay.  Now, looking at Defense Exhibit 2, there is no

15  column on here that says amount reported to Styx; is that

16  right?

17  A.   Reported as paid?

18  Q.   Reported as paid to Styx.

19  A.   No.

20  Q.   So that's just not -- this is based on the initial bid --

21  what was listed as the required payments in the initial bid.

22  A.   No, it's not.

23  Q.   Where did you -- where did you get that --

24  A.   That is the contractual DBE percentage times the final

25  contract amount.  So if the final contract amount increases,

1  we've increased the commitment amount; and if the final

2  contract amount decreases, then we've also decreased the

3  commitment amount.

4  Q.   Okay.  So you looked at the initial job and the

5  percentage that was allocated to Styx, not the dollars.

6  A.   We looked at the percentage of the original -- on the

7  Styx number.  We took Styx's -- the commitment to Styx over

8  the total commitment dollars off the commitment on the

9  contract and got that percentage, and multiplied that times

10 the final contract amount to get the same relative percentage

11 so that if the contract increased, presumably the DBE total

12 commitment would have increased because the contract

13 increased.

14 Q.   Why do you say presumably?  Do you know that to be the

15 case?

16 A.   I don't know that to be the case, but it makes sense to

17 me that if the contract goes up, that the government would

18 want you to spend that -- 6 -- if the contract requires

19 6 percent of the contract to be spent to DBEs and the contract

20 goes up, would the government not want you to spend more?  If

21 the contract goes down for some reason, you would not be able

22 to meet that commitment if the total contract price goes down.

23 Q.   Okay.  So this number, I wouldn't find it on any

24 document.  That's a calculation.

25 A.   You would not.  It is a calculated number.

PHYLLIS GRAYDON - CROSS

1  Q.   Okay.  And this is only half of what was the required

2  amount to Styx because you only took 50 percent of that

3  number.

4  A.   That's correct.

5  Q.   And why did you do that?

6  A.   Because as was stated by the second witness today, that

7  the allowable amount to be counted for Styx hauling is half of

8  the total.  Boggs Paving was allowed to use someone else, not

9  necessarily a DBE, to haul the other half.

10  Q.   Well, did you check and see if he -- if you were -- if

11  you were to know that he didn't subcontract to anyone, would

12  that change -- would that number go back up times two?

13  A.   I would not change the required payment number because

14  the required payment, again, for even reporting purposes is

15  only half of the amount that's committed.

16  Q.   When did -- Styx would still have to be -- have

17  management and control and he would actually have to

18  subcontract, so --

19  A.   That's not what I was engaged to look at.  I was only

20  engaged to analyze the numbers.  So I don't -- can't answer

21  that question.

22  Q.   Okay.  Are you an hourly -- are you paid hourly or just

23  for this project as a whole?  How much did you make?  How much

24  were you paid for your testimony?

25  A.   Well, I was paid to do all the work on this project.

1  Q.   How much have you been paid?

2  A.   A hundred and 25,000 dollars over the course of five

3  years, four years.

4  Q.   If you compare -- even if we stay with your 50 percent of

5  the number and compare it to the amount actually paid to Styx,

6  how many of those times was the amount that was paid to Styx

7  more than that 50 percent?  How many times in that line?

8  A.   Probably very few.

9  Q.   It's only twice.  I think I put dots next to them.  Is

10  that right?  I mean, go ahead and double check.

11  A.   Yeah, I think that's right.

12  Q.   So even just comparing what was paid to Styx to the half

13  of the amount, there's only two contracts where he's over half

14  of them; is that right?

15  A.   Yes.

16  Q.   So did you -- when you counted out payments to Styx, you

17  would have also counted the commission for the payments that

18  went to Boggs Transfer?

19  A.   I did not.

20  Q.   You didn't count those either?

21  A.   I did not.

22  Q.   Did you have the check register and spread those out to

23  determine the payments per job?

24  A.   The check register from Boggs Paving?

25  Q.   Yes.

1   A.   Yes.

2   Q.   So how did you know which checks had gone to the account

3   that was later moved on to Boggs Transfer versus the ones that

4   went to his account?

5   A.   In the Boggs accounting system Spectrum, the invoices

6   that were subsequently -- had amounts that were paid by

7   Boggs -- by Styx back to Boggs Transport had a zero in front

8   of them.

9   Q.   How did you --

10  A.   And we --

11  Q.   How did you find that out?

12  A.   When we pulled data to do all this analysis, we pulled as

13  much backup support as we could.  So when we would pull

14  support for a particular check that would have invoices behind

15  it, stapled with the invoices would be an invoice from Styx to

16  Boggs Paving and an invoice from Boggs Transport to Styx.

17  Calculate how much of the amount was going to be paid back to

18  Boggs Transport and what amount would have been left over for

19  Styx which is the commission.  And then we -- once we had

20  access to the BB&T account, we could follow the check pattern.

21  A.   These jobs, what was the general time frame that these

22  took place?

23  A.   2003 to 2013 or maybe 2004 to 2014.

24  Q.   So in that ten years, there was only twice where Styx was

25  even paid half of the amount that he should have been paid per

1  your analysis?

2  A.    Not in the ten years.  On these 37 jobs.

3  Q.    Well, on the ones that had a federal -- that had federal

4  funding in them.

5  A.    Well, only on these.  I didn't look at other jobs.  I

6  mean, there's lots of other jobs.

7  Q.    Right.  Did you look at the state projects where he was

8  written in for minority business credit?

9  A.    To the extent I could find information, I looked at them.

10  Q.    All right.  So you know a lot of his -- he worked on a

11  lot of other contracts that had a minority requirement besides

12  just the federal ones, right?

13  A.    Yes, like airport.  I looked at those as well.

14  Q.    So the -- strike that.

15        Did you hear the testimony earlier about the Small

16  Business Enterprise contracts obtained in Styx's name?

17  A.    The two stone haul jobs?

18  Q.    Yes.

19  A.    Yes.

20  Q.    Did you use those in your computations at all?

21  A.    They're down at the bottom of that schedule in the pink

22  section on the -- they're at the bottom, I think.  3166 and

23  3194 are the job numbers.

24  Q.    Okay.  So you didn't -- so you said it was unknown.

25  Well, the whole amount was supposed to go to a small business

1  enterprise, and the amount you listed is what went to Boggs

2  Paving and the entire rest of the price went to Buckhorn

3  Materials.  Did you see that in the record?

4  A.   I don't recall on that -- those particular jobs what I

5  saw underneath.

6  Q.   So would you -- if they had made an initial commitment to

7  Styx of a certain percentage and then later had made a change

8  to the project so that they were -- they said, Oh, this other

9  DBE can't do it, now we're going to commit more to Styx, would

10 you have analyzed that?

11 A.   I don't know that I would have known that.

12 Q.   So you wouldn't know.  So it may be that at some point

13 they told DOT, Hey, Styx is going to end up doing more of our

14 DBE work than some of our other people listed, and you

15 wouldn't know that?

16 A.   No, I don't know that I would know that.

17 Q.   Again, on this list of all of the DBEs, Defense Exhibit

18 1, you have no idea how many of these payments have odd jobs

19 that were for, like, a paving -- a Walmart parking lot where

20 there would have been no DBE requirement, right?

21 A.   No.

22 Q.   Do you have -- you have a number of construction clients,

23 right?

24 A.   Uh-huh.

25 Q.   Is that what you said?

PHYLLIS GRAYDON - CROSS

1   A.   Uh-huh.

2   Q.   Is that a yes?

3   A.   Yes.  Yes, I'm sorry.

4   Q.   That's all right.

5        And generally, in the late 2000s, around 2008, was the

6   economy affecting their ability to get work?

7   A.   Absolutely.

8   Q.   So it became a lot harder to work at that time?

9   A.   It was probably harder for everyone, yes.

10  Q.   And many of your clients were not making as much money as

11  they had in the past.

12  A.   Yes.

13  Q.   During that time period, though, there was still federal

14  contracting available, correct?

15  A.   I suppose there was.

16  Q.   And you're familiar with the stimulus bill.

17  A.   The stimulus bill, yes.

18  Q.   And that was putting more money into the economy.

19  A.   That was putting more money into it.  As a matter of

20  fact, some of these documents are marked that, stimulus money.

21  The South Carolina DBE reports are indicative of that.

22  Q.   Some of these jobs used stimulus money?

23  A.   Uh-huh.

24  Q.   Why didn't you think it was important the amount that

25  Boggs Paving told DOT had been paid to Styx?

PHYLLIS GRAYDON - CROSS

1  A.    I do think it's an important amount; but for purposes of

2  these schedules, what I was asked to come up with was the

3  amount paid to Styx actually and how much was committed to

4  Styx, not what was necessarily reported as paid to Styx.

5              MS. SUGAR:  One moment, Your Honor.

6              (Government counsel conferred.)

7              MS. SUGAR:  Nothing further.

8              MR. BELL:  No redirect, Your Honor.

9              THE COURT:  All right.  Any of the other attorneys?

10              (No response.)

11              THE COURT:  Anyone for Boggs Paving wish to make --

12  ask any questions?  Counsel?

13              MR. GALYEAN:  No, Your Honor.

14              THE COURT:  All right.  How about Mr. Winiker for

15  Mr. Hicks?

16              MR. WINIKER:  No, Your Honor.

17              THE COURT:  Mr. Fialko for Mr. Miller?

18              MR. FIALKO:  No, sir.

19              THE COURT:  Mr. Knight for Mr. Tucker?

20              MR. KNIGHT:  No, Your Honor.  Thank you.

21              THE COURT:  And Mr. Ashmore for Mr. Cuthbertson?

22              MR. ASHMORE:  No, sir.

23              THE COURT:  All right.  You may come down.  Thank

24  you.

25              (Witness stepped down.)

1          MR. BELL:  Your Honor, that's our evidence on loss

2     amount.

3          THE COURT:  Let's go ahead and get some arguments

4     done on this loss before we get into the other so I can try to

5     sort some of this out.  Know where the government is coming

6     from.

7          I look at the presentence report and it identifies

8     as victims in here City of Monroe; Darlington County, South

9     Carolina, Jetport; Federal Aviation Administration; Federal

10    Highway Administration of North Carolina; Federal Highway

11    Administration of South Carolina; Georgetown County airport;

12    Lancaster County airport; Myrtle Beach airport; North Carolina

13    Department of Transportation; South Carolina Department of

14    Transportation.

15         Those are the identified victims in the presentence

16    report.  I assume they got it from the government.  So go

17    ahead and tell me where the loss is.

18         MS. SUGAR:  Your Honor, in DBE fraud cases such as

19    this, we look at what was obtained by fraud.  We look at the

20    contracts obtained by fraud.  And notwithstanding Mr. Bell's

21    arguments, I think that the government and the rest of the

22    defense attorneys are in agreement that Boggs Paving used Styx

23    as a nominee to bid and win these large contracts.

24         THE COURT:  I mean, I agree there was a fraud here.

25    What I'm trying to figure out, and I don't want to interrupt

1    your -- the flow of your argument, but I do need -- I'm going

2    to ask Mr. Bell some questions too because he's giving me

3    calculations which essentially say zero loss and $27,000 loss.

4    And then I'm sitting here thinking about, well, Lord, let's

5    just go out here and have at it because there's, you know,

6    there's lots of money to be had and if you get caught there's

7    no punishment.

8         So -- but I do have a problem on the way that these

9    things are done.  Loss is an important aspect of it.  Just

10   recently affirming everything that he did in the case and the

11   excellent job that he did in the case on a cigarette case,

12   Judge Whitney in the *Qazah* case, they said that he had to use

13   the cigarettes at wholesale amount instead of what they would

14   have gotten from getting the cigarettes because that was --

15   that was the loss from the victim -- the loss from the victim

16   in that case.

17        Yes, sir, Mr. Savage.

18        MR. SAVAGE:  Actually not, Your Honor.  I argued

19   that case, and I think what the Court said, if you look at the

20   opinion, is that Judge Whitney failed to detail his reasons.

21   That he very well could have picked retail, but loss is from

22   the perspective of the victim.

23        THE COURT:  Right.  Right.  It's from the victim and

24   the victims in this case are the governmental agencies.

25        MR. SAVAGE:  Right, but the --

1          THE COURT:  And I want to know what they lost in
2     this case, which sounds like is zero.  If anybody lost
3     anything, it is the unknown and unproved person who would have
4     gotten the contract except for these cheaters.
5          MR. SAVAGE:  Well, I'm not going to take Ms. Sugar's
6     argument on that, but I think the important thing in *Qazah* is
7     that was a sting.  There was intended loss.  You didn't have
8     the actual numbers.
9          THE COURT:  And I've read the opinion and I've
10    talked to Judge Whitney about it and you're going to have to
11    talk do him about it because he thinks he's going wholesale on
12    it.  So you can go ahead, Mr. Savage.  Good luck.
13         MS. SUGAR:  Your Honor, there are certain types of
14    frauds like this where -- and Mr. Bell will tell you a million
15    times, the roads got built.  We admit it, the roads got built.
16    So this is an unusual case.  But that doesn't mean there's no
17    loss.  It doesn't mean there's no harm.  And there is special
18    provisions in the guidelines that govern this type of
19    government benefits fraud.  It's clear in the Fourth Circuit
20    that DBE fraud is a government benefits fraud so we look to
21    those special rules, and it's the amount of benefits obtained
22    by fraud.
23         And we would argue that here, since Boggs Paving had
24    this in-house DBE, that that's these full contracts.  That's
25    the contracts that they won using him, writing him in for

1    credit.  Because they weren't trying to get the trucking.

2    They were trying to get the big projects.  This is a bad

3    economy.  Any advantage you had --

4            THE COURT:  Let me tell you something.  They all

5    got -- there's all kinds of advantages in here.  They talk

6    about teaching -- teaching these folks and trying to develop

7    these.  You know how they developed the company that did my

8    office?  That company formed the day they got the contract out

9    of Atlanta and then did the office and disappeared the day

10   they finished the contract from Atlanta.  So that's a big help

11   for a DBE.  Taxpayers -- the taxpayers are being ill served.

12   It was a 2,000 square foot, non-load bearing wall that would

13   cost -- that cost a decent house to do it and took six months

14   longer than it took to build the Grove Park Inn.  The system

15   is broken.  Congress needs to know it.  They need to change it

16   and do away with it.  The program may have done good, but the

17   taxpayers are being eaten up by these programs.

18           Now, with all that said, there's something bad wrong

19   with what's happened here.  I need to find out what the right

20   sentence in this case is with regard to the loss and what the

21   punishment needs to be in this case.  This sounds like a

22   classic, a classic situation where the factors that I have to

23   decide in sentencing are going to be impactful in this case as

24   opposed to some loss that's out there.

25           The -- I understand that -- I've got -- you know,

1  I've got to figure out exactly how to do this with all of the
2  things that are -- the Court -- you look at the Application
3  Note 3A.  Intended loss is the pecuniary harm the defendant
4  purposely sought to inflict.  Well, that can't be against any
5  of those victims because there is no pecuniary harm.  The
6  government is not even seeking restitution.

7          The note provides further, the Court need only make
8  a reasonable estimate of loss and shall be based on available
9  information, taking into account as appropriate and
10  practicable under the circumstances a number of factors,
11  including the fair market value of the property unlawfully
12  taken, the approximate number of victims multiplied by the
13  average loss to each victim.

14         The general rule is the loss is determined by
15  measuring the harm to the victim.

16         This appears to be a case where, you know, if you
17  could ever figure out exactly who was -- who was going to lose
18  this, it would be some -- some DBE person that would have been
19  on -- that would have been with the winning bid.

20         But it's wrong, I think, to just automatically say
21  that the DBE -- that the Cuthbertson bid, the bid on the 80
22  some million dollar contract was saved only because of the
23  Cuthbertson bid.  They may have had that in their back pocket
24  and used that to make a lower bid.  But when they make these
25  estimations, they give a bid out.  I mean, they just do a

1  total bid to try to get these things.

2          Unfortunately -- and -- this is just -- I suspect

3  that somehow some of them seem to know it.  I mean, you do a

4  bid -- you do a government bid and you'd think -- and you'd

5  think that a bunch of people would show up for it.  Not many

6  show up for it.  And I'm wondering whether they talk to people

7  and they say, You take that bid, we'll take this bid, because

8  a lot of people don't show up for these bids when they do it.

9  I've been in the bidding process and I've seen it happen and I

10 go, you know, it's just -- it's unbelievable how it happens.

11         MS. SUGAR:  Well, we do think the special -- the

12 Government Benefits Rule applies, and we think that the loss

13 would be too high if you looked at the full dollars.  That's

14 why we've given you three different reasons why we think that

15 the 3.5 to 9.5 is the range that appropriately measures what

16 happened.  Three point seven million.  That's what they

17 said -- that's what they reported.  There's no -- you know,

18 right or wrong, you can't lie about someone doing work.  I

19 mean, 3.7 million worth they said of a legitimate DBE.  That

20 is just not true.  Most of that money was run through a bank

21 account.

22         THE COURT:  The integrity -- the integrity of the

23 process has been damaged.  The integrity of the process is

24 damaged any time somebody fools around and gets something

25 they're not supposed to have whether it causes a loss to

anybody or not.  There's definitely -- you know, people need
to be scared off from doing this sort of thing.

I seriously doubt that this case turned out because
some magnetic piece was found on the side of a truck.  It
happened because you can't get away with it, guys, because the
guys that are losing it -- losing the bid are going to turn
you in, just like basketball programs turn in basketball
programs because they didn't get a recruit.  And that's
probably where it started, not on some piece of magnetic thing
on the side of a truck.

MS. SUGAR:  Your Honor, there was a number of signs
that brought investigators into this case --

THE COURT:  It sounds like they've been watching
this for a while.

MS. SUGAR:  That's right.

THE COURT:  That those that had been unsuccessfully
getting the bids and had been outbid, some of them maybe out
cheated were mad, and so they didn't get the bids and they
made -- and that's good.  That's how it happens.  I've been a
prosecutor.  Thank God the bad guys turn in the other bad
guys.

So go ahead.

MS. SUGAR:  Your Honor, the other numbers that
brought us to that same loss range are the amount of money
that was run through that Styx nominee account, the

1    concealment money laundering here.  That's $7 million.

2          And then the third number is profit.  Now, yes, we

3    didn't take out all the times they were the lucky loser.  It

4    seems like a really weird thing where they've only made

5    $93,000, you know, ten years' worth of contracts because they

6    had one bad bid.  That's just not realistic.  And profit for a

7    lot of reasons, especially in this economy, keeping the lights

8    on, being busy is -- you know, it's a tough number to look at.

9    We went into that in detail in our memo for why you can't just

10   look at this 93,000.  Because, frankly, $93,000, Your Honor,

11   is less than these two small business jobs in his name.  He

12   got $80,000 of just the run-through commissions.  So to think

13   that he was doing the same as Boggs Paving is absurd.

14         THE COURT:  Well, they are entitled -- they are

15   entitled to deductions and things like that for certain

16   things.  But, you know, that's also not including, I imagine,

17   salaries paid to the principals and things like that.

18         Charlotte Medical -- the *Charlotte Observer* reports

19   every year, and I think their most recent one, 25 people over

20   there, one doctor who might do some work on people, one lawyer

21   who we hope is not working on anybody, and 23 other

22   bureaucrats made $35 million.  So those nonprofits like

23   Charlotte Medical, they're only nonprofit because they're

24   paying it out and people are doing it.

25         So my guess is that the 93 doesn't -- it does not

1  include money that Mr. Boggs made.  He's certainly got a

2  substantial personal net worth.

3       MS. SUGAR:  Your Honor, we need to have a result in

4  this case that makes sense and that's going to deter people.

5  And the loss is going to lead the guidelines in fraud cases.

6  That's always the case.  So we can't have a case where you can

7  lie for years about use of a DBE, you can lie and cheat, and

8  then the loss is zero because the roads got built or the loss

9  is zero because in a bad economy we only made $93,000,

10  .1 percent profit despite an industry standard even at its low

11  end of 2 percent.  That just doesn't make any sense.  That's

12  like a lucky loser can commit all the fraud they want and face

13  no consequences.  We have to get to the right result.

14       And the cases, you know, are mixed.  I think that

15  some of them, when they use the whole dollar amount, the

16  87 million, they come down.  And when they say it's zero, they

17  say you should probably vary up because you have to measure

18  the harm to the program.  You have to measure how things were

19  hurt.

20       Now, all this talk about other DBEs getting paid is

21  just not what we're talking about.  We're not talking about

22  all the times they didn't rob a bank.  We're talking about how

23  on every single one of those contracts over a ten-year period,

24  there's only twice where even if you use their 50 percent

25  argument, which isn't right, there's only twice where he met

1  it.  I mean, this was a long scheme of him -- this isn't
2  someone who was over committed.  This is someone who didn't
3  need to be committed because he would sign whatever you put in
4  front of him.  So you just can't, you know, say, Well, we paid
5  all these other people money.  That's not what the scheme was
6  about.
7              Let's talk about what --
8              THE COURT:  Why is Cuthbertson not a DBE?  Is it
9  because he didn't fill in the boxes or is it because he would
10  never qualify as a DBE?
11             MS. SUGAR:  Well, because to be a DBE, you have to
12  have your management controlled -- you have to run your
13  business.
14             THE COURT:  Okay.
15             MS. SUGAR:  And if you look at every questionnaire
16  that he gave them to say what he was doing, he said, I decided
17  what jobs to bid on.  Not true.  Decided by Boggs Paving
18  managers.  They wrote up the quote for him.  He signed it.  He
19  signed whatever.
20             He was supposed to give over a copy of every single
21  bank account he had.  Guess which bank account he never
22  supplied?  The one that was just the money running through
23  Boggs.  That was never provided.
24             He talked about all of his responsibilities and they
25  were not the responsibilities that he'd actually had.

1          If you talk -- when you hear from him -- we're going
2    to call at least one co-defendant later, perhaps more.
3    Mr. Cuthbertson just went wherever he was told.  He probably
4    didn't know what contracts he was even signing on.  He was
5    pretty much an employee.  The only person who is doing DBE
6    work is Boggs Paving.  He'd been there for 20 years.  He
7    worked for Mr. Boggs' father.  He was just a truck driver that
8    had -- he had the bare minimum under him.  The only thing --
9    checks that were written out of his account are for paychecks
10   to people.  Everything else was taken care of by the Boggs
11   Paving staff, which they charged him for on top of it so his
12   commission was pretty much annihilated by that.
13          THE COURT:  Can you not -- if you have a business,
14   can you not take your accounting and books out and do them --
15   give them to somebody else?
16          MS. SUGAR:  You can -- you know, any one factor is
17   not going to be determinative.  Determinative is the fact that
18   he never controlled the work.  He just went where they told
19   him.
20          THE COURT:  I understand that argument.
21          MS. SUGAR:  He was just going every week --
22          THE COURT:  That argument -- that argument I
23   understand.
24          MS. SUGAR:  Yeah.  I mean, no, any one thing we
25   could pick apart of an example why that wouldn't mean control.

But we have, you know, the statements of pretty much every
defendant except for Drew Boggs saying that Boggs Paving was
in control of Styx Cuthbertson.  And it's not just the
government over here saying that.  That is totally not the
case.  Everyone is in agreement with it except for Drew Boggs,
the CEO.

THE COURT:  Okay.  I'll give you a chance to argue
again in a minute.  Let me hear from Mr. Bell.

Mr. Bell, how are we going to figure this thing out?
It can't be -- it can't be that you can commit a crime and get
an $84 million contract and have --

MR. BELL:  No, no, no.

THE COURT:  -- and have no number that makes -- that
runs these -- that makes it go.  I mean, if the guidelines are
zero, then the guidelines aren't any good -- I mean, if the
loss is zero, then the guidelines are not helpful to the Court
in fashioning a sentence.

MR. BELL:  Well, it's a two-step process, Your
Honor.  As you said earlier, first the Court has to come up
with a guidelines calculation because that's what the Court's
told to do.  And then, of course, the 3553 factors are going
to come into play, which I understand we have some witnesses
about that this afternoon that are related to the role
enhancement thing that I think will illuminate for the Court
some more than just the government's view of how this thing

 1  happened and the relevant culpabilities and the overall
 2  culpabilities.
 3          But to get back to the loss amount, as Your Honor
 4  was reading earlier from the general provision in the loss
 5  calculation -- and it's not that section, Your Honor.  It's
 6  the -- it's the government benefits case which is Application
 7  Note 3(F)(ii) instead of the general loss or intended loss.
 8  And the Court's telling us very well how to calculate this.
 9          The *Ohio Brothers* is the only Fourth Circuit case
10  that's applicable to this case and it is applicable for two
11  purposes and then not for some others because *Ohio Brothers*
12  said first that DBE cases are government benefits cases.  So
13  we know which application note to go under, which is the one I
14  just cited.
15          They also say that what you look at, your starting
16  point is the DBE subcontract.  And for the life of me, I can't
17  understand why the government is clinging to this concept that
18  it's the overall $87 million contract.  In the *Brothers* case
19  it was a --
20          THE COURT:  Let me stop you there.  I'm not going
21  with the $87 million as being the loss.
22          MR. BELL:  In the *Brothers* case --
23          THE COURT:  And they're not asking -- they're smart
24  enough to know --
25          MR. BELL:  Well, they say that's the right number,

1    but you should vary.

2             THE COURT:  It's not the right number.

3             MR. BELL:  All right.  So what you look -- according

4    to *Brothers* is it's a government benefits case and then our

5    starting point is the subcontracts.

6             And then we look at the credit provision because as

7    we've discussed many times, they are entitled to a reduction

8    or a credit for either work that Mr. Cuthbertson did and was

9    paid for or the fair market value of what Boggs Transport did

10   that should have been done by somebody else.  And we've given

11   the Court some analysis as to what that -- the profit or the

12   value of that is.  That's awfully tough to do and we gave some

13   industry study type things to show, all right, if you had this

14   amount of work in the industry, industry wide over a decade,

15   and what's the profit margin for that.  And that's where we

16   came up with the 36 to 37 thousand.

17            But some of these charts, because I'm going about --

18   I tried to do this with some of the witnesses.  And again, I

19   know there are going to be 3553 factors involved here, but

20   what -- what the government charged this offense over was

21   fraud against the DBE program.  That is, we had millions of

22   dollars involved in these 41 projects that were supposed to go

23   to DBEs.  And as we've demonstrated, more money went to DBEs

24   on those projects than was committed.  Now, they did it all

25   wrong.  All wrong.  I mean, they committed Styx to stuff he

1    didn't do.  They reported that he did stuff that he didn't do.

2    They didn't report payments to DBEs on those projects that

3    they could have.  I mean, it's all messed up.

4        But if you look at programmatic harm and all the

5    lofty goals of the DBE program, was the program harmed?  That

6    is, was money taken away from the people who the government

7    wanted it to go to?  No.

8        THE COURT:  It's hard -- yeah, it's hard for me to

9    find a particular amount, but it does hurt the program in

10   that, you know, it would encourage people to allow this to go

11   on, to falsify exactly what they were going to do and just do

12   whatever they wanted to do.  If the program is going to

13   continue on as it probably is for some time, it's -- you know,

14   it's got to be -- it's got to be protected, and in more ways

15   than this.  I think there are probably a lot more egregious

16   things going on out there than this.

17       MR. BELL:  And, Your Honor, I would just ask you to

18   reserve judgment for now as to the severity of the conduct

19   that led to this because there are going to be more witnesses

20   and more argument about that because I'm afraid -- because you

21   just haven't heard the evidence so far.  I'm afraid the Court

22   is under the wrong opinion that this was some hugely

23   masterminded, well-crafted, decade-long, sophisticated fraud.

24   And it was more of a -- I don't know what to call it.  It was

25   a complete -- but we're going to explain that to you.  So

1  please just reserve judgment on the actual conduct of

2  Mr. Boggs or any of the other individual defendants until --

3          THE COURT:  How much -- how much deduction do you

4  believe you get off of any of the numbers the Court finds?

5          MR. BELL:  All right.  I would say the Court can do

6  it and should do it one of two ways.  I know you may not like

7  the answer, but this is --

8          THE COURT:  Yeah, I don't like --

9          MR. BELL:  This is the starting point.

10         THE COURT:  If it's the two ways that are in here,

11 I've already read them.

12         MR. BELL:  All right.  And the two ways are if you

13 look at the DBE program, programmatically there is no loss.

14 But if you look at just the Styx Cuthbertson piece of it, and

15 he was committed to get this much and he was paid that much

16 and it was reported that he did more and got paid more than he

17 was.  All right.  So if you look at, look, he should have done

18 this amount of work and he only did and got paid for this

19 amount of work, that's the loss, right?  And then you have the

20 credit against it because they got the roads.  The hauling got

21 done.

22         And so you have to look at what would a theoretical

23 wholly legitimate DBE who should have been doing this work,

24 what would he have made off of it after the goods and

25 services?  And that number, as we put in our sentencing brief,

1  was about -- I forget what it was -- 37,000 or something like

2  that.  I mean, that's -- that's the loss amount for starting

3  purposes before the Court gets into the severity of this

4  conduct and 3553.

5            THE COURT:  But what do you say to the fact that

6  Cuthbertson is not a DBE because he really didn't have control

7  of his own business?  He was being controlled.  And it does

8  sound, Mr. Bell, like he was being -- it sounds like he was

9  lucky.  I mean, if all these -- if legitimate DBE guys are

10  going to make off of this $37,000, best thing you can have is

11  somebody else doing your books, telling you to come on in and

12  finding work for you to do.  I mean, these DBEs are probably

13  crawling around out there begging for work.  In fact, it

14  sounds like the DOT has got to find help for them.  They're

15  going to try to nurture them and build them up.  So sounds

16  like Cuthbertson had fallen into a honey pot.

17            But that said -- that said -- that said, it does

18  sound like he was not a DBE.  He could have been a DBE.

19            MR. BELL:  I disagree.  He's been his own

20  businessman since long before Drew and Chris Boggs even

21  started their business.  And so yes, he worked almost

22  exclusively for Boggs.  You bet.  Because they had enough work

23  to keep him involved.

24            These administrative services that they did for him

25  was for a fee that they've done for another company.  So we'll

handle certain kinds of paperwork.  You owe us 400 or 450

dollars a month, whatever it is.  That's a business

arrangement.

And then as far as he wasn't his own boss, he went

where he was told, so did Blue Max.  So did these other DBE

truckers.  There's a guy down there at dispatch called Pork

Chop who's supposed to get trucks where they're supposed to go

on any given day and he calls up, whether it's Blue Max or

Styx, and says, Get your guys and your six trucks from here to

there today.  Everybody does it.  It's the nature of the

trucking business in the paving industry.  It's just so

overblown to say he did whatever he was told to do.

Was he written in to projects routinely?  Yes, for

the reasons we've explained in there.  He's known.  They use

him as much as he can be used because like everybody else,

they got to get their DBE credit.  He's reliable.  He doesn't

cherry pick.  That is, well, I'll let you bid me, but I may

not show up because I can make more money going to do this

other job, so good luck to you and run to DOT and see if you

can get one of those good faith effort excuses out of them.

So I would just reject -- I'll bet you

Mr. Cuthbertson thought he was his own businessman.  I mean,

prepared -- he had his sister working with him.  His son was

with him.  He had his own employees.  He hired and fired his

own employees.  There were some things he didn't do for

1  himself and maybe he couldn't have.  That doesn't make him a

2  wholly owned subsidiary.

3         THE COURT:  All right.  Let me hear from you,

4  Ms. Sugar.

5         MS. SUGAR:  Your Honor, Boggs Paving wrote in Styx

6  for jobs on Myrtle Beach that he didn't drive that far.  They

7  wrote him in to haul liquid asphalt when he didn't have a

8  liquid asphalt truck.  They wrote him in to do small business

9  bids that he didn't even know how to do and they got

10  100 percent of the money.  He would sign whatever.  He was a

11  truck driver so sometimes he ended up on the projects.  But

12  they knew in advance he wasn't really going to do the work and

13  that the paperwork would all match up.  That's what happened.

14  That's how easy it is.

15         I mean, you've seen the factual basis of every

16  defendant except for Drew Boggs.  It's not the government's

17  position versus Drew Boggs.  It is everyone else in the case's

18  position except for Drew Boggs, and I think that that's

19  important to note.

20         But I would go back to the *Ohio Brothers*.  I don't

21  think -- I think there's a special rule that applies -- I

22  mean, the case law says special rules.  When we have these

23  types of cases because the government benefits where, you

24  know, the road is going to get built, we have to have a

25  special rule for loss so we don't need to deduct.  And you

know, there's a recent case in the Third Circuit that went one way; but if you look at the Ninth Circuit case, they agreed that if it were a government benefits case, you wouldn't reduce the amount.

We need to talk about the harm to this, of a company writing in a guy they knew wouldn't do the work for ten years, being told over and over again you can't do this. Coming up with more and more complicated ways to hide what he was doing. Running $7 million through an account that comes right back to the company, sometimes going back to Boggs Paving, not even to Boggs Transport. That is real.

And, you know, other construction companies are watching. This is -- this case has gotten a lot of media coverage. And if you can do this and there is no loss, then, you know, I'm going to be very busy because what's to stop people from committing this fraud?

We can't have a loss that is $30,000 in this case. We can't -- it doesn't make any sense. It doesn't -- this is a program that was supposed to build people up. You can like it or not, but you have to have respect for the law and you have to do what you say you're going to do. There's no rule that says you can lie about the work someone did and send it in to the government agency and say they did. That -- there's no rule that says that. There's no rule that allows you to write in some guy on a bid that you know isn't going to come.

1      This is a competitive industry and they had a guy
2   who would sign whatever they wanted and that's what happened
3   here.  And people are watching.  And we can't have a zero loss
4   case.  It doesn't make any sense.
5      THE COURT:  Well, you can.  I mean, you can have --
6   you have to have a loss case as to whatever the loss is.  I've
7   got to figure out what the loss is.  What the sentence is is a
8   different story.  3553 factors is what comes into it.
9      MS. SUGAR:  Yes, Your Honor.
10      THE COURT:  The loss is going to be what the loss is
11   going to be and I've got to try to determine whether I can by
12   a preponderance determine --
13      MS. SUGAR:  As to Drew Boggs and Kevin Hicks, if you
14   can't determine the loss easily, then you can use the money
15   laundering guidelines as set out in the memo and that's based
16   on $7 million.  I mean, there's a -- there's an easy way to do
17   it.
18      THE COURT:  Mr. Bell.
19      MR. BELL:  That is darn convenient for the
20   government, Your Honor.  Lord, we just can't figure it out.
21   You better use the 7 million.  But since we have figured it
22   out -- I mean, I have to say one thing.  And again, it's a
23   little frustrating.
24      Ms. Sugar just said that the *Ohio Brothers* case
25   didn't give credit for the goods and services.  True.  When

1  *Ohio Brothers* was decided, there was no guideline application
2  note for credit.  And so then to cite *Ohio Brothers* as somehow
3  saying don't give them credit because they didn't in *Ohio*
4  *Brothers*, there was no law allowing that or in this case
5  requiring it.  So let's try to get past that.
6         What I want -- and I don't want to make everybody's
7  sentencing argument, certainly Mr. Boggs' sentencing argument
8  now because all I wanted to rise and do was draw the
9  distinction the Court just did before I started talking.
10        If you want to talk about loss here, there's a way
11 to calculate the loss for guidelines purposes.  We've given
12 Your Honor our views on that.  I really think it's either zero
13 or 37.  I'm standing by that.  That's just to set the
14 guidelines.
15        If you want to talk about, you know, there has to be
16 a loss that is to Mr. Boggs or to Boggs Paving, that is
17 punishment, that's exactly right, there needs to be and the
18 Court is going to have to look at that and whether how much
19 more punishment is required than Mr. Boggs having -- now out
20 of his profession.  He can't do anything.  He's been
21 challenged for trying to provide for his children and his
22 grandchildren.  His brother Chris Boggs, who's in the
23 courtroom here, had nothing to do with any of this.  Together
24 they've lost their company, will soon be in debt to the tune
25 of about 7-1/2 million dollars apiece.

1      I mean, there's punishment already inflicted by the
2  government by the bringing of this case and the
3  post-indictment debarment.  There's punishment handed out
4  already.  The Court -- and I keep saying please reserve
5  judgment on exactly what happened here and who did what and
6  how bad was this conduct.  We're going to have some witnesses
7  on that.
8      But the Court will then have to measure, if you want
9  to talk about loss in that second sense, how bad was this,
10  what does the punishment need to be for each individual
11  defendant and what's already happened, what's already been
12  inflicted by way of punishment.  That's a second step.
13      As far as the jump-off point for the guidelines
14  calculation, the government's numbers are indefensible.  The
15  case law is clear.  And the loss cannot be, frankly, for
16  guidelines calculations more than that 37,000 number.  If you
17  read the cases and you read the application notes, that's just
18  where it's got to fall.  And the Court can do what it thinks
19  is right on the sentence.  You've got lots of statutory
20  authority.
21      THE COURT:  All right.  Let me hear on role in the
22  offense before I take a recess to talk about this.
23      MS. SUGAR:  The United States calls Greg Tucker.
24      GREG TUCKER, GOVERNMENT WITNESS, SWORN,
25      DIRECT EXAMINATION

GREG TUCKER - DIRECT

1  BY MS. SUGAR:

2  Q.   Good afternoon, Mr. Tucker.

3  A.   Hello.

4  Q.   Mr. Tucker, you pled guilty to conspiracy to defraud the

5  United States in relation to United States versus Boggs

6  Paving.

7  A.   Yes, ma'am.

8  Q.   And are you, in fact, guilty of that offense?

9  A.   Yes, ma'am.

10  Q.   When were you employed at Boggs Paving?

11  A.   I was employed from February of 2000 to July of 2014.

12  Q.   And during that time period, what titles did you hold?

13  A.   I started out as an assistant project manager and then

14  moved into a project manager/estimator role and then

15  eventually as the vice president.

16  Q.   And when you were first hired, who hired you?

17  A.   I'm sorry?

18  Q.   Who hired you?

19  A.   A gentleman named Mike Lunsford.

20  Q.   And was he your initial supervisor?

21  A.   Yes, ma'am.

22  Q.   And was he your supervisor the entire time you worked at

23  Boggs Paving?

24  A.   No, ma'am.

25  Q.   When did that change?

GREG TUCKER - DIRECT

1  A.   I would -- thinking back, it was probably 2004 or '05

2  when Mr. Lunsford moved on to another -- to another job.

3  Q.   And who became your manager at that time?

4  A.   Mr. Greg Miller.

5  Q.   And who did Greg Miller report to?

6  A.   To Mr. Boggs.

7  Q.   Is that Drew Boggs?

8  A.   Yes, ma'am.

9  Q.   And did -- was that -- Greg Miller your supervisor for

10 the rest of your time at Boggs Paving?

11 A.   Until he -- until -- until the Monroe bypass project came

12 along and Mr. Miller was kind of moving off to the Monroe

13 bypass to handle the role on that job.  Then I started

14 reporting directly to Mr. Boggs.

15 Q.   Approximately when did that occur?

16 A.   That was 2012, 2013.  Somewhere right in there.

17 Q.   When you were a project manager and an estimator, just

18 tell the Court generally what were your responsibilities in

19 those roles?

20 A.   We -- each project manager and estimator would bid on

21 projects.  If we were successful after we bid on projects,

22 then you would manage that project to completion, handling

23 vendors, handling subcontractors, helping superintendents

24 schedule the work.  That kind of role.

25 Q.   So tell the Court how do you bid on -- I'm going to focus

1  on public jobs, government contracts.  How did the bid process

2  work at Boggs Paving when you were an estimator there?

3  A.   We would -- each estimator would be assigned a project to

4  bid.

5  Q.   Who would assign the projects out?

6  A.   Early -- well, Mr. Miller for the most -- for a long time

7  until I took over that role when he moved on to the bypass.

8  Then we would print off the DOT's list of contracts or the

9  letting list for the following month.  We would go over those

10 with Mr. Boggs and highlight the ones or pick the ones that we

11 wanted to bid on.

12 Q.   I know there's two Mr. Boggs so I just want to be clear,

13 is that Drew Boggs?

14 A.   I'll say Drew if you want me to call him Drew.

15     I would take the list to Drew.  We would highlight which

16 jobs we were going to bid.  The projects would be ordered.

17 Each estimator would be given a project to work on.  We used

18 an estimating system called Bid 2 Win.  The line items for the

19 contracts would be automatically uploaded into the Bid 2 Win

20 system.  Each estimator would go through, work on the costing

21 of the estimate, and would solicit quotes from each type of

22 subcontractor.  And when the subcontractor quotes came back

23 in, the estimator would plug in the quotes for the

24 subcontractor, and then that would be kind of the -- that was

25 the bones of the estimate.  Kind of the rough version of it.

1    And then the night -- day or night before the letting, we

2  would review as a group in the office --

3  Q.   Who was -- who do you mean "we"?

4  A.   It was usually -- each estimator, we may sit around a

5  round table and look at each other's estimate and critique

6  them, and then we always reviewed them with either Mr. Miller

7  or Drew before we put final numbers on projects.

8  Q.   All right.  I'm going to show you what's marked as

9  Government's Exhibit 383.  And you've seen this document

10 before, right?

11 A.   Not yet.

12 Q.   Oh, sorry about that.  Here you go.  383.

13   This is just -- this is called "Subcontractor Quote

14 Comparisons."  But does it basically show the process of how

15 you decided on subcontractors for a job?

16 A.   Yes, ma'am.

17 Q.   All right.  So if you could explain to the Court how did

18 that decision making work.

19 A.   Well, each of the groups of the subcontractor work types

20 were included in our estimating software and nine times out of

21 ten you take low bid.  Whoever -- whichever subcontractor

22 submitted the lowest price for the project, that was who we --

23 who we would choose.

24 Q.   You said nine times out of ten.  What was the other one

25 time out of ten?

1  A.   Well, there would be times where you may choose to use a

2  higher priced subcontractor just because the low priced sub,

3  you may not know who he is or where he is or you may have had

4  bad experiences with him on other projects.

5  Q.   How did you decide what DBEs or WBEs or MBEs to use on a

6  project?

7  A.   Well, they usually would be the typical ones that we

8  always used.  You know, they were -- most of the work types

9  from seating and pavement markings and guardrail usually are

10  minority subcontractors, and then trucking was always the last

11  piece of the puzzle.

12  Q.   All right.  So why don't you tell the Court about that.

13  How did the trucking amount for a DBE get decided during a

14  bid?

15  A.   After we -- after the final bid price was arrived at,

16  the -- and the other DBE subcontractors were included, so you

17  had a total price for the DBE subs versus total price of the

18  bid, we would take the difference or the remaining amount that

19  we had -- that we needed to achieve the DBE goal and that

20  remaining amount would be assigned to a hauler.

21  Q.   A particular hauler?

22  A.   Yes.

23  Q.   Who?

24  A.   It was given to Styx.

25  Q.   And who made that decision about how much of the contract

1  would be attributed to Styx?

2  A.   Mr. Boggs.

3  Q.   And that's Drew Boggs?

4  A.   Yes.

5  Q.   And during those -- who was present besides yourself and

6  Mr. Boggs when you were participating in this estimation?

7  A.   Generally it was whoever the estimator was that was

8  working on the project.  I may -- you know, the last couple

9  years I may or may not have been in the room early on.  I

10  usually wasn't.  It was mostly just Drew and maybe Greg Miller

11  and the estimator that was working on the job to finalize it.

12  Q.   Did it matter whether -- did you check with

13  Mr. Cuthbertson to see if he was going to actually be

14  available to do work on that particular project?

15  A.   No, ma'am.  I don't know that he was ever asked.

16  Q.   Why not?

17  A.   Because we didn't -- it didn't need to be asked.  It was

18  always just assumed that he could be the final number to plug

19  into the DBE committal sheet to make the job work.

20  Q.   And had that happened since you started there?

21  A.   Yes, ma'am.

22  Q.   And did you believe he was actually capable of doing all

23  of the work that he was committed to do on these projects?

24  A.   No, ma'am.

25  Q.   And was it common knowledge in this bidding that Styx

1  wasn't going to do the work?

2  A.   Yes, ma'am.

3  Q.   Did Drew Boggs know that?

4  A.   Yes, ma'am.

5  Q.   So why was he written in?

6  A.   He was written in because that was the only way that we'd

7  be able to win the projects.

8  Q.   But why was using Styx Cuthbertson helping you win the

9  projects?

10 A.   Somebody mentioned earlier that typically DBE prices were

11 higher.  In this case when we were able to use Styx, Boggs

12 Paving could set Styx's haul rates equal to our cost for our

13 in-house trucking rates.  And some of the other contractors

14 that were used would have higher -- that would quote, there

15 would be a few truckers that would send in quotes that would

16 be substantially higher.  And so by using -- being able to use

17 Styx's rates at the same as in-house cost rates, then we could

18 save money between -- so we wouldn't have to use outside haul

19 rates or other different truckers.

20 Q.   If you didn't think Styx could actually do the work, how

21 did you think that the DBE goals would be met on the project

22 using Styx?

23 A.   They would have to be just plugged in, shown or reported

24 to whatever value needed to be reported.

25 Q.   And did you know that to happen?

GREG TUCKER - DIRECT

1  A.   I do.

2  Q.   Did other people know that to happen?

3  A.   Yes.

4  Q.   Did Mr. Boggs know that to happen?

5  A.   Yes.

6  Q.   Did any people say, I don't want to put Styx on my job?

7  A.   There were times when people -- you know, you would push

8  back to say there's no way he can do that volume of work or

9  that dollar amount of work on that project.

10 Q.   And who would make the decision to include him?

11 A.   Drew would tell us, you know, if we didn't use him, we

12 hadn't gone through the good faith effort process.  So there

13 was no other way if we didn't plug his name in, his dollar

14 amount, whatever that may be, that we wouldn't get the

15 project.

16 Q.   All right.  I'm going to show you document 385.

17      And is this an example of the Disadvantaged Business

18 Enterprise Committal Sheet submitted by Boggs Paving on

19 project 3152?

20 A.   Yes, ma'am.

21 Q.   And at the bottom it says "Required" and then "Entered."

22 What is this required percentage amount?

23 A.   The required amount is the amount that was established in

24 the contract proposal.

25 Q.   And in this case, it was 11.5 percent.

1  A.   Yes, ma'am.

2  Q.   And does the top part show the Styx committal amount on

3  this project?

4  A.   Yes, ma'am.

5  Q.   Now, had he given you a bid for this amount of work?

6  A.   No, ma'am.

7  Q.   Had he been consulted about whether he thought that

8  project 3152 looked like a good project?

9  A.   No, ma'am.

10 Q.   Was the decision made without ever involving him in the

11 process at all?

12 A.   Yes, ma'am.

13 Q.   And why didn't you need to involve him in the process?

14 A.   Because Boggs Paving pretty much controlled whatever he

15 did.  He would go wherever he was told to go.  Sign -- like

16 you said earlier, it was just a stack of papers that he would

17 sign whenever he came by the office, and whatever it was it

18 was.

19 Q.   All right.  I'm going to show you Exhibit 384.

20      Is this the Styx quote for that same job?  Quotation?

21 A.   Yes, ma'am.

22 Q.   Now, did South Carolina require that a quotation from the

23 DBE was submitted along with the bid or after you won the bid?

24 A.   Yes.

25 Q.   Now, who created this document?

GREG TUCKER - DIRECT

1  A.    Wanda Knight usually created those documents.

2  Q.    And where did she get -- I'm sorry, keep going.

3  A.    She created those post-bid, yes, ma'am.

4  Q.    And how did she get the information to include in there?

5  A.    She would have gotten those from the information that was

6  turned in at bid time.

7  Q.    Would you give her the information sometimes?

8  A.    Yes, whoever was the estimator on the project, yes,

9  ma'am.

10  Q.    Now, do you ever remember Styx Cuthbertson being written

11  into a bid for anything other than hauling?

12  A.    Yes, ma'am.

13  Q.    Could you tell the judge an example of that.

14  A.    There was a project at one of the airports at Myrtle

15  Beach, and same deal that applied where there was no good

16  faith effort that had been applied -- or had been attempted

17  prior to bid.  And I want to say that the asphalt plant on

18  that project was to be sitting on the project so that would

19  limit the amount of hauling even that much more.  And there

20  was a couple specialty items of work.  We were putting

21  drainage around the airfield itself.

22       And the -- since there was no more -- there wasn't any

23  opportunity to put hauling in there to meet the DBE goal, the

24  estimator on that project was instructed to write Styx in to

25  install that drainage work around the airfield.

1  Q.   Who instructed him to write in Styx?

2  A.   Drew did that.

3  Q.   And did anyone think he was actually going to do that

4  work?

5  A.   No, ma'am.

6  Q.   I'm going to show you Exhibit 41.

7       Have you seen this document before?  Is this an email on

8  the bottom half from you to Drew Boggs regarding contract

9  proposal?

10 A.   Yes, ma'am.

11 Q.   And what did your email say?

12 A.   My email said, "It's a freaking small business contract.

13 Styx can bid I assume?"

14 Q.   What is a small business contract?

15 A.   It is a contract that is only available for companies

16 that are identified as a small business enterprise.

17 Q.   Is Boggs Paving a small business?

18 A.   I'm sorry?

19 Q.   Was Boggs Paving a small business?

20 A.   No, ma'am.

21 Q.   And so what did "Styx can bid I assume" mean?  What did

22 that mean?

23 A.   That meant that the only way that project could be bid

24 was if Styx's name was on the bid.

25 Q.   Was there ever any intention that Styx would actually do

1  that job?

2  A.   No, ma'am.

3  Q.   He's just a hauler; is that right?

4  A.   I'm sorry?

5  Q.   He's just a hauler; is that right?

6  A.   That's correct.

7  Q.   Would he have the know how to do that project?

8  A.   No, ma'am.

9  Q.   Why did you send that email to Drew Boggs?

10 A.   Because I was asked to pull that job from the DOT's

11 website to look at it to see -- since it was a stone haul job.

12 And just recently the quarry, the Buckhorn Materials Quarry

13 had been opened and it was an opportunity to possibly move

14 some rock, sell some rock from that quarry on a DOT project.

15      So I was asked to find -- or to look at it.  Found out

16 that it was an SBE.  So I was telling Drew, Look, it's an SBE

17 job.  We can't do anything with it, but Styx can.

18      The next part of the email was just a simple -- just a

19 "10-4," that yeah, we'll put Styx's name on the bid.

20 Q.   So did Drew Boggs -- in essence, he said, Yes, submit a

21 bid in Styx's name?

22 A.   Yes, ma'am.

23 Q.   Why would you have gone to Drew Boggs in that instance?

24 A.   Pretty much went to Drew for just about everything.

25 Q.   Will you tell the Court a little bit about his management

1  style.  Was he very involved in the day-to-day operations of

2  the business?

3  A.  Yes, ma'am.  He was a concerned owner, an involved owner.

4  From the financial side where we would have project manager

5  meetings to discuss job costs and billings to bids as small as

6  $80,000 all the way up to, you know, millions of dollars.  He

7  was very involved.

8  Q.  And was he aware of issues that came up with regard to

9  Styx Cuthbertson's performance on many of the projects?

10  A.  Yes, ma'am.

11  Q.  Did you have any direct conversations with him about the

12  problems with Styx?

13  A.  I'm sure that we talked about -- yeah, if there was ever

14  an issue on a project, big or small, we would -- I would take

15  it to Drew.  He would be my first person to go to to see how

16  we could rectify a situation.

17  Q.  Do you remember working on a job in North Carolina, a

18  small business job called Browns Hill?

19  A.  I don't think it was a small business job.

20  Q.  Oh, I'm sorry.

21  A.  Yes.

22  Q.  It was a state job.

23  A.  It was just a purchase order contract, yes, ma'am.

24  Q.  All right.  And did a problem come up on that job --

25  A.  Yes.

1   Q.   -- relative to the use of Styx?

2   A.   Yes.

3   Q.   And I'm going to show you Exhibit 9A.

4        Was this a project that you were in charge of?

5   A.   Yes, ma'am, I was the project manager.

6   Q.   And this letter references a telephone conversation with

7   you on July 17, 2008, about Styx Cuthbertson being the

8   approved hauler and that for their inspection records it

9   appears other non-DBE subcontractors were being utilized and

10  that there was a meeting set.  Did you go to that meeting?

11  A.   Yes, ma'am.

12  Q.   And after you had the phone call with North Carolina DOT,

13  who had you talked to about it?

14  A.   After we had the meeting?

15  Q.   No, before -- once you found out that there was a

16  problem, who did you talk to?

17  A.   I went -- back then that was when I was -- Mr. Miller was

18  my supervisor, so I went directly to him to bring up the

19  problem.

20  Q.   And after you met with Greg Miller, did you go to anyone

21  else to discuss it?

22  A.   Yeah, we discussed it with Drew.

23  Q.   And what -- what was the result of that conversation?

24  A.   The problem on that project was that the inspector on the

25  job had not seen many or any of Styx's trucks that were

1   hauling that were -- and he was the committed hauler for a

2   particular line item, so they suspended work on the project.

3   So then after -- I don't remember the phone conversation.

4   It's been a long time ago.

5       But me and Greg Miller had, you know, talked about what

6   do we do.  So we went to talk to Drew to figure out, you know,

7   what's the next step.  I remember the inspector's name was --

8   his name was Joe Hatley.  Still works for DOT.  And it was

9   kind of a stupid inspector.  Why is he bringing that up?

10  Don't he understand we need to get the project done?

11  Q.   All right.  And I'm going to show you Exhibit 9B.

12      Was there a response sent from Greg Miller copied to you

13  and to Drew Boggs and some other people regarding this?

14  A.   Yes, ma'am.

15  Q.   And was it represented that -- that Styx had been leasing

16  trucks from Boggs Transport?

17  A.   Yes.

18  Q.   Now, ultimately, DOT sent a letter to Greg Miller on

19  July 23rd that said that you indicated among other things that

20  Styx Cuthbertson is leasing trucks from Boggs Transport and

21  that their compliance specialist said that she didn't

22  interpret this provision as allowing that, and that the matter

23  would likely require further investigation.

24      Do you remember that the issue of Styx leasing trucks

25  from Boggs Transport came up?

1    A.    At the time of what?

2    Q.    Of this Browns Hill inquiry.

3    A.    Yes.

4    Q.    And had Styx been leasing any trucks from Boggs

5    Transport?

6    A.    No, ma'am.

7    Q.    And why do you say that?

8    A.    Because I don't know of a lease agreement that was ever

9    in place for this project to allow him to use Boggs Transport

10   trucks under his control on a project.

11   Q.    Have you ever heard of him leasing trucks from Boggs

12   Transport?

13   A.    Not -- not as an official document.  I've heard people

14   say that, yeah, we'll have a lease agreement with him, but I

15   don't know of a lease agreement that ever existed.

16   Q.    And what did you understand it to mean when people said

17   they'd have a lease agreement with Styx?

18   A.    That it was a way to claim Boggs Transport was under

19   Styx's control on the project.

20   Q.    But eventually, they actually changed the North Carolina

21   contract language to specifically prohibit that; is that

22   right?

23   A.    Correct.

24   Q.    And eventually they asked you for documentation to

25   provide any subcontracts for that project.  And you responded

1  to them on December 22nd, 2008.  Is that your signature?

2  A.  Yes, ma'am.

3  Q.  And it says, "Since the MBE haulers used on this project

4  were able to meet the goals of their own forces, no lease

5  agreements were established between them and any other

6  companies."  Is that right?

7  A.  Yes, ma'am.

8  Q.  So even though you originally told them there had been a

9  lease, you backed off that claim later.

10  A.  Yeah.  That first letter saying that was from Mr. Miller;

11  but this one, yeah, I said there were no lease agreements in

12  place.

13  Q.  Why did you back off that statement?

14  A.  Because there were no lease agreements in place.

15  Q.  I'm going to show you Exhibit 203A.

16     This is a subcontract between Boggs Paving and Styx on

17  job 3130; is that right?

18  A.  Yes, ma'am.

19  Q.  And if you look at the top line items, do you recall at

20  the time that this contract was signed, did Styx even have any

21  liquid asphalt trucks?

22  A.  I do not know.

23  Q.  Well, do you remember a time when he was written in for

24  liquid asphalt trucks when he didn't have any trucks?

25  A.  I don't remember that, no, ma'am.

GREG TUCKER - DIRECT

1  Q.   Do you know if he has liquid asphalt trucks?

2  A.   He does.  Well, when I -- before I left he did have

3  liquid asphalt tankers.

4  Q.   So looking at Exhibit 203, is this -- this is an email

5  for meeting minutes for I-77; is that right?

6  A.   Yes, ma'am.

7  Q.   And I guess you're not on this, but if we go down to item

8  16A, DBE -- 16, DBE for trucking, did it say Styx and then an

9  amount, but it's already been written in, "Consider Styx

10 getting an AC tanker truck"?

11 A.   Yes, ma'am.

12 Q.   I'm going to show you Exhibit 314.

13      Have you seen this document before?

14 A.   Yes.

15 Q.   What is it?

16 A.   This is an NCDOT letter of intent for the Monroe bypass

17 project.

18 Q.   And how much work does it say he was going to do on that

19 project?

20 A.   2,820,000.

21 Q.   Now, were you involved in -- well, actually, let me show

22 you Exhibit 70.

23      In October of 2010, had Drew Boggs sent an email to you

24 and Greg Miller saying, "We are short and need more trucking

25 for the Monroe bypass"?

GREG TUCKER - DIRECT

1    A.    Yes.

2    Q.    And as a result of that, were you involved in preparing a

3    committal for Styx on this project?

4    A.    Yes.

5    Q.    And tell us a little bit about that.  Did -- how did the

6    number 2.8 million come to be?

7    A.    At the end of -- again, once all of the DBE committals

8    had been made on the project, at the very end one -- there

9    were two haulers, I believe, used on that project.  One was

10   written in for an amount and Styx was going to be the second

11   one, and we were just waiting on -- to see the final amount

12   that was needed to be able to write Styx in for that amount.

13   Q.    And who was involved in this waiting?

14   A.    Me and Greg Miller were waiting to get final word from

15   Drew and the rest of the joint venture team how much we needed

16   to write him in for.

17   Q.    And did you believe that -- and was there any discussion

18   with Styx about whether he was able to do that amount of work?

19   A.    I don't think so.

20   Q.    Did you have any conversation with him?

21   A.    I did not, no, ma'am.

22   Q.    And knowing how much -- how many trucks he has, do you

23   believe he was able to do 2.8 million?

24   A.    No, ma'am.

25   Q.    Show you an exhibit, Exhibit 75, and start at the bottom.

GREG TUCKER - DIRECT

1    At the bottom is this an email you sent to a variety of
2  people regarding plant hauls?

3  A.   Yes, ma'am.

4  Q.   And what does the email say?

5  A.   It says, What is the possibility of putting Styx trucks
6  on plant hauls for upcoming material needs?  We have him
7  written in on the Anson contract.  Need to be utilizing him as
8  soon as possible.

9    Do you want me to read it all?

10         MR. BELL:  I'm sorry, I missed the exhibit number.

11         MR. SAVAGE:  75.

12         MR. BELL:  75.  Thank you.

13  Q.   And do you go on to say that you've been told that you're
14  going to have to submit invoices for haul materials and/or
15  canceled checks to back up the plant haul amount?

16  A.   Yes, ma'am.

17  Q.   And going back to page 1.  Did Drew Boggs respond to
18  that?

19  A.   Yes.

20  Q.   What did he say?

21  A.   He asked if the contract for specifications required us
22  to submit all the documents that DOT had asked for or if they
23  were just asking for it as additional backup.

24  Q.   All right.  Did you guys maintain records of plant hauls
25  to be used in situations like this?

1  A.   You mean...

2  Q.   Why were you forwarding this to Drew Boggs?  I mean, why

3  would he even care about this topic?

4  A.   Because that was a situation where DOT was questioning

5  our relation -- Boggs' relationship with Styx, and it was

6  forwarded to him to make sure that all of the information they

7  needed was the proper information or information that would

8  not lead DOT to ask more questions.

9  Q.   So whenever you had a potential issue on anything, would

10  you make sure to keep Drew Boggs in the loop?

11  A.   Yes, ma'am.

12  Q.   I'm going to show you 76.

13       This is an email from you to a variety of people.  It

14  says, "Attached is one yearly truck lease with Styx and one

15  generic that can be modified."

16       Why would you have created a generic truck leasing

17  agreement with Styx?

18  A.   With all the questions that had been brought up on

19  projects about where is he at and why are Boggs Transport

20  trucks showing up, I was instructed to generate a lease

21  document that could be used if needed or when needed.

22  Q.   So it wasn't for a specific contract.  It was just if DOT

23  started asking questions.

24  A.   Correct.

25  Q.   Who would have instructed you to create that?

GREG TUCKER - DIRECT

1   A.   Back then it would have been Drew or Greg.

2   Q.   I'm going to show you Exhibit 77.  Look at the bottom of

3   it.

4        And is this an email from you?

5   A.   Yes, ma'am.

6   Q.   And it's to a variety of people, including Drew Boggs and

7   Greg Miller, dated August 18 of 2008.

8   A.   Yes.

9   Q.   And does the sentence say, "To meet these goals, we will

10  need to run as many Styx trucks as possible and then match

11  them with the same number of outside non-BTI trucks"?

12  A.   Yes, ma'am.

13  Q.   Why couldn't they be matched with BTI trucks?

14  A.   Why could they not?

15  Q.   Yes.

16  A.   Because you're not supposed to sublease back to the prime

17  contractor.

18  Q.   And you were aware of that in 2008?

19  A.   Well, back then probably not.

20  Q.   Well, why did you say that in an email in 2008?

21  A.   Well, I said that you could.  I said we needed to take as

22  many Styx trucks and match them one to one with as many Boggs

23  trucks.

24  Q.   No, it says outside non-BTI trucks.

25  A.   Oh, it does say outside non-BTI.  So yes, that would have

1  been that we cannot run Boggs Transport underneath Styx to get

2  credit.

3  Q.    I'm going to show you Exhibit 94.

4      At the bottom is there an email from someone at NCDOT to

5  you and others regarding Oshwood Drive?

6  A.    Yes, ma'am.

7  Q.    And then did you send out that email to a variety of

8  people at your office, including Brad Currin, Drew Boggs, Lee

9  Sanders, Kristy Lawrence, Greg Miller -- and Greg Miller?

10 A.    Yes, ma'am.

11 Q.    And if you can just read it to the Court.

12 A.    It says, "Guys, see the email below from our engineer on

13 the Scotland County project.  This is the fourth regarding

14 this subject today.  Those folks are placing a huge emphasis

15 on trucking operations this year and we need to keep things on

16 the up and up.  DOT would rather see us using a Styx truck

17 with an outsider DBE, like HL Henry, than our stickered trucks

18 for day-to-day hauling.  We need to keep a Styx truck on site

19 each day that hauling takes place and match with an HL Henry

20 truck since she is a DBE.  When larger haul days come up, our

21 trucks will have to supplement which should not be any

22 problem."

23 Q.    And the date on that one was -- this was in June of 2009?

24 A.    Yes.

25 Q.    All right.  Have you ever heard the term run -- "run it

1    through Styx"?

2    A.    Yes, ma'am.

3    Q.    What does that mean?

4    A.    That meant to run any active hauling on the project

5    through Styx for credit.

6    Q.    And it meant that he wasn't actually going to do the

7    work; you were just going to attribute it to him?

8    A.    Yes, ma'am.

9    Q.    And was that a commonly known phrase at Boggs Paving?

10   A.    Yes, ma'am.

11   Q.    Did Drew Boggs know what that meant?

12   A.    Yes, ma'am.

13   Q.    And there's an email at the bottom to you from Kristy

14   Lawrence that says, "You have Styx wrote in for hauling

15   aggregates to plant.  Do you still want me to run asphalt

16   through just in case we don't have enough to meet the goal?"

17        And you say, "Absolutely.  Thanks for thinking ahead."

18   A.    Yes, ma'am.

19   Q.    And this was a regular practice to just make the numbers

20   work regardless of what Styx had actually done?

21   A.    Yes, ma'am.

22   Q.    And this was not a secret at Boggs Paving?

23   A.    No, ma'am.

24        MR. BELL:  I'm sorry, what was that number?  I keep

25   falling behind.

1       MS. SUGAR:  90.

2       MR. BELL:  Thank you.

3  Q.   And that was on December 9th of 2010.

4  A.   Yes, ma'am.

5  Q.   And then looking at job 92.

6       At the bottom there's an email from Richard Moses.  Who

7  is Richard Moses?

8  A.   He was the manager at the rock quarry.

9  Q.   Buckhorn Materials?

10 A.   Buckhorn Materials, yes, ma'am.

11 Q.   And who did he report to?

12 A.   To Drew, I would assume.

13 Q.   All right.  And then it says "Dispatch."  Is that under

14 Boggs Transport?

15 A.   Yes, ma'am.

16 Q.   And who did Boggs Transport report to?

17 A.   To Drew.

18 Q.   What about Wes Malone, who is he?

19 A.   He was the project superintendent.

20 Q.   And who did he report to?

21 A.   Lee Sanders.

22 Q.   All right.  And Kristy Lawrence, she was in accounting?

23 A.   Yes, ma'am.

24 Q.   And who did she report to?

25 A.   Kevin Hicks.

GREG TUCKER - DIRECT

1   Q.   All right.  And Rich sends an email that says, "I just

2   talked to Chop."  That's the dispatcher right, Pork Chop?

3   A.   Yes, ma'am.

4   Q.   "He says he didn't get this email.  He has no Styx trucks

5   for tomorrow and probably can't start until Friday.  Will that

6   be okay?"

7       Then Kristy responds and includes you and others, and she

8   says, "Do it however you need to.  Put our trucks on it if

9   possible and I can run this through Styx on my end."

10      Is that another example of running through?

11  A.   Yes, ma'am.

12  Q.   And this was not a secret in the company about how the

13  numbers -- how Styx's goals were being met?

14  A.   No, ma'am.

15  Q.   Now, did there come a time when -- did you ever hear of

16  any -- any steps taken after DOT would ask questions about

17  Styx to make it harder for them to question why he wasn't on

18  the job?

19  A.   Say that again, now.

20  Q.   Did you ever hear -- was there a time when Styx began

21  being written in more for plant hauls?

22  A.   Oh, yes.

23  Q.   And how did that come to be?

24  A.   Well, once the quarry was opened in South Carolina and

25  then you have plants that are scattered 30 to however far, the

1  one down at the coast was away, it was an easy way to keep

2  Styx from being visible on projects.  So don't write him in

3  for hauling asphalt day-to-day where inspectors are watching.

4  It was an easy way to write him in on the aggregate haul from

5  the quarry to the plant that nobody monitored so nobody would

6  see him on a day-to-day basis.

7  Q.   Did you have a specific conversation with anyone about

8  the importance of visibility, of him not being -- there not

9  being a visibility issue?

10  A.   Yeah, I think we actually had a company -- or a project

11  manager estimator meeting and were told that that was the way

12  to start doing things.

13  Q.   Who told you that?

14  A.   Drew.

15  Q.   Did any project manager ever say, I'm not putting Styx

16  Cuthbertson in on this haul?

17  A.   There were times that there was push back on it, yes,

18  ma'am.

19  Q.   Do you remember any specific examples?

20  A.   Not specific.

21  Q.   And what was Drew Boggs' reaction to that push back?

22  A.   It was always if we don't write him in, then there's no

23  need to bid the job because we don't have the good faith

24  effort to back up the project.

25  Q.   Was there a time after this investigation started where

1   there was an attempt to get some more jobs with using him

2   less?

3   A.   Say that again, now.

4   Q.   Was there a time when you tried to start writing him in

5   less on projects?

6   A.   Not that I'm aware of.

7   Q.   No?

8        Now, were you aware of the specific way that trucks were

9   run through Styx?  Like, did you know anything about the

10  accounting process?

11  A.   No, ma'am.

12  Q.   Who would have known about that?

13  A.   That would have been the accounting side.  Kristy

14  Lawrence and Kevin.

15  Q.   All right.  Who had control over where Styx's trucks

16  would go on any given day?

17  A.   Boggs Paving did.

18  Q.   Why do you say that?

19  A.   Because if -- if he was on a project -- written in on a

20  project or not written in on a project, transport -- the

21  dispatcher would tell Styx each day where he was going to

22  work.

23  Q.   Did Styx have any way of knowing even which projects he

24  was on at any time or do you know if he knew?

25  A.   As far as ones that he had been committed as the DBE on?

GREG TUCKER - DIRECT

1  Q.    Yes.

2  A.    He may know because he had to sign the contracts or

3  letters of intent; but other than that, I don't think so.

4  Q.    When you were working on a project, did you have any

5  discussions with anyone about how the costs were going on?

6  Would anyone be watching your projects for costs?

7  A.    Yeah, we had regular monthly job cost meetings with all

8  project managers for all projects.

9  Q.    And who was leading those meetings?

10 A.    Most of the time Drew and Kevin would lead them to

11 discuss billings and costs and why a job is not making money

12 or it's over billed.  Why is it over billed.  That kind of

13 information.

14 Q.    Was anyone watching how the hauling -- was anyone

15 watching the hauling costs on projects?

16 A.    Yes.

17 Q.    Who paid attention to that?

18 A.    Well, I don't remember when it was, but when an employee

19 had started doing a dashboard -- they called it a daily

20 dashboard where he would generate haul costs, daily haul costs

21 for all projects company wide.

22 Q.    Who was this, I'm sorry?

23 A.    Former -- his name was Juan Guarda.

24 Q.    Did Drew Boggs ever talk to you about haul costs on

25 projects?

1   A.   Yes.  Oh, yes.

2   Q.   Would you say he was very in the weeds as a manager?

3   A.   Yeah.  He knew -- he knew when jobs were going well and

4   when they were not going well.

5   Q.   Who ultimately -- who ultimately made the decisions about

6   use of Styx on projects?

7   A.   Drew did.

8   Q.   And if there was a problem involving the use of Styx on a

9   project, who did you and the other project managers go to?

10  A.   We would go to Drew.

11  Q.   And was Drew Boggs well aware of the practice of running

12  Styx -- running trucks through Styx?

13  A.   I would say so, yes.

14  Q.   And you personally saw Drew Boggs -- or you watched Drew

15  Boggs write in Styx for doing drains or tell someone to write

16  him down for drains even though that wasn't the kind of work

17  he did?

18  A.   Yes, ma'am.

19  Q.   And Drew Boggs authorized you to bid on small business

20  jobs in Styx's name even knowing that that would be Boggs

21  Paving's project?

22  A.   Yes, ma'am.

23  Q.   Did Boggs Paving control Styx Cuthbertson?

24  A.   Yes, ma'am.

25  Q.   And who ultimately at Boggs Paving was the person who had

1   that top level of control?

2   A.   Drew.

3           MS. SUGAR:  No further questions.

4           THE COURT:  Mr. Bell.

5           MR. BELL:  Thank you, Your Honor.

6                       CROSS EXAMINATION

7   BY MR. BELL:

8   Q.   Mr. Tucker, let me go back to the bid night process.  I

9   take it you all were bidding on a lot of jobs all the time; is

10  that right?

11  A.   Yeah, there would be months we bid 10 to 12 jobs on a day

12  on a certain highway letting.

13  Q.   You could bid 10 or 12 projects all at one time?

14  A.   Well, it didn't happen all at once.  It would be a month

15  long process, and then final bid day there would be 10, 12

16  bids submitted.

17  Q.   And how many, just on average, if you had that many bids

18  going in at one time, how many would you get?  How many would

19  you win?

20  A.   If you were lucky, you'd win three or four.

21  Q.   So you might bid 12 and you hoped to get 3 or 4?

22  A.   Yeah.

23  Q.   Okay.  The judge made some mention of this earlier.  Do

24  you know of any collusion among road pavers in this area,

25  that, you know, one paver would win this job and the other

1  paver would win the other job, some sort of agreement?

2  A.   No, sir.

3  Q.   All right.  So if you're bidding 10 or 12 projects at one

4  time as a company and all your subs, right, putting in subs

5  for all these bids, what if you won them all?

6  A.   It would be an exciting day for the estimators, but a

7  miserable day for the operations folks.

8  Q.   Well, it would also be -- everybody would be hugely over

9  committed, right?  I mean, if you had your guardrail guy --

10  A.   Well --

11  Q.   -- written in for 12 projects and you got all 12 of them,

12  there's no way in the world he's going to be able to do all

13  that work, right?

14  A.   The majority of the projects that we would be bidding

15  when there would be that number on a day wouldn't be -- it

16  would be resurfacing type projects where there wouldn't be a

17  whole lot of sub work.  Maybe for pavement marking guys, that

18  would be one thing that they could get over committed in a

19  hurry.  Haulers could get over committed in a hurry.  But,

20  yeah.  And 10 to 12 jobs to bid in a month was a

21  once-in-a-blue-moon kind of thing.  It wasn't something that

22  happened on a regular basis.

23  Q.   Right.  But I guess my point here is that -- let's just

24  stick with haulers.  If you're bidding on a lot of jobs and

25  you know you're only going to get some of them and you're

1   bidding your usual haulers or your usual striper or your usual
2   guardrail, or whatever, it can look like you're bidding people
3   knowingly beyond their capacity, but it's not beyond their
4   capacity because you know you're not going to get them all.
5   A.    That is correct.
6   Q.    Okay.  Let me ask you about DBE reports.  Well, let me
7   back up.  Let's say you're a project manager on a particular
8   project.  And as I look at the 41 projects that are at issue
9   here, nearly all of the South Carolina projects the government
10  has had us look at are Arnold Mann projects and nearly all of
11  the North Carolina projects that we have been looking at are
12  your project where you're the project manager.  So if you're
13  the project manager over a program, what are your
14  responsibilities for it soup to nuts?
15  A.    From soup to nuts would be win the project.  Have admin
16  people issue subcontracts and purchase orders to the
17  subcontractors or vendors that were chosen.  Attend a
18  preconstruction conference with the DOT.  And then nine times
19  out of ten, again, they would -- the project would be handed
20  off to the operations side; and unless there was an issue, the
21  superintendent on the project would handle it to completion
22  unless an issue arose on the project with workmanship from our
23  perspective or an unforeseen issue on the roadway that needed
24  attention.  Most of the time operations took the project and
25  ran with it.

1    Q.   Okay.  So who is -- who tells dispatch that we've got a
2    DBE hauler on this project and for this amount?  Who tells
3    them that?
4    A.   The project manager would tell dispatch that here's the
5    goals for each of the haulers on the project.
6    Q.   Okay.  And so on the project where you were project
7    manager on these projects that we've been looking at, that
8    would have been your responsibility.
9    A.   Yes, sir.
10   Q.   And who would you tell down there?  Would it be
11   Mr. Mullis himself or...
12   A.   Yes.  Well, and sometimes it would be a couple of people.
13   When we would have an in-house preconstruction conference, the
14   superintendent that was on the job that was going to be
15   building it, that was going to be ordering the haulers every
16   day or the trucks every day, we would tell him and then, yes,
17   we would tell Mr. Mullis himself.
18   Q.   All right.  So he would be informed that he needs to get
19   the DBE hauler that the commitments were made to on these
20   projects, right?
21   A.   Yes.
22   Q.   All right.  And would it be the program manager's job to
23   check on that as the project goes on and see that Mr. Mullis
24   was, in fact, getting the committed DBE hauler out on those
25   jobs?

1   A.    It probably should be, yes, but I'm not going to say that
2   always happened.
3   Q.    Well, I'm going to ask you specifically since you were
4   the project manager on nearly all the problem North Carolina
5   jobs.  Did you do that?
6   A.    No.
7   Q.    But that was your job, right, to make sure that Pork
8   Chop, as he goes by, gets Styx on your jobs?
9   A.    And we would do that once the -- you know, after our
10  first pay estimate was made and it was time for one of the
11  admin people to enter in the DBE tracking portion on the
12  project or to do the report.  And if DOT brought up or came
13  back and said, Hey, you're not using who you're supposed to,
14  then the project manager would be involved.
15  Q.    Well, I'm talking about long before DOT should have found
16  out.  As project manager, don't you track whether you were
17  meeting your DBE goals?
18  A.    Not on a day-to-day or a weekly basis.
19  Q.    How about on a quarterly basis or as the project goes on,
20  as project manager, what do you do to make sure your DBE
21  commitments are being reached?
22  A.    We relied on the operations side to make sure that they
23  were using the correct trucks that were written in on the
24  project to use.
25  Q.    So once you turned it over to dispatch, just sort of

1    hoped it goes okay?

2    A.   No, not to dispatch.  We relied on our operations people,

3    the guys that would call in and say, Hey, Pork Chop, I need

4    XYZ hauler today or I'm going to have to have ten trucks.

5         And I feel like you're -- you know, that you're aware

6    that there was a giant whiteboard in the dispatch office that

7    showed all of the projects and all of the haulers that were

8    assigned to those projects.  So when the superintendent would

9    call in, say, Okay, tomorrow I'm on job 10 and I need 10

10   trucks, then Pork Chop would look at the board and say, Okay,

11   that's a Styx project.

12        So it was -- it a three-prong attack.  It wasn't solely

13   on the project manager's head.

14   Q.   So bottom line, somewhere along the line with the project

15   manager and operations and Pork Chop in dispatch, Styx should

16   have been put on the jobs he was committed to.

17   A.   He should have been.

18   Q.   Yeah.  Now, the DBE reports, what's your role in

19   preparing or reviewing DBE reports for haulers?  Let's just

20   keep it to haulers.

21   A.   I did not do -- I didn't do any of the online DBE

22   reporting on the North Carolina projects.

23   Q.   Okay.  Who prepared the DBE reports within Boggs Paving?

24   A.   Charity Coleman, as far as I know.

25   Q.   And those are submitted online in North Carolina?

1  A.   Yes, sir.

2  Q.   And on paper in South Carolina?

3  A.   Yes, sir.

4  Q.   And did you ever review her reports?

5  A.   No, sir.

6  Q.   Do you know how she created those reports, where she got

7  her information?

8  A.   No, sir.

9  Q.   Let me ask you about this Myrtle Beach project that you

10 say Mr. Boggs told somebody to write in Mr. Cuthbertson to do

11 some drain pipe work, strip drains.

12 A.   Yes.

13 Q.   And who do you say he told that to?

14 A.   Dean Floyd.

15 Q.   All right.  Now, we've been looking for a committal sheet

16 for that project that would show what you're just saying.

17 Have you seen such a one?

18 A.   I have not.

19 Q.   Well, shouldn't there be one?

20 A.   There should be one, yes, sir.

21 Q.   So if what you're saying is true, either we or the

22 government ought to be able to find a committal sheet backing

23 that up.

24 A.   Yes, sir.

25 Q.   Let's talk a little bit more about the Browns Hill Road

1    project.

2            MR. BELL:  Your Honor, may I talk to the government

3    for just a second?

4            THE COURT:  Yes, you may.

5            (Counsel conferred.)

6            THE COURT:  We're going to take a break in a minute,

7    Mr. Fialko.  I know you're getting stiff back there.

8            MR. FIALKO:  Thank you, Your Honor.

9            THE COURT:  How much longer do we have on cross,

10   Mr. Bell?

11           MR. BELL:  Not very long, Your Honor.  But we're

12   trying to locate an exhibit that I can show him so if you want

13   to take a quick break while we do that.

14           THE COURT:  Yeah, why don't we do that.  Let me just

15   say, we're going to get all the evidence and stuff we can in.

16   I want to talk a little bit more on this valuation thing.  But

17   we may have to use a little bit of time on Monday morning to

18   finish up some of these decisions.

19           MR. BELL:  I don't have much longer with this

20   witness.

21           THE COURT:  Okay.  Let's go ahead and take a quick

22   break.  Take about a ten minute break.

23           (Brief recess at 3:44 p.m.  Court resumed at 3:53

24   p.m.)

25           THE COURT:  Mr. Bell, go ahead -- you can go ahead

1  and get started.  I was going to talk about something before

2  you did.  Just go ahead.

3         MR. BELL:  Okay.  Thank you.

4                    GREG TUCKER

5              CROSS EXAMINATION (Cont'd.)

6  BY MR. BELL:

7  Q.  Let me show you Defendant Boggs Exhibit 5.

8      And this -- the government had shown you some letters

9  connected with that Browns Hill Road project to and from the

10  DOT.  Do you remember that?

11 A.  Yes, sir.

12 Q.  All right.  And this isn't focusing all that well, but

13 can you see that that's a November 7, 2008, letter to DOT from

14 you?

15 A.  Yes, sir.

16 Q.  With your signature?  Do you see that?

17 A.  Yes, sir.

18 Q.  Just not sure how clear it was for you.  That's all.

19     And then in the second paragraph it says, "Copies of

20 subcontracts, requests for subcontracts, also copies of

21 invoices from these two subcontractors have been included."

22     Do you see that sentence?

23 A.  Yes.

24 Q.  All right.  And so is that in response to what they had

25 been asking, they wanted some backup documentation for what

1  they were being told that included invoices from

2  Mr. Cuthbertson?

3  A.    Yes.

4  Q.    Okay.  And he also provided copies of the checks to

5  Mr. Cuthbertson.

6  A.    Yes.

7  Q.    And that's what this is.

8  A.    Looks to be, yes, sir.

9  Q.    And that signature line there, Drew Boggs, that's a

10  signature stamp that Mr. Hicks had control of?

11  A.    I guess.  I do not know.

12  Q.    Well, you've seen it probably a hundred times, haven't

13  you?

14  A.    Not really.  I never looked at a whole lot of checks.

15  Q.    Okay.  And then is this one of the invoices that you sent

16  as part of this response package, a Styx Cuthbertson Trucking

17  invoice?

18  A.    I know there were some sent.  I would assume this was one

19  that was attached, yes.

20  Q.    Okay.  And how did you go about getting this invoice to

21  give to the DOT?

22  A.    I would have gotten it from Kristy Lawrence.

23  Q.    Anywhere else?  Could it have been anybody besides

24  Kristy?

25  A.    No, sir.

1  Q.   And in fact, Kristy Lawrence creates the invoices for
2  Cuthbertson Trucking to be submitted to Boggs, correct?
3  A.   Correct.
4  Q.   All right.  Now, I'm going to have to try to go back and
5  forth a little bit here.  But this is the invoice format that
6  was sent to DOT by you that you say you got from Kristy to try
7  to satisfy the DOT that there was an invoice behind this.
8       This is what a real Styx Cuthbertson Trucking invoice
9  looks like as Kristy prepares them.  You can see that it's not
10 an invoice like you sent to DOT.
11      And I will represent to you that there are no accounting
12 entries in Boggs' records to show -- to back up the existence
13 of these invoices.
14      So what I'm asking you is, you agree with me this is a
15 falsified, created invoice that was sent to DOT?
16 A.   If it was, it was done by Kristy.
17 Q.   Well, and I thought that might be your response.  But the
18 one I'm showing, and it's on the screen now, these are the
19 ones that Kristy prepares.  So if she was going to create a
20 false invoice, she'd make it look like a real invoice instead
21 of this invoice.
22      So if this is a false invoice and according to you, you
23 got it from Kristy, one of the two of you created a false
24 invoice, but she knows how to create ones that look right.
25      So I'm asking you straight out, did you create false

1   invoices to send to DOT?

2   A.   No, sir, I did not.

3   Q.   Do you have another explanation as to how a false invoice

4   got sent to DOT?

5   A.   I do not.

6   Q.   All right.  Getting back to these DBE reports.  Did you

7   tell me earlier you never reviewed them?

8   A.   I don't remember reviewing them, no, sir.

9   Q.   Do you know what was being reported to the DOTs for DBE

10  performance on your projects with respect to DBE trucking?

11  A.   No, sir.  It was mentioned earlier that someone had said

12  that they would go in and grab the checks paid to the DBE

13  contractors off of the accounting system and enter those in as

14  the payments made to those DBE contractors.

15  Q.   Okay.  I'm just asking if you know what was being

16  reported?

17  A.   No.

18  Q.   Independently while you were being project manager on

19  these problems, did you know what was being reported to DOT?

20  A.   From a month to month basis or --

21  Q.   I don't care whether it's quarterly, project end, yearly,

22  I don't care.  Did you know at any time what was being

23  reported to DOT for DBE trucking purposes?

24  A.   Yes.

25  Q.   And how did you know that?

1  A.   Most of the time it would be towards the end of the

2  project.  If DOT brought it to our attention that we were not

3  meeting our goal or were getting close to end of project but

4  we hadn't reported enough.  It could be that we had -- it was

5  time for a pay estimate to be due and DOT said you hadn't

6  entered your DBE information and we're not going to send you

7  another check until you catch up your DBE payments, and that

8  would usually be the time that we would look at it.

9  Q.   Okay.  And that's if you were not reporting enough DBE

10 credit and DOT wondered.  But on the 41 projects we're looking

11 at, the North Carolina projects where you were always or

12 virtually always the project manager, DBE's being told you're

13 meeting your goal.  So they wouldn't come back to you and say

14 you've got a problem.

15 A.   Right.

16 Q.   Now they're being told wrong because you weren't meeting

17 your goal.

18      So I'm asking you as project manager, did you know what

19 was being reported to DOT with respect to meeting your DBE

20 trucking goal?

21 A.   Did we know --

22 Q.   Did you know?

23 A.   Did I know the amount that was reported?

24 Q.   Yes.

25 A.   Typically I didn't look unless -- the only time that I

1  would have any reason to check on it is if DOT made us aware

2  that we were not meeting the goal.

3  Q.   So you weren't following up in any way to see whether --

4  and the project is yours, that not only -- because you've

5  already told us you weren't making the effort to see if

6  Mr. Cuthbertson was being trucked on these projects.  You also

7  didn't look to see whether DOT was getting correct information

8  about what he actually did on those projects.

9  A.   Correct.

10 Q.   All right.  And so since you've been asked so many times

11 who you report to, you did not report the fact that you had no

12 idea what the numbers at DOT were or that they were wrong up

13 your chain of command, did you?

14 A.   Only when there was an issue brought to our attention, a

15 negative issue brought to our attention would I report it up

16 the line.

17 Q.   Right.  But on these -- your share of these 41 projects,

18 you weren't telling your superiors we're misreporting on our

19 DBEs, we're over reporting on our DBEs.  You didn't tell them

20 anything like that, did you?

21 A.   No, sir.

22        MR. BELL:  Those are all the questions I have, Your

23 Honor.

24        MR. FIALKO:  Your Honor, I actually have a few

25 questions if this is the appropriate time.

1     THE COURT:  Yes, sir.

2     MR. FIALKO:  Okay.

3     THE COURT:  This would be a good time.

4                      CROSS EXAMINATION

5  BY MR. FIALKO:

6  Q.   Mr. Tucker, I'm Chris Fialko.  I represent Greg Miller.

7  I just had a few questions for you.

8     Mr. Tucker, I'm going to read you one sentence.  It's

9  from the factual basis of Greg Miller.

10     MR. FIALKO:  Your Honor, is it okay if I stand?

11     THE COURT:  Yeah, you can stand.  No problem.  Do

12  what you need to do that makes you comfortable.

13     MR. FIALKO:  Thank you.

14  Q.   All right.  So I'm going to read you this.  It says, "In

15  March 2009 when Greg Miller's wife was diagnosed with cancer,

16  Miller spent extensive time away from work for 16 months to

17  transport his wife to all doctors appointments, extensive

18  chemotherapy, and other treatment facilities and home

19  treatment.  She died July 16, 2010."

20     Do you remember that time period?

21  A.   Yes, sir.

22  Q.   Mr. Miller really didn't come into the office very much

23  at all in that 16 months, did he?

24  A.   No, he was pretty busy.

25  Q.   And you had to step up and fill some of his roles?

1   A.   Yes, sir.

2   Q.   And was Greg Miller's role mostly helping people who --

3   Boggs employees who were trying to put together bids to make

4   sure that the bids were going to be good ones?

5   A.   Yes, sir.

6   Q.   And that's what you helped him do and you kind of took

7   over for him a little bit in 2009 and '10.

8   A.   Yeah.

9   Q.   When he came back in July of 2010 was when Boggs was

10  starting to try to -- with this joint venture bid on the

11  Monroe bypass.  That's about that time period, correct?

12  A.   Yes, sir.

13  Q.   And just for a moment, the Monroe bypass joint venture

14  was not Boggs by itself.  There were three companies, correct?

15  A.   Correct.

16  Q.   United was one, right?

17  A.   Yes.

18  Q.   And Anderson was one.

19  A.   Yes.

20  Q.   And Boggs.

21  A.   Correct.

22  Q.   And I could have this wrong.  United did well with

23  bridges and overpasses.  That was one of their strengths; is

24  that right?

25  A.   Correct.

1  Q.   And Boggs with paving.

2  A.   Yes.

3  Q.   And Anderson with bonding or what?

4  A.   Yeah.  They were project -- they were big project

5  management people.

6  Q.   Right.  And so Drew Boggs asked Greg Miller to help put

7  that bid together, at least the part that Boggs was going to

8  be doing, correct?

9  A.   Yes, sir.

10  Q.   That bid happened in October of 2010, right?

11  A.   It's been a long time, but, yeah, if you say so, yes.

12  Q.   Okay.  I think you were asked by Ms. Sugar earlier, you

13  know, about how Styx was in there, and I think she gave you

14  the date, but October 2010.  And it was the low bid, joint

15  venture was the low bid, right?

16  A.   Correct.

17  Q.   And then it was accepted by North Carolina in early 2011;

18  is that right?

19  A.   Sounds right.

20  Q.   And at that point Greg Miller was essentially assigned to

21  work for the joint venture, correct?

22  A.   That is correct.

23  Q.   He was going to be the procurement manager, correct?

24  A.   Right.

25  Q.   He was the guy who was going to have to procure all the

1   materials that would be needed for this giant project, right?

2   A.   Yes, sir.

3   Q.   And sometime in 2011 formally you were promoted to vice

4   president, right?

5   A.   I don't know that it was 2011.  I was thinking it was

6   '12.  Late '12.

7   Q.   Okay.  So informally were you basically doing what Greg

8   had been doing, chief estimator, once he went away?

9   A.   Yes.

10  Q.   Just a couple more questions, Mr. Tucker.

11       You, Kevin Hicks, and Andrew Boggs were all roughly the

12  same age, right?

13  A.   Same what?

14  Q.   You're about the same age.

15  A.   I guess.

16  Q.   Four or five years apart.

17  A.   Yeah.  I don't know how old everybody is, but sure.

18  Q.   And the three of you became pretty good friends.

19  A.   I'd say so.

20  Q.   You went on -- Drew Boggs took you and Mr. Hicks on

21  extensive hunting trips out to Montana or somewhere out west;

22  is that right?

23  A.   Yes, we went on two trips.

24  Q.   Did Mr. Miller go with you?

25  A.   No, sir.

1  Q.   He was of a different generation.  He was an older -- he
2  was an Andy Boggs guy, right?

3  A.   He was, yes, sir.

4          MR. FIALKO:  Those are the questions I have.  Thank
5  you.

6          THE COURT:  Anybody else?

7          MR. ASHMORE:  May I, Your Honor?

8          THE COURT:  Yes, sir, certainly.

9          MR. ASHMORE:  They make me stand in South Carolina,
10 Your Honor.  If I may?

11         THE COURT:  You may.  It's hard enough to do stuff
12 in court without changing your style.

13         MR. ASHMORE:  Thank you very much, Your Honor.

14                     CROSS EXAMINATION

15 BY MR. ASHMORE:

16 Q.   Mr. Tucker, I'm Beattie Ashmore.  I represent Styx
17 Cuthbertson.

18      How are you today?

19 Q.   Very well.  And yourself?

20 Q.   I'm doing fine.

21      How well do you know Styx?

22 A.   Very little.

23 Q.   Okay.  How long have you known Styx?

24 A.   I have known of Styx since I started working or when I
25 worked at Boggs.  So 2000.

1   Q.   Well, what -- what would you say -- what's your

2   impression of his educational level?

3   A.   I've never been around him enough to say.

4   Q.   Okay.

5   A.   I mean, we would speak in the hallway, Hey, how you

6   doing, when he came in to sign his paperwork, and that was the

7   only interaction we had.

8   Q.   Did you ever see him sign a document, a bid, a contract?

9   A.   I saw him do that, yes, sir.

10  Q.   Did you -- you would actually see him sign such a

11  document?

12  A.   Yes.

13  Q.   Did you ever see him read such a document?

14  A.   I did not.

15  Q.   Do you know whether or not he can read and write?

16  A.   I do not.

17  Q.   Would it surprise you if he couldn't read and write?

18  A.   Yes.

19  Q.   Now, you talked earlier about him being plugged into a

20  bid concerning, I think, maybe a drain.  He had nothing -- he

21  had no knowledge of that, correct?

22  A.   No, sir.

23  Q.   He never had anything to do with the bidding process,

24  correct?

25  A.   No, sir.

1  Q.    I mean, what did he do?

2  A.    He was a truck driver as far as I knew.

3  Q.    He drove a truck all day long, right?

4  A.    Far as I knew, yes, sir.

5  Q.    And based on your prior responses, it sounds like he was

6  rarely even at Boggs Paving.

7  A.    Only to come sign papers when somebody called him to come

8  by.

9  Q.    Now, he -- how many DBE trucking companies are there in

10  Monroe, North Carolina?

11  A.    I couldn't tell you.

12  Q.    Do you know if there's more than one?

13  A.    Yes.

14  Q.    How many would you guess?

15  A.    I would guess four or five.

16  Q.    And would Styx show up when he said he was going to show

17  up?

18  A.    As far as I knew unless he had truck problems.

19  Q.    Okay.  How about the other DBE trucking companies?

20  A.    Sometimes you didn't get any response from those guys.

21  Q.    They weren't as reliable, were they?

22  A.    They would tend to be, yeah, tend to be not as reliable.

23  Q.    And when Styx said it was going to show up and haul for

24  Boggs Paving, he showed up every time unless he had truck

25  problems, correct?

GREG TUCKER - REDIRECT

1   A.   Yes, sir.

2          MR. ASHMORE:  Your Honor, that's all I have.  Thank

3   you very much.

4          THE COURT:  All right.  Thank you.

5          Anyone else?

6          (No response.)

7          THE COURT:  All right.  For the government.

8          MS. SUGAR:  Thank you.

9                     REDIRECT EXAMINATION

10  BY MS. SUGAR:

11  Q.   Mr. Tucker, Mr. Miller's attorney asked you a question.

12  I'm going to read you a statement from Mr. Miller's factual

13  basis and let me know if this is right.  Mr. Miller was

14  supervised by Drew Boggs; is that right?

15  A.   Yes, ma'am.

16  Q.   "During Boggs Paving bid meetings with Drew Boggs, Tucker

17  and others, when Miller or other employees expressed doubt

18  that Styx could or would actually perform the DBE work as bid,

19  Drew Boggs told and directed them to write Styx in anyway."

20  Is that true?

21  A.   Yes, ma'am.

22  Q.   Now, did Styx ever not meet a goal on one of the projects

23  you had him working on for you?

24  A.   Did he ever not?

25  Q.   Did he ever not meet -- did you ever not meet your DBE

1   when he was your guy?

2   A.   No.

3   Q.   Why is that?

4   A.   Because the numbers were worked out on the back side to

5   make it --

6   Q.   So --

7   A.   To make it work.

8   Q.   So you didn't need to make sure that he was dispatched to

9   a location to get the DBE reports correct.  Is that -- was

10  that the practice?

11  A.   That's correct.

12  Q.   And was that done even before you went to Boggs Paving?

13  A.   I would say that it was.

14  Q.   And who directed you to use Styx in that manner?

15  A.   Drew.

16  Q.   So there's no reason for you to reach out to dispatch if

17  you know that it's going to be worked out on paper anyway,

18  right?

19  A.   Correct.

20  Q.   Did anyone ever say you should know exactly how much Styx

21  is being written in on a project?

22  A.   No, ma'am.

23  Q.   Why is that?

24  A.   Because he was going to be used for the amount that

25  needed to be used to report or to get the job.

GREG TUCKER - REDIRECT

1  Q.    And that was the practice when you started at Boggs

2  Paving?

3  A.    When I started I really didn't have anything to do with

4  highway projects.  But a few years in, that -- I mean, he was

5  used as early as some of the first highway lettings that I

6  ever went to.

7  Q.    There were some questions asked about you don't know if

8  you're going to win all the bids so you don't know if someone

9  is going to be over committed; is that right?

10  A.    Correct.

11  Q.    If you have a DBE on a job, did the DBE rules provide for

12  how they can be replaced if that person ends up being over

13  committed?

14  A.    Yes.  If the DBE came back and said I can't do that work

15  on that job because I got job Y, then the provisions allow him

16  to write a letter saying I can't perform the work.  You go

17  through the good faith effort process to replace him and you

18  move down the road.

19  Q.    Do you remember that ever having to be done with a case

20  that Styx was written in on?

21  A.    No, ma'am.

22  Q.    Why not?

23  A.    Because he always met the goals.

24  Q.    Why did he always meet the goal?

25  A.    Because the paperwork always said that he made the goal.

1    Q.    Was it a secret at Boggs Paving that Styx would sign
2    whatever DBE amount you wanted him to?
3    A.    Secret is not the word.  I don't know that he ever said,
4    No, I'm not signing that.  So secret or however you want to
5    say it, he never refused to sign anything, as far as I know.
6    Q.    And often when you wrote him in a bid, you knew he was --
7    you already knew he was over committed because he had had --
8    he was already over committed on the day the bid happened.
9    A.    That's correct.
10   Q.    So there wasn't an issue of he'll only be over committed
11   if we win all these.  You knew he was over committed because
12   he had already been over committed.
13   A.    Correct.
14   Q.    With regard to the Browns Hill job and the inquiry that
15   related to that, who would you have kept informed about that
16   whole audit process?
17   A.    Drew would have known about it.
18   Q.    And you knew that Styx hadn't actually done work on that
19   project himself; is that right?
20   A.    Yes.
21   Q.    So you knew whatever information that you were providing
22   to them as his documentation was not accurate.
23   A.    Correct.
24   Q.    Did Drew know that too?
25   A.    Yes.

1  Q.   So regardless of who created those fake documents, you

2  certainly knew that they were fake.  Or you certainly knew

3  that he didn't work on that project.

4  A.   Yes, that's correct.

5  Q.   And your supervisor knew that as well.

6  A.   Yes.

7          MS. SUGAR:  That's all.  No more questions, Your

8  Honor.

9          MR. BELL:  Your Honor, if I may briefly?

10          THE COURT:  Yes, sir.

11                      RECROSS EXAMINATION

12  BY MR. BELL:

13  Q.   Mr. Tucker, you were just asked a series of questions to

14  which you affirmed that you knew at all times Styx was over

15  committed; that he couldn't possibly do the jobs he was being

16  written in on, right?

17  A.   Correct.

18  Q.   All right.  You've been here all day, I think?

19  A.   Yes, sir.

20  Q.   I turn around and look every once in a while.

21      Well, you heard the testimony that we put on earlier that

22  during this 10-year period or 11-year period that the

23  indictment is about, Boggs Paving paid Styx Cuthbertson more

24  money than was committed to him on these projects, right?  You

25  heard that.

1    A.    I heard that, yes, sir.

2    Q.    So maybe if a project manager had been keeping up with

3    his project better and if dispatching had been doing a better

4    job and Styx had been put on the jobs he was written in on, he

5    did have the capacity to do what he was committed to.  And we

6    know that by the fact that he was actually paid more than he

7    was committed to.  Would you agree with me?

8    A.    I don't agree with that.

9    Q.    Why is that?

10   A.    Because the jobs that -- if he has four trucks and

11   he's -- you know, Styx is a DBE but Styx, if he had his four

12   trucks going to another project, he didn't -- he wasn't

13   calling another truck to match four trucks with his trucks.

14   The extra four trucks were just assigned to him by Boggs.

15   Q.    Now, you --

16   A.    He wasn't performing dispatch operations inside his

17   own -- inside his own business.

18   Q.    Well, nobody does that, right?  Blue Max doesn't do that.

19   I mean, Pork Chop calls whoever he calls, Blue Max, and says,

20   Get me 50 trucks over here by tomorrow.

21   A.    Blue Max isn't a minority so who cares about Blue Max.

22   Q.    Well, you seem to be making a point out of the fact that

23   Styx was told where to go and I'm telling you Blue Max was

24   told where to go.

25   A.    Yeah.  Yeah, I agree with that.

GREG TUCKER - REDIRECT

1  Q.   Every hauler was told where to go.

2  A.   But if you were using All Points Hauling, who is a

3  minority company, and you called All Points and said, I need

4  15 minority truckers on my job, and they said, Well, we don't

5  have but 7 tomorrow or they don't have but 8 tomorrow, then

6  All Points would have to find 7 additional trucks to send to

7  you to give you your 15 truck order for that day.

8  Q.   Yeah, but you're missing my point, Mr. Tucker, so let me

9  try again.

10      If over a ten-year period Styx was supposed to get paid

11  3-1/2 million dollars, just to make up a number, on these

12  projects he was committed to, and in fact he worked enough to

13  get paid 4-1/2 million dollars, if he had been put on the

14  right projects, he obviously had the capacity to work 3-1/2

15  million dollars worth of work.  Do you agree with me now?

16  A.   I agree with that, yes, sir.

17          MR. BELL:  All right.  That's all I have, Your

18  Honor.

19                  REDIRECT EXAMINATION

20  BY MS. SUGAR:

21  Q.   Mr. Tucker, did -- if Styx was written in for a hundred

22  thousand dollars, you knew that he couldn't -- that if he was

23  subcontracting any work, he would actually have to subcontract

24  work.  He didn't get to just forget about 50 percent of that

25  money, right?

GREG TUCKER - REDIRECT

1   A.    Yes, ma'am.

2   Q.    That would not be correct under the rules, would it?

3   A.    No, ma'am.

4           MS. SUGAR:  Nothing further.

5           THE COURT:  Anybody else?  Any of the other defense

6   attorneys wish to ask additional questions?

7           (No response.)

8           THE COURT:  Speak now or...

9           (No response.)

10          THE COURT:  Okay.  Come on down.

11          THE WITNESS:  Thank you, sir.

12          (Witness stepped down.)

13          THE COURT:  All right.  Any other witnesses?

14          MS. SUGAR:  Your Honor, I have some exhibits I'd

15  like to show.  I can show them by proffer or I can call the

16  agent to walk through them.  I really -- you know, being what

17  time it is, I don't know what your preference is in that

18  regard.  This is a narrow hearing --

19          THE COURT:  I want to try to get everything I can in

20  my head.

21          MR. BELL:  Your Honor, if I may, if it is -- because

22  I have some things that I want to put in documentary too.  I

23  do have one witness.  She's been here all day.  Of course, we

24  didn't know what order we were going to take things in and how

25  long that would take.  And rather than even thinking about

1  bringing her back Monday, I'd like to put her on today.

2  THE COURT:  Let's just do that.  And we may have to

3  do some additional stuff on Monday.

4  I'd like you all to be thinking about some things,

5  too, if I -- you know, if I use -- trying to figure out -- I'm

6  trying to -- I haven't decided yet what I'm going to do about

7  this.

8  Let me ask a question to you, Mr. Bell.  If I were

9  to use -- if I were to take -- I'm looking at the special

10  rules for government benefits.  It says that in a case

11  involving government benefits, which includes this program,

12  although it sounds like if you're a minority contractor -- if

13  you're Blue Max, you get to just send the trucks out there and

14  you're ready to go or if you don't have the trucks, you can

15  call anybody you want.  But the poor old minority contractor's

16  got to try to hunt somebody down.  So it sounds like they're

17  disadvantaged businesses again.

18  But it does say here that the loss shall be

19  considered to be not less than the value of the benefits

20  intended by unintended recipients or diverted unintended uses,

21  as the case may be.

22  If I were to find that the contract, that the profit

23  on the contract based on testimony that's been here is

24  normally 2 percent in these contracts and I was to find that

25  the contract itself that was gotten was 84 million, 2 percent

GREG TUCKER - REDIRECT

1  of 84 million would be 1.7 million.  And I don't know whether
2  you get any offsets on that or not.
3          There are other -- there are other calculations I'm
4  thinking about too.  But why would that be bad under that?
5  And not right now, not right this minute, but I'm just saying
6  be thinking about that because that's stuff I'm going to need
7  to talk about.  Why would that -- why is that a bad way to go?
8          And I'm trying to come up with some guideline range
9  that makes sense to me on the numbers.  The sentence is going
10 to be based on the 3553 factors.  I've got to make a
11 determination on what this number should be and have some
12 reason for it that makes sense to me rather than I just pick
13 this number because I like that guideline range.  I've got to
14 come up with something that makes sense to me.
15         So you all be thinking about that and any other ways
16 that I can look at it, and we'll talk about those before we
17 leave tonight and I make a final decision about all this on
18 Monday morning, recognizing you'd rather have the whole
19 weekend to get ready for sentencing knowing what the value of
20 that was.  But it's -- it's going to -- certainly -- we
21 already know it's not going to be up at 84 and we're all
22 talking about in the neighborhood of what everybody has talked
23 about here today.  So I'm trying to find something that makes
24 sense.
25         Mr. Bell, put your witness on with regard to this.

1    MR. BELL:  We call Charity Coleman.

2    CHARITY COLEMAN, DEFENDANT BOGGS' WITNESS, SWORN,

3    DIRECT EXAMINATION

4    BY MR. BELL:

5    Q.   I know you've been waiting a long time, but would you

6    tell us your name, please.

7    A.   Charity Coleman.

8    Q.   Where do you live, Ms. Coleman?

9    A.   Pageland, South Carolina.

10   Q.   And what's your educational background?

11   A.   I have -- I graduated from high school in Pageland and

12   went to Francis Marion University in Florence.

13   Q.   All right.  And when did you get out of school?

14   A.   High school or college?

15   Q.   College.

16   A.   College in '94.  1994.

17   Q.   All right.  So tell me a little bit about your work

18   history leading up to Boggs Paving.

19   A.   After I got out of college, I worked for United Carolina

20   Bank at their operations center in Monroe.  They were bought

21   out by BB&T and moved their headquarters to Charlotte, so I

22   chose not to move to BB&T.  And left there and went to work

23   for Potter & Company, which is a local CPA firm in Monroe, and

24   worked there for a couple of years as a bookkeeper until I

25   started having children and went out on maternity leave and

1   stayed out for a little while.  And then started to work at

2   Boggs in January or February of 2002.

3   Q.   All right.  And what were you first assigned to do at

4   Boggs Paving?

5   A.   I was hired through a temp agency originally and I did

6   accounts payable entry.

7   Q.   All right.  So if somebody owed Boggs money based off an

8   invoice, you'd make an accounting entry for that.

9   A.   Yes.

10  Q.   And who was your supervisor at that time?

11  A.   Barbara Chapman.

12  Q.   What was her position in the office?

13  A.   She was the office manager.

14  Q.   And did there come a time when you took responsibility

15  for preparing DBE reports?

16  A.   Yes.

17  Q.   All right.  When was that?

18  A.   Late 2009.  Like the end of 2009, I believe.

19  Q.   Okay.  And who had that responsibility before you?

20  A.   Wanda Knight.

21  Q.   And who had it before her?

22  A.   Nancy Bovender.

23  Q.   All right.  So how far back does that take us on people

24  preparing DBE reports if you go back as far as Nancy?

25  A.   Nancy was there for a very long time so -- that's as far

1  back as I know.

2  Q.   Okay.

3  A.   Probably back to the beginning.

4  Q.   Back into the '90s at least?

5  A.   Yes.

6  Q.   Okay.  All right.  So when you took over responsibilities

7  from Wanda Knight, how were you taught or instructed about

8  filling out DBE reports?

9  A.   There wasn't really a lot of training.  I mean, she

10  didn't -- she didn't have a lot of training when Nancy left.

11  Nancy retired and Wanda took it over.  She didn't really have

12  a lot of training either so it was more of just it made sense

13  for me to do the reports because of the position.  She would

14  have to ask me or someone else in the accounting department

15  for information anyway to complete the reports.  So it just

16  made sense for us to complete them -- for me to complete them.

17  Q.   Okay.  Is it fair to say that Nancy taught you and

18  Ms. Bovender taught Nancy, and we don't have any idea who

19  taught Ms. Bovender?

20  A.   Nancy taught Wanda.

21  Q.   That's right, I'm sorry.

22  A.   Wanda taught me.  And I have no idea where Nancy --

23  who...

24  Q.   Well, when you took over responsibility for DBE

25  reporting, what department were you in at that time?

CHARITY COLEMAN - DIRECT

1   A.   I was job cost accountant.

2   Q.   And so who was your direct supervisor then?

3   A.   Barbara Chapman was still my direct supervisor.

4   Q.   And she didn't do anything about teaching you how to do

5   DBE reports?

6   A.   No.

7   Q.   All right.  Is there a -- is the DBE reporting

8   responsibility different depending upon whether it's a North

9   Carolina or South Carolina job?

10  A.   Yes.

11  Q.   How is it different?

12  A.   South Carolina is actual paper reporting.  Form has to be

13  completed and signed and sent in.  North Carolina is all done

14  online through a website.

15  Q.   Okay.  Now, who handled the accounting entries within

16  Boggs Paving during this time?  Let's stay on '09 if you like.

17  The accounting entries for subcontractors, that money paid to

18  subcontractors for work, who does those accounting entries?

19  A.   I handled all subcontractors except haulers, except the

20  truckers, the haulers.

21  Q.   And who was responsible for entering the money paid to

22  the haulers?

23  A.   Kristy Lawrence.

24  Q.   Is there any -- do you know why those duties were split?

25  A.   The haulers, there was just -- they were paid on a

1  different schedule than regular subcontractors.  It was a --

2  it was very time consuming.  There was so many truckers,

3  outside truckers and such so it just made sense to have one

4  person devoted completely to that.  And with them being on a

5  different pay schedule than the other subs, then it just made

6  sense to have them split that way.  They were split that way

7  when I came and that just kind of made sense.

8  Q.   It was that way -- before you got there it was split like

9  that?

10 A.   Yes.

11 Q.   Okay.  So if there was an invoice from somebody doing

12 guardrails, that was your job to make the accounting entry.

13 A.   Yes.

14 Q.   But if a hauler had an invoice, that was Ms. Lawrence's

15 responsibility.

16 A.   Yes.

17 Q.   Did she have anything to do with preparing DBE reports?

18 A.   No.

19 Q.   So when -- how often do you have to file DBE reports on a

20 project?

21 A.   Quarterly.

22 Q.   And what would you do to fill out that report whether

23 it's online in North Carolina or on paper in South Carolina?

24 A.   I would run a report in our accounting software for that

25 specific time period that I was reporting and get the dollar

1  amounts that were paid to that sub.

2  Q.   Okay.  So you would run -- let's stick with

3  Mr. Cuthbertson since that's the most relevant.  If you were

4  filling out a DBE report on money paid to Mr. Cuthbertson, run

5  me specifically through how you would do that.

6  A.   I would run a check register history for the particular

7  job that I was reporting for for that particular time period,

8  that quarter, and it would give me either a detail or a

9  history, whichever I specify, of the checks paid to that

10 vendor for that job for those dates.

11 Q.   And so every check that Boggs Paving wrote to

12 Mr. Cuthbertson or Cuthbertson Trucking, that would get picked

13 up in the report you're running, right?

14 A.   Yes.

15 Q.   Whether it was written to him for work he did himself or

16 a check that was written to him that was later paid to Boggs

17 Transport by him, it would pick up both numbers, right?

18 A.   Yes.

19 Q.   Okay.  You didn't always know that, did you?

20 A.   No.

21 Q.   When did you learn that the numbers you were putting on

22 the forms included money that was actually going from

23 Mr. Cuthbertson to Boggs Transport?

24 A.   Not exactly sure when, but it was sometime after the

25 investigation began and all of the research was done.

CHARITY COLEMAN - DIRECT

1  Q.   Do you remember Ms. Graydon coming up and having you walk
2  her through how you did your reports?
3  A.   Yes.
4  Q.   And is that when the light sort of came on and said, uh
5  oh, we've been overreporting?
6  A.   Yes.
7  Q.   Well, did anybody direct you to just go into those
8  accounting systems and pull the number for every Cuthbertson
9  check?  Did you get direction to do that from anybody?
10  A.   No.
11  Q.   And did anybody tell you at all, alert you in any way
12  that the -- doing it the way you were doing it was incorrectly
13  picking up money that eventually went to Boggs Transport?
14  A.   No.
15  Q.   After the investigation started and you started drilling
16  down on how this ought to be done, did you learn that there
17  was another problem with the DBE reports that you were
18  creating just by going into accounting?
19  A.   Yes.  The software also picked up -- we would sometimes
20  pay to a subcontractor, on the same check pay for multiple
21  jobs at one time.  And when you ran the report the way that we
22  had always ran them and you put in a job number, the way the
23  accounting system worked, it had some sort of hierarchy within
24  the system that picked up one of the job numbers within that
25  check and maybe not the other ones or vice versa.

1  Q.   So as an example, Mr. Cuthbertson might get a check that

2  represents payment for work he did on four projects.

3  A.   Correct.

4  Q.   But in the accounting system, all that money would just

5  be allocated to one of the projects instead of split among the

6  four.

7  A.   When the report was ran, that's how it would show up.

8  Q.   And those are the numbers you used to create the DBE

9  reports, right?

10 A.   Yes.

11 Q.   All right.  So now knowing that that was going on in the

12 system, is it fair to say that with respect to some DBE

13 reports, you're probably overreporting payments to him because

14 it was picking up his work on four projects, then on three

15 others you're underreporting his work on those projects

16 because the accounting system didn't show any?

17 A.   Yes.

18 Q.   Okay.  And that was figured out after the investigation

19 began?

20 A.   Yes.  I even called our accounting software tech support

21 to question it why the report would run that way and they told

22 me that it was comparing apples to oranges, and that didn't

23 really satisfy me, but -- because it didn't make sense at all

24 to me, but that's --

25 Q.   So after the investigation, after you learned that, did

1  you start doing things different?

2  A.   Yes, I did.

3  Q.   What do you have to do now?

4  A.   I have to run multiple reports to get the information and

5  a lot more cross checking within the various reports to, you

6  know, back up the information that we're reporting.

7  Q.   Okay.  Now, let me ask you about payments for plant

8  hauls.  And you know what plant hauls are, I guess, when I use

9  that term, right?

10  A.   Yes.

11  Q.   Well, tell me what you think it is.

12  A.   Hauling plant -- hauling material to the plant.

13  Q.   All right.  Now, did you -- when you were preparing the

14  DBE reports, did you include for the dollars paid on that, did

15  you include plant hauls in Mr. Cuthbertson's DBE reports?

16  A.   Yes, we have.

17  Q.   Pardon me?

18  A.   Or I have.  Yes, I have.

19  Q.   And how did you go about doing that, allocating a

20  particular plant haul to a particular project?

21  A.   I would determine which plant the asphalt that was

22  supplied for that job came from and all of the plant hauls

23  were charged to -- we had job numbers for each plant and I

24  would -- could run a report -- the same report that I used for

25  that plant to get what hauls he made for plant material for

1  that period.

2  Q.  Okay.  And had you always done that?

3  A.  Sometimes the goal would specifically list plant hauls as

4  the line items that he was working towards.  It didn't -- it

5  didn't matter -- it was -- sometimes it would say "Surface" --

6  you know, "Surface B mix" or sometimes it may say

7  "Intermediate" or whatever.  Any hauls that were done.

8  Sometimes it would say "Stock piles."  But it didn't matter.

9  Whatever he hauled all was reportable for him and for any

10  other hauler.

11  Q.  Okay.

12  A.  Anything that was hauled.

13  Q.  So are you saying you sort of used your best judgment to

14  allocate plant haul payments on a given project with a DBE

15  goal?

16  A.  Yes.

17  Q.  Did anybody tell you where to put these plant haul

18  payments?

19  A.  No.

20  Q.  Just working on your own making your best call.

21  A.  Yes.

22  Q.  Now, who -- did you show -- after you prepare the DBE

23  reports, do you show them to anybody?

24  A.  No.

25  Q.  Does the sub have to --

CHARITY COLEMAN - CROSS

1    A.    The sub -- yeah, the sub -- after I fill out the amount

2    that they're paid, the South Carolina ones are sent to the sub

3    for signature.  They verify the amount and send it back.

4    Q.    Okay.

5    A.    And then I -- and then the prime signs it and returns it

6    to the resident.

7    Q.    And who on behalf of the prime signs it?

8    A.    I was signing on behalf of the prime.

9    Q.    Did Greg Tucker look at the North Carolina DBE reports

10    that you prepared?

11    A.    The North Carolina ones, yes, we would look at those

12    together because they were done differently.  I didn't always

13    have the actual committal sheet to know who were -- who needed

14    to be reported for the North Carolina ones so we would do

15    those -- we did those together.

16    Q.    Okay.  Are you sure you looked at them together because

17    not 20 minutes ago he said he had never seen a DBE report.

18    A.    North Carolina was done online and we would sit together

19    and pull up what payments were made.

20    Q.    Let me ask you this.  Has Drew Boggs ever looked at one

21    of your DBE reports?

22    A.    No.

23            MR. BELL:  Those are all my questions, Your Honor.

24            THE COURT:  Cross examination.

25            MS. SUGAR:  Thank you.

1                          CROSS EXAMINATION

2   BY MS. SUGAR:

3   Q.   Hi, Ms. Coleman.

4   A.   Hi.

5   Q.   We've spent a lot of time together in the past.

6   A.   Yes, we have.

7   Q.   How are you?

8   A.   I'm good.  How are you?

9   Q.   Doing well, thank you.

10       Where are you currently employed?

11  A.   Contractors Management Services.

12  Q.   Is that in the Boggs Paving building?

13  A.   No.

14  Q.   Is that affiliated with Boggs Paving?

15  A.   Boggs Paving, no.

16  Q.   What kind of work is that?

17  A.   We are an accounting company.

18  Q.   Were you involved in the bid process at all at Boggs

19  Paving?

20  A.   No.

21  Q.   Do they have bid nights?  Do you remember that?  You

22  would pick up pizza for people.

23  A.   Yeah, sometimes I did.

24  Q.   And who was at the bid night?

25  A.   I would pick up -- if I did ever pick up, it would be

1  early.  I mean, they would be hanging around.  They would
2  sometimes go home and come back.
3  Q.   Who's they?
4  A.   Greg Tucker, Greg Miller.  It varied depending on what
5  jobs they were bidding and where the work was.
6  Q.   Was Mr. Boggs there too?
7  A.   Sometimes.
8  Q.   Do you remember telling me during an interview that Drew
9  Boggs was there at bid night?
10  A.   Yeah.  I mean, he was there some bid nights, yes.  I
11  wouldn't know if he was there every one because I wasn't there
12  every one.
13  Q.   And you don't know anything about how the amount that was
14  written in for Styx happened in a bid, do you?
15  A.   No.
16  Q.   All right.  And you're in the accounting department, so
17  Barbara Chapman was your supervisor for -- even in 2010 and
18  '11?
19  A.   Yes.
20  Q.   And who was her supervisor?
21  A.   Kevin Hicks.
22  Q.   So were you in a separate part of the company than the
23  project managers?
24  A.   Do what?  Repeat that.
25  Q.   Is that a separate part of the company than the project

1  managers in terms of the supervisory chain?

2  A.   Yes.

3  Q.   And who supervises the project managers?

4  A.   I believe Drew would have been the -- I don't know if he

5  was their immediate supervisor.  I'm not exactly sure how

6  their hierarchy went.  It changed at different times while I

7  was there.  I'm not really sure.

8  Q.   And who's -- and Kevin Hicks was over the accounting part

9  of the business?

10 A.   Yes.

11 Q.   And who was his supervisor?

12 A.   Drew.

13 Q.   Now, you said Spectrum sometimes made errors.  I've seen

14 a bunch of reports where the number on the DBE report is

15 exactly the amount of the Styx invoices.  So plenty of times

16 it was also right.

17 A.   Yes.

18 Q.   Okay.  It wasn't wrong all of the time.

19 A.   No.

20 Q.   Are you familiar with the term "running job costs through

21 Styx"?

22 A.   I am now, yes.

23 Q.   But you were several years ago as well, right?

24 A.   Yeah, after the investigation began.

25 Q.   So before the investigation you didn't know what that

1   was?

2   A.   No.

3   Q.   So let's -- so from 2009 when you started doing DBE

4   reporting until 2011 when you became aware of an

5   investigation, during that time period did anyone ever say,

6   We're doing our DBE reports wrong?

7   A.   No.

8   Q.   Did you know that, in fact, a letter had been written to

9   South Carolina DOT saying that the DBE reporting had been done

10  incorrectly?

11  A.   No.

12  Q.   Would that surprise you?

13  A.   Yes.

14  Q.   Because no one went -- you're upstairs, right?

15  A.   Yes.

16  Q.   No one went upstairs and said, Hey, guys, the DBE report

17  is wrong?

18  A.   No.

19  Q.   Now, you mentioned sometimes you did plant hauls, but

20  otherwise you used Spectrum.  Were there any other ways you

21  would figure out the DBE reporting to do on a project?

22  A.   It was all through Spectrum.

23  Q.   All right.  I'm going to show you Exhibit 98.

24       And is that an email from you to Greg Tucker in December

25  of 2010?

1      MR. SAVAGE:  Hang on a second.  We're not up yet.

2      MS. SUGAR:  Oh, this is a long day, Your Honor.

3      THE COURT:  It is.  It's okay.

4      Let me ask you a question while you're doing that.

5  Now, on Monday there was a reason we could not do something on

6  Tuesday.

7      MS. SUGAR:  Yes, Your Honor.  Both Mr. Savage and

8  myself have early flights out of town for Thanksgiving on

9  Tuesday.  I let the Court's scheduler know that a long time

10  ago.

11      THE COURT:  Then we will either -- we will do as

12  much as we can on Monday going late.  If something happens,

13  we'll move any sentencings.  Most of the heavy lifting will be

14  done by then.  We'll move any sentencings over that we have

15  to, but we'll try to finish all of the sentencings we can.

16  I'm not talking about tonight.

17      MS. SUGAR:  We can stay longer tonight, though,

18  right?

19      THE COURT:  A little bit longer tonight.

20      MS. SUGAR:  Okay.

21      THE COURT:  A little bit longer tonight.

22      MR. BELL:  He's got a two hour drive; we don't.

23      MS. SUGAR:  That's right.

24      THE COURT:  A little bit longer tonight.  Not a lot

25  longer tonight.  We might go a little bit longer.  Okay.

CHARITY COLEMAN - CROSS

1    MS. SUGAR:  All right.

2    Q.   (By Ms. Sugar:) Now, can you see --

3         THE COURT:  We'll start at 9:00 on Monday and go

4    right on.  Bring lunch.  We'll have a 30 minute lunch and

5    we'll get as much done as we can get done.

6         MS. SUGAR:  Yes, Your Honor.  I know some of the

7    defendants have witnesses coming in from out of town.

8         THE COURT:  We'll put those -- we'll go out of

9    order.  I think probably we need to go ahead and sentence

10   Mr. Boggs first, Boggs Paving.  Is that what you --

11        MS. SUGAR:  We had done it -- we had just changed it

12   to reverse order.  I apologize for that.

13        THE COURT:  That should make it really pretty easy,

14   then.  Because whoever wants to go out of order can -- has

15   people coming in can go then.  That should make that awful

16   easy.

17        MR. WINIKER:  I have a family member who has a 4:10

18   flight out so that's our only goal in that.

19        THE COURT:  We will do the best we can.  We'll start

20   at 9:00 and finish whatever we don't get done here today and

21   move immediately into sentencings and go hard into the

22   evening.  And anybody that has to get out by 4:00, if we have

23   to take them out of order, we'll take them out of order.  By

24   the afternoon we ought to be seeing where this thing is going

25   in terms of sentencing.  Okay.

1  Q.   (By Ms. Sugar:) All right.  Ms. Coleman, drawing your

2  attention to the screen.

3      This is an email from you to Greg Tucker dated

4  December 2010.  And you say, "I should probably include some

5  time for Styx???"  Is that right?

6  A.   Yes.

7  Q.   So sometimes you sort of had to guess to figure out

8  whether to write in time for Styx?

9  A.   That wouldn't have had anything to do with the DBE

10  reporting.

11  Q.   This was maybe for the stimulus hourly and wage reports

12  that you did on behalf of Mr. Styx?

13  A.   I really don't remember specifically.

14  Q.   Well, do you remember doing stimulus reporting on behalf

15  of Styx related to the hours worked by his employees as

16  required by the stimulus projects?

17  A.   I remember having to report for stimulus.  I can't really

18  remember specifics about it now.

19  Q.   Do you remember what a haul cost analysis is?  Do you

20  know what a haul cost analysis is?

21  A.   No.

22  Q.   Do you remember doing those on the job?

23  A.   No.

24  Q.   No?  It was analysis of how much the hauls were costing

25  on a job.

1  A.   No.

2  Q.   You don't remember working on those?

3  A.   No, I don't remember doing those at all.

4  Q.   Okay.  But you may have remembered years ago in 2013 when

5  we talked?  If we would have talked about it then, you would

6  have remembered?

7  A.   Maybe.

8  Q.   How often did you interact with Kevin Hicks?

9  A.   I mean, daily just being in the same department.

10  Q.   And how often did you interact with Drew Boggs?

11  A.   Maybe weekly.  Maybe -- I mean, it just depended if he

12  was in the office.  Some days -- I mean, sometimes I would go

13  days without seeing him.

14  Q.   He was just -- he was a little bit higher up than you in

15  terms of chain of command?

16  A.   Well, and with me being upstairs and some downstairs, a

17  lot of times we would go days without seeing each other unless

18  we had something specific to talk about.

19  Q.   Did he ask you questions about jobs ever?

20  A.   Who?

21  Q.   Drew Boggs.

22  A.   Very rarely.

23  Q.   If you had a question about the DBE program, who would

24  you talk to?

25  A.   The actual program, I don't -- I mean, the only -- I

CHARITY COLEMAN - CROSS

1  would probably go job specific.  I mean, if I had a question

2  about it, it would be whoever the project manager for that

3  specific job would be.

4  Q.   Were you aware that bank accounts for one of Styx

5  Cuthbertson -- bank accounts in the name of Styx Cuthbertson

6  were coming to the Boggs office?

7  A.   Not until the investigation.

8  Q.   All right.  Do you remember testifying before the grand

9  jury a number of times in this case?

10  A.   Yes.

11  Q.   And one of those times was on May 17, 2012.  And the

12  question is, "Have you ever heard about bank statements for

13  some of -- for Styx Cuthbertson's account coming to the Boggs

14  office?"

15      And you answered, "I have seen the bank statements just

16  because they sometimes get stuck in my bank statements and

17  they used -- they would -- they used to say 'Attention Mike

18  Moore' and it switched to Kevin, so I would just give it to

19  them.

20      "Did you ever ask why you got bank statements that had

21  Styx Cuthbertson on them?"

22      And you answered, "No."

23      Would those answers have been correct when you gave them,

24  Ms. Coleman?

25  A.   Yes.

1  Q.   Now, you're aware that a number of individuals have pled

2  guilty to felony charges in this case; is that right?

3  A.   Yes.

4  Q.   So you understand that Drew Boggs, Kevin Hicks, Greg

5  Miller, Greg Tucker, and Arnold Mann have all pled guilty

6  related to a DBE fraud scheme; is that right?

7  A.   Yes.

8  Q.   And of all those people, who was the CEO of Boggs Paving?

9  A.   Drew Boggs.

10          MS. SUGAR:  Nothing further.

11          MR. BELL:  No redirect, Your Honor.

12          THE COURT:  All right.  Thank you, ma'am.

13          MR. BELL:  Did you ask --

14          THE COURT:  Oh, I'm sorry.

15          MR. BELL:  -- the others?

16          MR. FIALKO:  No questions, Your Honor.

17          MR. ASHMORE:  None, Your Honor.

18          MR. WINIKER:  Very briefly, Your Honor.

19          THE COURT:  Yes, sir.

20          MR. WINIKER:  I don't even need the chair.  I'll

21  need to approach.

22                    CROSS EXAMINATION

23  BY MR. WINIKER:

24  Q.   Ms. Coleman, my name is Rick Winiker.  I represent Kevin

25  Hicks.  Good afternoon.

1    I don't have anything on the screens like these folks.  I

2  just have it on this little screen.

3  A.    Okay.

4  Q.    So is this the excerpt of the grand jury testimony you

5  read to the prosecutor --

6  A.    Yes.

7  Q.    -- just now?

8    Now, right below where it said, "Did you ever ask why you

9  got statements -- got bank statements that had Styx

10  Cuthbertson on them," you answered "No," right?

11  A.    Yes.

12  Q.    There was another question right after that and do you

13  see that question there?

14  A.    Yes.

15  Q.    What was the question they asked you?

16  A.    "Did you ever have a conversation with Kevin Hicks about

17  that?"

18  Q.    And what was your answer?

19  A.    "Huh-uh.  No."

20  Q.    Is that correct?

21  A.    That's correct.

22        MR. WINIKER:  Okay.  Thank you.

23        No further questions, Your Honor.

24        THE COURT:  Does that inspire any questions from

25  anyone?

1          MS. SUGAR:  No, Your Honor.

2          THE COURT:  All right.  You may come down.

3          THE WITNESS:  Thank you.

4          (Witness stepped down.)

5          MR. BELL:  Your Honor, I have one witness that I

6    won't spend five minutes with, but he's been here all day just

7    like Ms. Coleman.

8          THE COURT:  Okay.

9          MR. BELL:  Keith Jordan.

10         KEITH JORDAN, DEFENDANT BOGGS' WITNESS, SWORN,

11                       DIRECT EXAMINATION

12   BY MR. BELL:

13   Q.   Thank you for waiting, sir.  If you would just tell us

14   your name.

15   A.   My name is Keith Jordan.

16   Q.   All right.  And how are you employed right now?

17   A.   I am employed by Boggs Transport, Incorporated.

18   Q.   In what capacity?

19   A.   I'm the president.

20   Q.   How long have you been with Boggs Transport?

21   A.   Since February of 2015.

22   Q.   And where did you work before that?

23   A.   I was with Boggs Paving, Incorporated.

24   Q.   How long were you with Boggs Paving?

25   A.   From 2001 until January of 2015.

1    Q.    And what did you do -- what were your jobs at Boggs

2    Paving?

3    A.    I was equipment manager.

4    Q.    And what does that mean?

5    A.    I was responsible for helping purchase, sell, maintain

6    the fleet of equipment and all the mechanics and all the

7    repairs.

8    Q.    All right.  And the only reason I made you sit around

9    here all day today is to answer this one question.

10        The government has interviewed a person who told them

11   that in this person's presence, Drew Boggs called you, an

12   employee of Boggs Paving, and asked you where Styx Cuthbertson

13   Trucking and Boggs Transport purchased their placards, and

14   then instructed you to order 10 or 12 more of the Styx

15   Cuthbertson's Trucking placards to put on Boggs Transport

16   trucks.  Did Drew Boggs call and tell you all that?

17   A.    No, I do not recall that.

18   Q.    How often would you talk to Drew?

19   A.    It was rare that I talked to Drew.

20   Q.    Why?  Just too big a break in the chain or what?

21   A.    I'm sure that had something to do with it.  When we

22   talked it was pretty much over the departmental financials.

23   You know, how the equipment department was running and the

24   cost for that.  That was pretty much the extent of our

25   conversations.

1      MR. BELL:  Those are all my questions.

2      THE COURT:  Cross examination.

3                    CROSS EXAMINATION

4  BY MS. SUGAR:

5  Q.   Mr. Sanders [sic]G27022, were you aware of magnets with

6  the Styx logo that were held at Boggs Transport?

7  A.   I had heard about magnets, yes.

8  Q.   So you knew that there -- there were, in fact, magnets

9  that had the Styx logo that were sometimes put on Boggs Paving

10 trucks?

11 A.   From my understanding.  I can't personally say as I ever

12 saw them.  But to my understanding in conversations with co --

13 you know, with coworkers that there was.

14 Q.   All right.  But that just wasn't in your wheel house.

15 A.   No, ma'am.

16 Q.   All right.  You did know in your wheel house that -- did

17 you have anything to do with the trucking?

18 A.   The only thing that I had to do with trucking was

19 repairs.

20      MS. SUGAR:  Hang on one moment, Your Honor.

21      (Pause.)

22      MS. SUGAR:  I'm sorry, I've gotten really

23 disorganized.

24      THE COURT:  Take your time.

25 Q.   (By Ms. Sugar:) I'm going to show you what's marked as

1   Exhibit 229.

2       This is an email from Ralph Hawkins dated May of 2011; is

3   that right?

4   A.   (No response.)

5   Q.   And you're one of the people on the copy line, Lee

6   Sanders.

7   A.   I'm not --

8   Q.   I'm sorry.

9   A.   -- Mr. Sanders.

10  Q.   You're Keith Jordan.  I got confused while I was looking.

11  I'm so sorry, Mr. Jordan.  I'm going to find what I am looking

12  for.  One moment.

13          (Pause.)

14  Q.   (By Ms. Sugar:) All right.  I'm going to show you an

15  exhibit.  This is marked 381.  I'm going to go to the third

16  page of it.

17      And is that an email dated February 25, 2011, to Kevin

18  Hicks from Brad Currin copied to Keith Jordan?

19  A.   Yes.  And as I said, I -- you know, I wasn't over

20  trucking.  All I did was maintain the trucks.  So I probably

21  paid no attention.  I had no idea what was going on with that.

22  Q.   Okay.  But you are on this email, right?

23  A.   Yes.

24  Q.   And it says, "Kevin, have you had a chance to get the two

25  Boggs trucks switched over to Styx's name?"  Is that right?

KEITH JORDAN - REDIRECT

1    A.    Yes.

2    Q.    And then you were also copied on the next email where

3    Kevin Hicks replied, "No, I have all the paperwork ready but

4    he has the flu and pneumonia this week and I didn't really

5    want to be around him."

6         The next email you're not on.  It's from Brad Currin to

7    Kevin Hicks.  And it says, "10-4.  I already got a guy hired

8    on to drive his truck and can start any day.  He used to haul

9    AC for us so he knows what to do."  Is that right?

10   A.    Yes, that's what it says.

11             MS. SUGAR:  All right.  Nothing further.

12             MR. BELL:  Just one quick question.

13                      REDIRECT EXAMINATION

14   BY MR. BELL:

15   Q.    Has anyone from the government come to ask you about the

16   statement that I asked you about?  Anybody ever come to you

17   and say, Did this happen?

18   A.    No, sir.

19             MR. BELL:  Okay.  Thank you.

20             That's all, Your Honor.

21             THE COURT:  Any recross?

22             MS. SUGAR:  No, Your Honor.

23             THE COURT:  Thank you, sir.  You may come down.

24             (Witness stepped down.)

25             MR. BELL:  Your Honor, the only other thing I would

1 offer, I have several excerpts from Kristy Lawrence's grand

2 jury testimony that's sort of the opposite, the other side of

3 what Charity Coleman was talking about. It will give the

4 Court context to cogitate on on the weekend or we can wait,

5 whatever you want. It will take about 15 minutes to read it.

6       THE COURT: Let's go ahead and hear that. And then

7 if anyone wants to make any comments about -- in terms -- to

8 cogitate again on the weekend on how to come up with a loss.

9 You know, you look at the *Nagle* case as quoted by the defense,

10 but it does note in here fair market value -- it talks about,

11 "If possible and when relevant, the District Court should keep

12 in mind the goals of the DBE program that have been frustrated

13 by the fraud."

14       And in determining the amount of the -- of it, why

15 would not -- in other words, if you got a 2 percent profit on

16 80 some million dollars and it was 1.7, that would take all

17 the costs into account. And they weren't doing this for

18 charity work.

19       MR. BELL: I'm sorry, I lost you there, Your Honor.

20       THE COURT: The government had -- there was

21 testimony from the government that on these -- typical profits

22 on these things are 2 percent, and that would be 1.7 million

23 dollars giving credit for everything. You want me to have it

24 down to about 50 cents once you give them credit for

25 everything. And it's got to be some -- I've got to be able to

1    put some kind of real number on this.  There are a lot of --
2    there are a lot of additions and subtractions in the defense,
3    but it's not -- it's not just the total -- it's not -- the DBE
4    program is the one that is alleged to have been abused.  But
5    the benefit -- the reason the DBE program was abused was not
6    to get the DBE money.  It was to get the contract.  And so why
7    would not be a profit off of the contract a place for me to go
8    in terms of determining what would that figure be?
9              MR. BELL:  Well --
10             THE COURT:  What would that figure be?
11             MR. BELL:  Two things to that, Your Honor.
12             THE COURT:  Okay.
13             MR. BELL:  One, that when *Nagle* is talking about
14   when possible and appropriate take into account the other
15   goals, I think that's talking about -- that's 3553.
16             THE COURT:  That's 3553.  I know that.
17             MR. BELL:  And, Your Honor, not -- with all due
18   respect on the -- a couple of things that you've thrown out.
19   The way to calculate loss, the way that the controlling case
20   law and the guidelines say is fairly straightforward.  *Ohio
21   Brothers*, which is a Fourth Circuit case, says you do not
22   look -- you cannot look, should not look at the entire
23   contract amount as 87 million.
24             I know the government keeps pushing that and for the
25   life of me I can't figure out why because in that case it was

just like this.  There was a prime contractor like Boggs.
There was a defendant.  The fraud had to do with the DBE
subcontract.  And the Fourth Circuit looked at the DBE
subcontract only as a starting point, and then said -- they
said, Here is what the contract is for.  Here is what the DBE
was actually paid.  The loss is the difference between those
two.  So that's what the Fourth Circuit said you need to do in
this case.

        Now, what's changed since *Ohio Brothers* is that the
guidelines now have this credit provision where the Court
shall provide credit against the goods and services provided.

        So what the Court needs to do -- and, you know,
again, I know you don't really like the number, but the
process is just whatever the process is.

        According to *Ohio Brothers*, we look at the DBE
contracts regarding Styx.  That's our starting point.  What
was the commitment to him?  Again, we argue that under their
own rules and their own controlling --

        THE COURT:  Why would it not be the DBE under the
contract with the 3.7 million which is the required amount?

        MR. BELL:  No, no, no.  That's the reported amount,
Your Honor.  That was not the required amount.  Remember, we
put up -- we can look at it again when we get more down to it.

        So what you look -- what's the committal -- what's
the -- the committed, this is what he's supposed to be paid.

1   And then I would argue to the Court, since the government's
2   argument for the losses or the victimhood here is that we lost
3   control of where our money goes.  But with their own DBE
4   program administrator up there, she admitted that under their
5   guidelines for hauling, we're okay -- now, you got to do it
6   right, I understand that.  We're okay if half the hauling
7   commitment goes to a DBE and the other half goes somewhere
8   else.

9           So what the Court should do is look at the
10  commitment to Mr. Cuthbertson and take that in half because --
11  before sentencing.  The DBE -- or the DBE program only worried
12  about controlling half of that.  They wanted half of that to
13  go to a DBE.  After that they didn't care.  So that's the
14  number -- and then you take from that what Mr. Cuthbertson was
15  actually paid because he did do work on these projects, not as
16  much as he should, but he got paid on these projects.  And I
17  don't have the numbers right in front of me, but it was
18  roughly -- the commitment to him is 1.2 something million, and
19  the paid to him is 500 and some thousand.  And so the lost
20  opportunity, if you would, over that is whatever that comes
21  out to be.

22          And then you have to factor in the credit as the
23  guidelines say for goods and services provided, and which
24  we've done that in our sentencing brief, Your Honor.  We
25  walked through all that and that does result in a number in

1  the 30 thousands.

2       But -- and I hope the Court doesn't think I would

3  ever intentionally mislead it on what I think the law is.  I'm

4  pretty darn sure that's what controlling case law and the

5  guidelines say to do.

6       Now, after you start there, of course, and you do

7  your guidelines calculation, you've got statutory authority to

8  do whatever you think is the right sentence in this case using

9  3553.  But as far as calculating the correct guidelines, I

10 think that's the way it needs to be done.

11       THE COURT:  All right.  Let me hear -- yes, ma'am,

12 Ms. Sugar.

13       MS. SUGAR:  Thank you, Your Honor.

14       I disagree with the characterization of *Ohio*

15 *Brothers*.  It's sort of like the situation of JT Russell knew

16 what was going on and there was a fake DBE and a real DBE and

17 let them work together.  This is totally different in our case

18 where we had a nominee DBE used to get contracts, 87 million.

19       I don't know why Mr. Bell, who's my friend, keeps

20 talking about this commitment amount like it's this Holy

21 Grail.  What we should look at -- you're not allowed to lie.

22 You're not allowed to say he did this work he didn't do.  This

23 is the amount reported as having been done.  And sometimes the

24 commitment amounts changed.  Sometimes other people didn't do

25 the work and they wrote him in instead.  Sometimes things

1    changed.

2         So let's look at what was reported to DOT that

3    Mr. Styx did and that was the $3.7 million.  You can't lie

4    about that having been done.  And we would argue that none of

5    that matters that -- the work he did because it wasn't real

6    DBE.  He went to work there every day.  He worked during the

7    winter when there weren't federal job.  That's where he

8    worked.  He was not a legitimate DBE.  The only defendant who

9    does not say that in their factual basis is Drew Boggs.  But

10   nevertheless, that's 3.7 million.

11        So under *Ohio Brothers*, what is the gain?  What is

12   the full value of the contracts, whether it's the 87 million

13   or the 3.7, which we don't think that's what the case law says

14   because what they were trying to get is the full 87 million.

15   Nevertheless, this is a special rule.  So the only case that

16   says you have to -- for these special rule cases where you

17   don't use A, where you offset against -- you offset in a

18   special rule case is *Lakey*.  *Martin* decided by the Ninth

19   Circuit a few months earlier came out differently, and it said

20   that DBE fraud wasn't government benefits.  So that's why they

21   did the loss offset.  But they also said if this were a

22   government benefits, you wouldn't do that application.  So

23   there is certainly mixed case law on whether in a special rule

24   case you would need to look at it.

25        And indeed, the Sixth Circuit case that we cite,

they find that a DBE fraud in another provision of the special
rules that specifically says you don't discount the amount
paid because it just sort of creates this -- this idea that
there's no -- there's no loss because the roads got built.

But moreover, if we are going back to the beginning
of the guidelines, if we are going back to the beginning of
the loss applications, it's difficult to find the harm to the
DBE program, to all the people who didn't get the jobs, to the
integrity of the system. So the guidelines say if you can't
figure out that amount, you can look at gain, you can look at
profit. And I think that, you know, profit has a lot of
problems. I talk about a lot of those in my filing. But
2 percent of the 87 million would be a place you could go
under that profit analysis. We would agree with that.

But I mean, we do think that the money that's
laundered, $7 million -- you know, Mr. Bell is talking about
what was required to be paid by Styx. But he's ignoring that
we stopped looking at 87 million. But we know that he was
used for North Carolina credit all the time and we can look at
what was happening with the DBE bank account, with that
nominee bank account and tell what was really going on. The
amount of money that was paid to him directly for invoices is
half of what was run through the account just in a five-year
period. The difference is $1.8 million. So even if there was
a one-to-one ratio and you counted both, there's still

1    $1.8 million.

2          THE COURT:  All right.  Let's stop there for a

3    minute.  Am I going to be sentencing under a money laundering

4    count too in this calculation?

5          MR. BELL:  Well, Your Honor, the way the guidelines

6    read is, if you're able to calculate the loss, which we can,

7    then the money laundering gets a two-level enhancement.  You

8    only start looking at the $7 million and then -- because we

9    haven't argued over yet what money was laundered because I

10   would contest that number.  But you don't do that if you can

11   determine the amount of loss because under the guidelines you

12   take the loss amount, do that, the enhancement for the levels

13   of that amount of money, then you put two on top of it for

14   money laundering.  So you don't have to do that once you

15   determine the loss.

16         MS. SUGAR:  Your Honor, in addition to the 3553(a)

17   factors, one of -- at least one of the DBE cases that we cite

18   mentions Provision 28 in the loss section for upward

19   departure.  So sometimes they say loss, you can't measure it

20   just in a number and there should be an upward departure as to

21   the loss determination.  So it's not just 3553(a).  It's

22   actually a loss determination based on the number not

23   reflecting the harm in the case.

24         THE COURT:  But I haven't given any notice of upward

25   departure so I have to -- I can upward vary without notice,

1   but I can't upward depart --

2           MS. SUGAR:  Not upward departure in that sense, Your

3   Honor.  If the sense of...

4           THE COURT:  You're talking about --

5           MS. SUGAR:  I think this is as to the loss --

6           THE COURT:  You're saying that it under reports --

7   that it under reports the loss.

8           MS. SUGAR:  Yes.  Yes.  Specifically in the loss

9   provision.

10          THE COURT:  Or the financial wrong.  It would under

11  report the financial wrong rather than the --

12          MS. SUGAR:  Yes.

13          THE COURT:  -- than the actual loss.

14          MS. SUGAR:  Yes.

15          MR. FIALKO:  Your Honor, can I speak briefly on the

16  loss amount?

17          THE COURT:  Yes, sir.

18          MR. FIALKO:  I don't want to get into all the

19  figures, but I -- a lawyer a long time ago, I was in a

20  courtroom in McDowell County and the judge started talking and

21  I wasn't paying attention, and a lawyer leaned over and said

22  pay very close attention when a judge is thinking aloud.  And

23  earlier you said these words, which was -- you asked Mr. Bell,

24  If a guideline loss amount is zero in this case, then the

25  guidelines are not helpful to the Court.

1          And my -- the reason I stood up is because I wanted
2     to say to you, so be it.  You know, for 184 years judges
3     didn't have sentencing guidelines and grids in these federal
4     courtrooms and they still figured out a sentence for people.
5     The guidelines, I think, calculation in this case, if you
6     follow the law as Mr. Bell said, comes out to close to zero or
7     low; and I think you can find that and then still use the
8     statute to figure out the appropriate sentence for these
9     people.
10          The reason I'm -- it's important to my client is
11     that if you establish one of the other reasons, like the one
12     the government wants, we get a lodestar guideline range.  You
13     know, the presentence report says for my client it's 37 to 46
14     months and then you've got to work off of that.  But it's
15     really artificial in this case.  I don't think there's a
16     lodestar you should start with based on a really strange law
17     applied to an amorphous set of facts here concerning loss.
18     And so I don't think you should have any lodestar based on
19     that.
20          THE COURT:  Well, I -- you know, and I don't -- with
21     regard to these things, none of these -- even five years
22     there's no -- if I'm going to vary upward or downward, I'm
23     going to vary to a sentence that I think is appropriate under
24     the 3553 factors upward or downward.  I'm not one of these
25     that thinks that it needs to be six months up or down or a

1    year up or down.  If I need to go all the way to zero, I go

2    all the way to zero.  If I need to go all the way up -- I

3    haven't had to do that yet.  I'm probably more likely -- vary

4    more down than up.

5              But I want to get -- I do want to get this right.

6    And then there's got to be a sentence that recognizes the

7    goals of the DBE because they are lofty goals.  They're good

8    goals.  I may disagree on whether they meet the test when they

9    do things like that.  I mean, if -- I have no idea, but if

10   Cuthbertson is illiterate, he couldn't get -- he couldn't run

11   a DBE company successfully.  He'd be barred unless he got some

12   help with his books.  So it obviously doesn't help him.  It

13   helps some sharp guy that can sit in an office and find

14   somebody to drive trucks for him, but it doesn't help the

15   truck driver get the job.  But they are lofty goals.  They are

16   lofty goals.  They're there to try to help.

17             But they could be done -- they can be done in a

18   fashion that helps -- that helps the DBEs and does not charge

19   the taxpayer one dollar more.  And that is not happening, I

20   can tell you that.  The taxpayer is ill served by these

21   government programs because it's just -- the DBEs are going to

22   get some of these jobs and nobody else is going to bid them

23   because they know they can't get them.  So then you can charge

24   anything you want if you're the only guy in the game.

25             Okay.  All right.  I'll be thinking about this.

1   Now, do you want to give me something else you want me to
2   think about over the weekend because I'm going to be thinking
3   about these -- these arguments that are being made in this and
4   I want -- I want to get the amount right.  I understand what
5   the government is saying and I'm frustrated by -- I'm
6   frustrated a little bit by trying to get my hands on the right
7   amount, but in the end I'm going to come up with an
8   appropriate sentence for everybody in the case.
9          MR. BELL:  Your Honor, it's entirely up to you.  The
10  transcript portions I was going to read of Kristy Lawrence
11  have more to do with role enhancement, yes, but also the --
12  it's more of a 3553 kind of thing.  It's the -- it's the other
13  side of the explanation of how all this happened.  It doesn't
14  have to do with loss amount so if you don't want to take on --
15         THE COURT:  I think that would be better Monday --
16         MR. BELL:  That's fine, Your Honor.
17         THE COURT:  -- in terms of me trying to hear that,
18  particularly in terms of trying to hear on sentencing things
19  that you want me to hear because I'm hearing, you know, a lot
20  from the government on it.  And this is on enhancement.
21  Although it does seem -- it does seem -- I have to have an
22  answer as to -- the DBE program was being frustrated and -- in
23  its entirety and it's hard for me to think that the boss --
24  everything points to the boss knowing about what was going on.
25  So I mean, I'd be glad to hear about role enhancement.  I know

1 you don't like role enhancement any more than they may not

2 like some of the -- some of the abilities to determine loss

3 amounts.

4 But it does seem to the Court at this moment, and

5 I'll hear anything else you have, that it's very difficult --

6 seems like everybody there -- not everybody, maybe not the

7 bookkeeper, but a lot of the folks dealing with this knew what

8 was going on with regard to Cuthbertson and you can't -- you

9 can't operate a business and then try to -- and then try to

10 bid knowing there's a program there and then knowing the way

11 you're operating is not going to protect all of the -- all of

12 the goals of at least crossing the T's and dotting the I's.

13 Cuthbertson may have been a real DBE. It sure

14 sounds like -- he's a truck driver. He needs the jobs. He

15 shows up. He does what he's supposed to do. Maybe he --

16 maybe he can't do all the book work and stuff. Maybe he

17 couldn't do all that and somebody was going to help him. And

18 that guy gets defeated by the technicalities of the system.

19 But the technicalities of the system are there. If people are

20 going to do government contracts, you've got to cross the T's

21 and dot the I's.

22 But by the same token, these government programs

23 need to be run in a way that doesn't disadvantage the

24 disadvantaged more by making them have to do more than the

25 regular guy has to do. It would seem to me that would be a

1    way to -- it would be a great benefit.

2              That has nothing to do with sentencing, by the way,

3    as probably half the things I say don't have anything to do

4    with that.  They are observations that I'm making having lived

5    and having seen all this stuff close up.

6              All right.  I'm going to be thinking about this and

7    working on it.  And David and I, I'm sure, will have some

8    phone conversations over the weekend too because I am

9    concerned about getting this right.

10             MS. SUGAR:  Your Honor, I do have more

11   leader/organizer evidence.  I think I spelled it out pretty

12   clearly in our brief.  I do have more evidence, a document

13   signed by Mr. Boggs and whatnot.  I don't -- I mean, he was

14   the supervisor to everyone else who pled guilty.

15             THE COURT:  Why don't you wait --

16             MS. SUGAR:  He was the guy who --

17             THE COURT:  Why don't you wait and let me hear what

18   Mr. Bell has and if I need to hear any more from you on

19   Monday, I will.

20             MS. SUGAR:  Thank you.

21             THE COURT:  I just said I'm leaning toward -- I'm

22   leaning toward that portion of finding that, that he is a -- I

23   mean, I don't -- I don't think he was -- that this was a daily

24   thing.  That he got up in the morning thinking, I've got to

25   lead this DBE fraud from the top down.  I think this is just

1  something that went on.  But he's the guy in charge and I
2  don't think anybody is doing anything that he didn't want
3  done.  But I'll listen to anything that goes against that next
4  week.

5          MS. SUGAR:  Thank you, Your Honor.

6          THE COURT:  And I'll be thinking about the amount of
7  money and how to come to the correct decision on that.

8          Okay.  Very good.  Anything further tonight?

9          (No response.)

10          THE COURT:  All right.  Let's get in here at 9:00 on
11 Monday and we'll move as quickly as we can to get the
12 information in so we can move on to sentencing.

13          And then if you all will try to coordinate, if
14 there's somebody that really has to get out of here by the
15 afternoon, we can try to take some of those out of order.  I
16 think the government's main reason of doing this is the
17 government wants me to hear everything that it wants me to
18 hear about Mr. Boggs so -- so as those people get sentenced,
19 they will --

20          MR. SAVAGE:  And the company, Your Honor, as well.

21          THE COURT:  And the company.  As part of their
22 program, they're going to be saying there's a bigger billy
23 goat coming down the way waiting for him.  I understand that.
24 That's what I'd be doing.

25          MS. SUGAR:  Your Honor, also, I hope that because

1   some of the 3553(a) factors are similar to many of the
2   defendants, that it will be abbreviated at some of the
3   hearings, so that might make things go a little bit faster as
4   well.  I won't need to repeat a lecture about the DBE program
5   at everyone's sentencing.
6           THE COURT:  Right.  On the 35 -- I know.  There's
7   a -- and this one I think will have specific arguments with
8   regard to 3553 factors instead of the ones that we normally
9   have to -- we normally see in the courtroom where we -- I hear
10  a reading of the 3553 factors, which I almost am getting to
11  the point that I can quote them by heart.
12          All right.  Anything further?
13          MR. BELL:  No, Your Honor.
14          THE COURT:  Okay.  Very good.  See you all next
15  week.
16          (Evening recess at 5:26 p.m.)
17                      *****
18
19
20
21
22
23
24
25